# ACCOUNTS RECEIVABLE ADMINISTRATION AGREEMENT

This AGREEMENT is entered into as of M a r c h  _ _ ,  2 0 1 9 between NEWTEK BUSINESS CREDIT a d/b/a for CDS Business Services, Inc. ("NEWTEK"), with its chief executive office located at 1981 Marcus Avenue, Suite 130, Lake Success, New York 11042, and Capstone Pediatrics, PLLC, Debtor-In-Possession a Tennessee professional limited liability company ("Client"), with its chief executive office located at 1420 Donelson Pike, Suite B-17, Nashville, TN 37217.

The parties agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION

1.1 **Terms**. As used in this Agreement, the following terms shall have the following meanings:

*"Accounts Receivable"* means, in addition to the definition of accounts in the Code, all presently existing and hereafter arising accounts receivable, contract rights, and all other forms of obligations owing to Client arising out of the sale, lease, license or assignment of goods or other property, or the rendition of services by Client, whether or not earned by performance, all credit insurance, guaranties, and other security therefor, as well as all merchandise returned to or reclaimed by Client and Client's Books relating to any of the foregoing.

*"ACH"*, means, Automated Clearing House, the computer-based clearing and settlement facility established to process the exchange of electronic transactions between participating depository institutions.

*"Advances"* means all advance payments made by NEWTEK toward the purchase price of Approved Accounts Receivable and any extensions of credit and financial accommodations by NEWTEK to or for the benefit of the Client, including those under this Agreement.

*"Agreement"* means collectively this Accounts Receivable Administration Agreement, any concurrent or subsequent exhibit or rider thereto, and any extensions, supplements, amendments, addenda or modifications to or in connection with this Agreement or any such rider.

*"Approved Accounts Receivable"* means those Accounts Receivable created by Client in the ordinary course of business, which are and at all times shall continue to be acceptable to NEWTEK in all respects in Newteks sole and absolute discretion; provided, however, that standards of eligibility may be fixed and revised from time to time by NEWTEK in NEWTEK's exclusive judgment. In determining such acceptability and standards of eligibility, NEWTEK may, but need not, rely on payment history, accounts receivable agings, reports and schedules of Accounts Receivable furnished by Client, but reliance by NEWTEK thereon from time to time shall not be deemed to limit NEWTEK's right to revise standards of eligibility at any time as to both Client's present and future Accounts Receivable. In general, an Account shall not be deemed eligible to be an Approved Account unless: (1) the account debtor on such Account Receivable is and at all times continues to be acceptable to NEWTEK as determined by NEWTEK in its sole and absolute discretion, and up to credit and concentration limits acceptable to NEWTEK in its sole and absolute discretion, and (2) such Account complies in all respects with the representations, covenants and warranties hereinafter set forth. Except in NEWTEK's sole discretion, Approved Accounts Receivable shall not include any of the following (a) Accounts Receivable with respect to which goods are sold on a bill and hold basis or placed on consignment or for a guaranteed sale, or which contain other terms by reason of which payment by the account debtor may be conditional; (b) Accounts Receivable with respect to which the account debtor is not a resident of the United States; (c) Accounts Receivable with respect to which the account debtor is the United States or any department, agency or instrumentality of the United States (unless NEWTEK is satisfied that the Client has complied with the Federal Assignment of Claims Act and has obtained, to NEWTEK's satisfaction the written consent and acknowledgement of the relevant Federal Governmental entity of the assignment of such Accounts Receivable to NEWTEK) other than Medicare or Medicaid or any state city town or municipality (but only if NEWTEK and the Client have implemented lockbox, blocked/controlled account depository agreements and procedures with a depository bank which are in form and substance satisfactory to NEWTEK to administer such Federal Government Accounts Receivable, or any State of the United States or any city, town, municipality or division thereof), unless

the Client has delivered to NEWTEK'S satisfaction, a signed acknowledgement of and consent to the assignment of the Client's Accounts Receivable from such state, city, town, municipality or division thereof (as the case may be) in

33165557 v1

Case 3:19-bk-01971   Doc 3-1   Filed 03/28/19   Entered 03/28/19 16:12:35   Desc
Exhibit A - DIP Agreement   Page 1 of 30

the form provided by NEWTEK or such other form as may be used by such governmental entity for such purpose if such other form is satisfactory to NEWTEK in its discretion; (d) Accounts Receivable with respect to which the account debtor is an officer, employee or agent of, or subsidiary of, related to, affiliated with or has common shareholders, officers or directors with Client; (e) Accounts Receivable with respect to which Client is or may become liable to the account debtor for goods sold or services rendered by the account debtor to Client or otherwise; (f) Accounts Receivable with respect to which the account debtor disputes liability or makes any claim with respect thereto, or is subject to any insolvency proceeding, or becomes insolvent, fails or goes out of business; (g) Accounts Receivable where the account debtor is in a jurisdiction for which Client is required to file a notice of business activities or similar report and Client has not filed such report within the time period required by applicable law; (h) any Account Receivables as to which an invoice has not been issued to the account debtor within thirty (30) days of NEWTEK's Credit Approval; (i) Any Account Receivable which has terms of sale exceeding thirty (30) days; (j) Accounts Receivable which are from account debtors as to which twenty-five percent (25%) or more of their then outstanding balances are more than ninety (90) days from invoice date; (k) the Account or any portion of the Account pertaining to reimbursement for medical or related services is payable by a Person other than: (i) a commercial insurance company organized under the Laws of any jurisdiction, having its principal office in the United States and licensed as an insurer in the state in which the services giving rise to such Account were rendered, (ii) a Blue Cross/Blue Shield Plan, (iii) any Government Account Debtor, making payments under the Medicare or Medicaid programs (provided a Deposit Account Restriction Agreement is in effect with respect thereto ) or for which Lender has received from the account debtor a notice of assignment in accordance with subpart (c) above or (iv) a HMO, PPO, or an institutional (as opposed to a natural person) account debtor, organized under the Laws of any jurisdiction in the United States, having its principal office in the United States; (l) (to the extent the Client is a licensed operator) the Account does not arise from goods or services provided by the Licensed Operator at the skilled nursing facilities that are Licensed Locations; (m) the Client has not signed and delivered notices, if, and in the form, requested by NEWTEK, directing the Account Debtors (other than Account Debtors who are individuals) to make payment to the applicable Lockbox Account; (n) other than Accounts in the form of Permitted PIP Accounts, if the Account arises out of or pertains to the Medicare Part A reimbursement program or the Account arises out of periodic interim payment plan administered by or for Medicare; or (o) any Account Receivable which represents a progress billing on a contract which has not been fully completed by Client.

"*Authorized Officer*" means any officer or other representative of Client authorized in a writing delivered to NEWTEK to transact business with NEWTEK.

"*Business Day*" means any day which is not a Saturday, Sunday, or other day on which banks in the State of New York are authorized or required to close.

"*Bankruptcy Court*" means the U.S. Bankruptcy Court for the Middle District of Tennessee Nashville Division before which the Client's Chapter 11 proceeding is pending.

"*Client's Books*" means all of Client's books and records including all of the following: ledgers; records indicating, summarizing, or evidencing Client's assets or liabilities, or the Collateral; all information relating to Client's business operations or financial condition; and all computer programs, disk or tape files, printouts, runs, or other computer prepared information, and the facilities containing such information.

"*CMS*" means the federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration), and any successor Governmental Authority.

"*Code*" means the New York Uniform Commercial Code, as amended or revised from time to time.

"*Collateral*" means all assets of the Client, whether now owned or existing, or hereafter acquired or arising, and wherever located, including, without limitation, all of the following assets, properties and interests in property of Client (as such capitalized terms are defined in the Code): all Accounts Receivable (both Approved Accounts Receivable and those Accounts Receivable which are not Approved Accounts Receivable); all Equipment; all Commercial Tort Claims, all General Intangibles; all Chattel Paper; all Inventory; all Negotiable Collateral; all Investment Property, all Financial Assets, all Letter of Credit Rights, all Supporting Obligations, all Deposit Accounts, all money or any assets of Client which hereafter come into the possession, custody, or control of

NEWTEK; all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, lease, license or other disposition of the foregoing, or any portion thereof or interest therein, and all proceeds thereof, and any other assets of Client or any Guarantor which may be subject to a lien in favor of NEWTEK as security for the Obligations.

*"CON"* means any certificate of need or similar license which determines that there is a need for a healthcare facility at a particular location or within a certain geographic region.*"Daily Balance"* means the amount of the Obligations owed at the end of a given day.

*"Deposit Account Control Agreement"* means an agreement, in form and substance satisfactory to Lender, Client and each bank in which such Client maintains a Deposit Account, which agreement provides that (a) such bank shall comply with instructions originated by Lender directing disposition of the funds in such Deposit Account without further consent by the applicable Client, and (b) such bank shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of commercially reasonable fees and other items, in each such case expressly consented to by Lender, and containing such other terms and conditions as Lender may require, including as to any such agreement pertaining to any Lockbox Account, providing that such bank shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account all funds received or deposited into such Lockbox or Lockbox Account.

*"Deposit Account Restriction Agreement"* means an agreement, in form and substance satisfactory to Lender, a Client and each bank in which such Client maintains a Deposit Account and into which Deposit Account proceeds of Accounts from Governmental Account Debtors are paid directly by the Governmental Account Debtor, and which agreement provides that (a) such bank shall not enter into an agreement with respect to such Deposit Account pursuant to which the bank agrees to comply with instructions originated by any Person, other than the Client that owns the Deposit Account, directing disposition of the funds in such Deposit Account, and (b) such bank shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of commercially reasonable fees and other items, in each such case expressly consented to by Lender, and containing such other terms and conditions as Lender may require, including as to any such agreement pertaining to any Lockbox Account, providing that such bank shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account and/or a Lockbox Account subject to a Deposit Account Control Agreement (as Lender shall elect and direct at the time such agreement is signed) all funds received or deposited into such Lockbox Account and associated Lockbox unless the applicable Client shall otherwise instruct the bank in writing, subject to the limitations set forth in the Deposit Account Restriction Agreement and the other Financing Documents.

*"Event of Default"* means the events specified in Section 8, below.

*"General Intangibles"* means in addition to the definition of general intangibles in the Code, all of Client's present and future general intangibles and other personal property (including without limitation choses or things in action, goodwill, patents, trade names; trademarks, service marks, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, infringement claims, computer programs, computer discs, computer tapes, Client's Books, literature, reports, catalogs, deposit accounts, insurance premium rebates, tax refunds, and tax refund claims) other than Goods and Accounts Receivable.

*"Governmental Account Debtor"* means any Account Debtor that is a governmental authority, including, without limitation, Medicare and Medicaid.

*"Guarantor"* means each person or entity which guarantees the Obligations or issues a validity guaranty relating to the Collateral or pledges any assets to NEWTEK as additional security for the Obligations.

*"Healthcare Laws"* means all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, equipment, personnel, operating policies, fee splitting, including, without limitation,

(a) all federal and state fraud and abuse Laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(6)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 *et seq.*), (b) TRICARE, (c) HIPAA, (d) Medicare, (e) Medicaid, (f) quality, safety and accreditation standards and requirements of all applicable state Laws or regulatory bodies, (g) all Laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (h) any and all other applicable health care Laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (h) as may be amended from time to time.

"*Healthcare Permit*" means a Permit (a) issued or required under Healthcare Laws applicable to the business of Client or any of its Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of Client or any of its Subsidiaries, (b) issued by any Person from which Client has, as of the Closing Date, received an accreditation (including, without limitation, JCAHO), and/or (c) issued or required under Healthcare Laws applicable to the ownership of a Licensed Location.

"*HIPAA*" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"*HMO*" means a health maintenance organization within which a primary care physician directs patient referrals to any other health care professionals which may be needed, except in an emergency

"*Insolvency Proceeding*" means any proceeding commenced by or against any person or entity under any provision of the federal Bankruptcy Code, as amended, or under any other state or federal insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with its creditors.

"*Instruments*" shall have the meaning ascribed to such term in the Code.

"*Inventory*" means, in addition to the definition of inventory in the Code, all present and future inventory in which Client has any interest, including goods held for sale or lease or to be furnished under a contract of service, Client's present and future raw materials, work in process, finished goods, tangible property, stock in trade, wares, and materials used in or consumed in Client's business, goods which have been returned to, repossessed by, or stopped in transit by Client, packing and shipping materials, wherever located, any documents of title representing any of the above, and Client's Books relating to any of the foregoing.

"*IRC*" means the Internal Revenue Code of 1986, as amended, and the regulations thereunder.

"*JCAHO*" means the Joint Commission on Accreditation of Healthcare Organizations.

"*Laws*" means any and all federal, state, local and foreign statutes, Laws, judicial decisions, regulations, guidances, guidelines, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to Client and any Licensed Operator in any particular circumstance. "**Laws**" includes, without limitation, Healthcare Laws.

"*Licensed Operator*" means the singular or collective (as the context requires) reference to the following Persons: (a) Client or any Subsidiary that is licensed under Healthcare Laws to operate a Licensed Location, or is otherwise providing or furnishing goods or services governed by Healthcare Laws, or is otherwise providing or furnishing goods or services (other than the mere leasing of a Licensed Location as a lessor and the collection of rentals in connection therewith) from a Licensed Location, (b) any Person with whom Client or any

Subsidiary has contracted for management or other services for a Licensed Location, and/or (c) any Person to whom Client has leased a Licensed Location.

"*Lockbox*" has the meaning set forth in Section 2.4 and 2.15.

"*Lockbox Account*" means an account or accounts maintained at the Lockbox Bank into which collections of Accounts are paid.

"*Lockbox Bank*" has the meaning set forth in Section 2.4 .

"Medicaid" means the medical assistance programs administered by state agencies and approved by CMS pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. § 1396 *et seq.*

"*Medicare*" means the program of health benefits for the aged and disabled administered by CMS pursuant to the terms of Title XVIII of the Social Security Act, codified at 42 U.S.C. § 1395 *et seq.*

"*Negotiable Collateral*" means all of Client's present and future letters of credit, notes, drafts, Instruments, Documents, leases, and Chattel Paper.

"*NEWTEK*" means, NEWTEK BUSINESS CREDIT a d/b/a for CDS Business Services, Inc., its successors and assigns.

"*NEWTEK Expenses*" means all of the following: costs and expenses (whether taxes, assessments, insurance premiums or otherwise) required to be paid by Client under any of the Purchase Documents which are paid or advanced by NEWTEK; filing, recording, publication, appraisal and search fees paid or incurred by NEWTEK in connection with NEWTEK's transactions with Client; costs and expenses incurred by NEWTEK in the disbursement or collection of funds to or from Client or its account debtors; charges resulting from the dishonor of checks; costs and expenses incurred by NEWTEK to correct any default or enforce any provision of the Purchase Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; and costs and expenses incurred by NEWTEK in enforcing or defending the Purchase Documents or otherwise exercising its rights and remedies upon the existence of an Event of Default, including, but not limited to, costs and expenses incurred in connection with any proceeding, suit, enforcement of judgment, or appeal; and NEWTEK's reasonable attorneys' fees and expenses, including allocated fees of in-house counsel, incurred in advising, structuring, drafting, reviewing, administering, amending, modifying, terminating, enforcing, defending, or otherwise representing NEWTEK concerning the Purchase Documents or the Obligations.

"*Obligations*" means all Advances, extensions of credit, loans, debts, liabilities (including all interest and amounts charged to the Obligations pursuant to any agreement authorizing NEWTEK to charge the Obligations), obligations, lease payments, guaranties, covenants, and duties owing by Client to NEWTEK, its subsidiaries or affiliates, of any kind and description (whether pursuant to or evidenced by the Purchase Documents or by any other agreement between NEWTEK and Client, and irrespective of whether for the payment of money), whether made or incurred prior to, on, or after the Termination Date, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including any debt, liability or obligation owing from Client to others which NEWTEK may obtain by assignment or otherwise, and all interest thereon and all NEWTEK Expenses.

"*Payment Account*" means the bank account established by NEWTEK into which collected funds arising from collected proceeds of Accounts and other payments received attributable to the Client are credited to the Client's Obligations.

"Permitted PIP Accounts" means an Account owing to Client who is a Licensed Operator, in the form of (A) a positive and quantified adjustment (based on an actual accounting and settlement approved by the applicable fiscal intermediary) in respect of services rendered by such Client at the Licensed Locations under the Medicare Part A program, which such adjustment represents compensation for an underpayment under Medicare's periodic interim payment plan ("PIP Adjustments"), or (B) one regularly scheduled payment (but representing compensation in respect of no more than a two week period) under Medicare's periodic interim payment plan. The portion of Permitted PIP Accounts which are PIP Adjustments are the amounts that have been determined to be due and owing to Client by the applicable fiscal intermediary, net of any offsets, recoupments or other adverse claims, but which remains unpaid.

"*PPO*" means a preferred provider organization whereby the insured may see a health care professional without a referral either inside or outside of the insurance company's network.

"*Purchased Account Receivable*" means an Approved Account Receivable sold by Client to NEWTEK and purchased by NEWTEK from Client, in all cases with full recourse to the Client.

"*Prime Rate*" means the daily rate of interest published as the prime rate of interest in the Wall Street Journal (as reflected on the website www.bankrate.com), or any successor thereof, from time to time as its prime rate, which shall not necessarily constitute the lowest available prime rate.

"*Purchase Documents*" means, collectively, the Agreement, any note or notes, any security agreements, pledge agreements, mortgages, deeds of trust, guarantees or other encumbrances or agreements which secure the Obligations, and any other agreement entered into between Client and NEWTEK or by Client or a Guarantor in favor of NEWTEK relating to or in connection with the Agreement or the Obligations, as each of same may be amended, modified, renewed, extended or substituted from time to time.

"*Revolving Purchase Advance Facility*" means the revolving purchase advance facility provided for in Section 2.1 hereof.

"*Term*" means the period from the date of the execution and delivery by NEWTEK of this Agreement through and including the later of (a) the Termination Date and (b) the payment and performance in full of the Obligations.

"*Termination Date*" means (a) the date which is the 120th day from the date of this Agreement, which date may be extended by Newtek in its sole discretion for up to an additional period or periods upon prior written notice to the Client (which may be by email transmission) aggregating up to the one year anniversary of the date of this Agreement without the further approval of the Bankruptcy Court (the period through such 120th day and any extension (if any) thereafter up to the first anniversary of this Agreement the "Initial Term"), unless such date is extended pursuant to Section 3.1 hereof, and if so extended on one or more occasions the last date of the last such extension, or (b) if earlier terminated by NEWTEK pursuant to section 9.1 hereof, the date of such termination.

"*Third Party Payor*" means Medicare, Medicaid, TRICARE, and other state or federal health care program, Blue Cross and/or Blue Shield, private insurers, managed care plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"*Third Party Payor Programs*" means all payment and reimbursement programs, sponsored by a Third Party Payor, in which a Licensed Operator participates.

"*TRICARE*" means the program administered pursuant to 10 U.S.C. § 1071 et. seq., §§ 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

    **1.2** **Construction**. Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural. The words *hereof, herein, hereby, hereunder,* and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Section, subsection, clause and exhibit references are to this Agreement unless otherwise specified. Words importing a particular gender mean and include every other gender.

    **1.3** **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with generally accepted accounting principles (GAAP) as in effect from time to time.

    **1.4** **Exhibits**. All of the exhibits (if any), addenda or riders attached to this Agreement shall be deemed incorporated herein by reference.

    **1.5** **Code**. Any terms used in this Agreement which are defined in the Code shall be construed and defined as set forth in the Code, unless otherwise defined herein.

33165557 v1      - 6 -
Case 3:19-bk-01971    Doc 3-1    Filed 03/28/19    Entered 03/28/19 16:12:35    Desc
Exhibit A - DIP Agreement    Page 6 of 30

## 2. ADVANCES AND TERMS OF PAYMENT

**2.1     Revolving Advances; Advance Limit**. Client hereby agrees to sell and assign to NEWTEK and NEWTEK agrees to purchase (in all cases with full recourse to Client), from and after the date hereof until the Termination Date, those now existing and hereafter arising Accounts Receivable of Client which NEWTEK in its sole discretion determines to be Approved Accounts Receivable. The purchase price of each Approved Account Receivable shall be the gross amount thereof less any trade discounts, cash discounts and medical insurance company, Medicare or Medicaid discounts which may be available to the account debtors with respect to such Accounts Receivable. So long as no Event of Default, or an event which through the passage of time or the giving of notice or both would constitute an Event of Default, has occurred, if NEWTEK purchases any such Approved Account Receivable, the Client may request, and NEWTEK may in its sole discretion, make, Advances of the purchase price of Purchased Accounts Receivable in an amount of up to eighty percent (80%) of the realizable collection value (as determined by Netwtek) of the aggregate outstanding amount of Purchased Accounts Receivable; provided, however, that in no event shall the aggregate amount of the outstanding Advances under this Agreement be greater than One Million Dollars ($1,000,000.00) at any time outstanding plus the sum of interest, fees and expenses (said dollar limit the *Advance Limit*). NEWTEK may in its discretion repay the Advances from the collected proceeds of any Accounts Receivable (or other Collateral), if NEWTEK determines that it is unable to effectuate timely collection of an Approved Account for any reason or determines the Approved Account Receivable is no longer an Approved Account Receivable. If, at any time and for any reason, the aggregate amount of the outstanding Advances under this Agreement exceeds the Advance Limit or percentage limitations contained in the preceding sentence, then Client shall, upon demand by NEWTEK, immediately pay to NEWTEK, in cash, the amount of such excess, or at NEWTEK's option NEWTEK may charge such excess against any reserves held by NEWTEK. NEWTEK shall maintain reserves against Client's availability for Advances and may maintain reserves against non-Approved Accounts Receivable as well, or maintain a cash collateral deposit account, which NEWTEK in its discretion deems appropriate, and may increase such reserves or reduce its advance percentages based on Purchased Accounts Receivable without declaring an Event of Default and without prior notice, if it determines, in its discretion, that such increase in reserves or reduction is necessary, including, without limitation, to protect its interest in the Collateral and/or against diminution in the value of any Collateral, or to insure the prospect of payment or performance by Client of its Obligations to NEWTEK are not impaired, and/or maintain a reserve of not less than $50,000 per month from availability to cover carve-outs for professionals provided for under any financing order issued by the Bankruptcy Court.

**2.2     Authorization to Make Advances**. NEWTEK is hereby authorized to make the Advances based upon emailed correspondence in reply to NEWTEK's availability report or other acceptable written instructions received from anyone purporting to be an Authorized Officer, or, at the discretion of NEWTEK, if such Advances are necessary to satisfy any Obligations. All requests for Advances shall specify the date on which such Advance is to be made (which day shall be a Business Day), the amount of such Advance and if such Advance is to be effectuated through ACH or wire transfer. Requests for Advances must be received on two days prior to the day receipt of the Advance is requested. All Advances made under this Agreement shall be conclusively presumed to have been made to, at the request of, and for the benefit of, Client, when deposited to the credit of Client or otherwise disbursed in accordance with the instructions of Client or in accordance with the terms and conditions of this Agreement. Unless otherwise requested by Client, all Advances shall be made by ACH to the deposit account of Client designated on schedule 2.2 annexed hereto, or such other account as Client shall notify NEWTEK in writing.

**2.3     Interest**.

A.     Except where specified to the contrary in the Purchase Documents interest shall accrue on the Daily Balance at the per annum rate of seven percent (7.00%) above the Prime Rate (but not less than five percent (5.0%)). The Obligations shall, at the option of NEWTEK, (i) from and after the occurrence of an Event of Default, and without constituting a waiver of any such Event of Default, or (ii) if the Obligations are not paid in full by the Termination Date, and without waiving the maturity of the Obligations on the Termination Date, bear interest at the per annum rate which is three percent (3.0%) above the Rate otherwise then in effect}(the "Default Rate"). All interest payable under the Purchase Documents shall be computed on the basis of a three hundred sixty (360) day year for the actual number of days elapsed on the Daily Balance. Interest as provided for herein shall continue to accrue until the Obligations are paid in full.

B.     The interest rate payable by Client under the terms of this Agreement shall be adjusted in accordance with any change in the Prime Rate from time to time on the date of any such change. All interest payable by Client shall be due and payable on the first day of each calendar month during the Term. NEWTEK may, at its option, add such interest and all NEWTEK Expenses to the Obligations, and such amount shall thereafter accrue interest at the rate then applicable under this Agreement.

C.     In no event shall interest on the Obligations exceed the highest lawful rate in effect from time to time.  It is not the intention of the parties hereto to make an agreement which violates any applicable state or federal usury Laws. In no event shall Client pay or NEWTEK accept or charge any interest which, together with any other charges upon the principal or any portion thereof, exceeds the maximum lawful rate of interest allowable under any applicable state or federal usury Laws. Should any provision of this Agreement or any existing or future Notes or Purchase Documents between the parties be construed to require the payment of interest or any other fees or charges which could be construed as interest which, together with any other charges upon the principal or any portion thereof and any other fees or charges which could be construed as interest, exceeds the maximum lawful rate of interest, then any such excess shall be automatically applied to the remaining principal balance of the Obligations, if any, and the remainder refunded to Client.

## 2.4     Collection of Accounts Receivable.

Upon execution of this Agreement the Client shall send the form of letter to its account  debtors who are not Governmental Account Debtors substantially in the form attached hereto as Exhibit A. All of  Client's sales shall be billed and invoiced by Client at Client's expense on forms acceptable to NEWTEK directing payment of invoices to the appropriate lockbox as directed by NEWTEK to Client. Those account  Debtors who are  Governmental Account Debtors, to have  imprinted thereon, alternatively, instructions, in form satisfactory to NEWTEK, for the account debtors to make  payments into a lockbox account or other blocked account or in the case of Governmental Account Debtors on Medicaid and Medicare payments into a bank account subject to a Deposit Account Restriction Agreement , established by NEWTEK pursuant to which collections  shall be transferred to NEWTEK's account, and Client shall enter into such documentation with the bank and  NEWTEK as shall be required by NEWTEK and the bank to effectuate such purpose (as more fully described in  Section 2.4(d) herein below). As to all Accounts from  account debtors the  assignment of whose Accounts  Receivable are not prohibited by applicable law, NEWTEK may at any time, with or without notice to Client, notify  customers or account debtors or other obligors that the Accounts Receivable or other Collateral have been assigned  to NEWTEK, and that NEWTEK has a security interest in them and collect the Accounts Receivable and other  Collateral directly, and add the collection costs and expenses to the Obligations. If notwithstanding said notice  Client obtains payment on any Account Receivable or other Collateral, including, without limitation, collections  under credit card sales, Client shall receive all such payments on Accounts Receivable and other related Collateral  and other proceeds, including, cash, in trust for NEWTEK and immediately deliver said payments to NEWTEK in  their original form as received from the account debtor or other obligor, together with any necessary endorsements,  and the failure by the Client to do so within three (3) Business Days of Client's receipt thereof shall constitute an  Event of Default.

(a)     Without in any way limiting NEWTEK's rights or remedies or implying any consent or waiver by NEWTEK to Client's failure to make timely delivery, if at any time following four weeks after the date of this Agreement, Client receives any form of payment directly with respect to any Purchased Account Receivable and Client fails to remit such payment in kind (duly endorsed) to NEWTEK  within three (3) Business Days of Client's receipt thereof, the Client shall pay NEWTEK an administrative  processing fee equal to fifteen percent (15%) of any payment so received by Client, which fee shall be assessed and   shall constitute an Obligation chargeable to Client's account with NEWTEK.

(b)     Client shall maintain a lockbox (the "**Lockbox**") with a United States depository institution designated from time to time by Lender (the "**Lockbox Bank**"), subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Control Agreement and such other agreements related to such Lockbox as Lender may require.  Client shall ensure that all collections of Accounts (other than Accounts for which the Account Debtor is a Governmental Account Debtor) are paid directly from Account Debtors into the Lockbox for deposit into the Lockbox Account and/or directly into the Lockbox Account; *provided, however*, Client shall be permitted to cause Account Debtors who are individuals to pay Accounts directly to Client, which Client shall promptly (in any event, within three (3) Business Days) deposit into a  bank account (over which Lender maintains a Deposit Account Control Agreement without lockbox features, if  Lender

shall at any time so elect) which is set-up to automatically sweep to the Payment Account once the balance in such bank account exceeds $1,000.00.

(c)　　If any of the Account Debtors are Governmental Account Debtors, Client shall establish and maintain additional lockboxes (also herein referred to collectively in the singular as the "**Lockbox**") and related Lockbox Accounts with the Lockbox Bank, subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Restriction Agreement and such other agreements related to such Lockbox as Lender may require. Client shall ensure that all collections of Accounts due from Governmental Account Debtors are paid directly from such Account Debtors into the applicable Lockbox and/or Lockbox Account established pursuant to this subsection for deposit into the Lockbox Account established pursuant to this subsection.

(i)　　All funds deposited into a Lockbox Account shall be transferred into the Payment Account by the close of each Business Day; provided, however, that all funds deposited into a Lockbox Account that is subject (or required to be subject) to a Deposit Account Restriction Agreement shall be transferred into either (at Lender's option) (i) the Payment Account by the close of each Business Day, or (ii) the Lockbox Account established pursuant to Section 2.4(d) which transfer shall be made via an automatic immediate intrabank transfer, and then transferred to the Payment Account by the close of each Business Day.

(ii)　　Notwithstanding anything in any lockbox agreement or Deposit Account Control Agreement or Deposit Account Restriction Agreement to the contrary, Client agrees that they shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox and the Lockbox Account, and that Lender shall have no liability therefor. Client hereby indemnifies and agrees to hold Lender harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and expenses, arising from or relating to actions of Lender or the Lockbox Bank pursuant to this Section or any lockbox agreement or Deposit Account Control Agreement or Deposit Account Restriction Agreement other than actions by Lender or the Lockbox Bank which constitute gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(d)　　Lender shall apply, on a daily basis (subject to subsection (d) above, all funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Revolving Loans in such order of application as Lender shall elect or as otherwise provided in this Agreement. If as the result of collections of Accounts pursuant to the terms and conditions of this Section a credit balance exists with respect to the Payment Account, such credit balance shall not accrue interest in favor of Client, but shall be available to Client upon request of Client at any time or times for so long as no Default exists.

(e)　　Client acknowledges and agrees that compliance with the terms of this Section is essential, and that Lender will suffer immediate and irreparable injury and have no adequate remedy at law, if Client, through acts or omissions, cause or permit Account Debtors to send payments other than to the applicable Lockbox, or if Client fails to immediately deposit collections of Accounts or proceeds of other Collateral in the Lockbox Account as herein required. Accordingly, in addition to all other rights and remedies of Lender hereunder, Lender shall have the right to seek specific performance of the Client's obligations under this Section, and any other equitable relief as Lender may deem necessary or appropriate, and Client waives any requirement for the posting of a bond in connection with such equitable relief.

(f)     Client shall not, and Client shall not suffer or permit Client to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral. Client shall, and shall, cooperate with Lender in the identification and reconciliation on a daily basis of all amounts received in or required to be deposited into the Lockbox Accounts.

(g)     If Client breaches its obligation to direct payments of the proceeds of the Collateral to the Lockbox Account, Lender, as the irrevocably made, constituted and appointed true and lawful attorney for Client, may upon reasonable prior notice to Client, by the signature or other act of any of Lender's officers (without requiring any of them to do so), direct any Account Debtor to pay proceeds of the Collateral to Clients by directing payment to the Lockbox Account.

**2.5     Bank Accounts**. Client will not, and will not permit any Subsidiary to, directly or indirectly, establish any new bank account into which proceeds of Collateral are deposited without prior written notice to Lender and unless (a) Lender, Client or such Subsidiary and the bank at which the account is to be opened, enter into a Control Agreement regarding such bank account pursuant to which such bank acknowledges the security interest of Lender in such bank account, agrees to comply with instructions originated by Lender directing disposition of the funds in the bank account without further consent from Client, and agrees to subordinate and limit any security interest the bank may have in the bank account on terms satisfactory to Lender, and (b) Lender shall have received such confirmations or agreements as Lender shall deem necessary to confirm that no holder of Subordinated Debt has or will have any Lien upon such bank account.

**2.6     Covenants Pertaining to Licensed Operator**. To the extent Client or any of its subsidiaries (if any) is a Licensed Operator, to induce Lender to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, each Licensed Operator hereby covenants and agrees with Lender that:

(a)     Licensed Operator will:

(1)     maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Licensed Operator for its current use, all Healthcare Permits necessary under Healthcare Laws (A) to carry on the business of Licensed Operator as it is conducted on the Closing Date, and (B) if Licensed Operator receives or has applied for Medicaid or Medicare reimbursements as part of its business, to continue to receive reimbursement under Medicare and Medicaid in substantial compliance with all requirements for participation in, and for the licensure required to provide the services that are reimbursable under, Medicare and Medicaid, including, without limitation, the Medicare and Medicaid Patient Protection Act of 1987, as the same may be amended, and such other Third Party Payor Programs as to which any Licensed Operator receives or has applied for reimbursement as part of its business;

(2)     not suffer or permit to occur any of the following:

(i)     any transfer of a Healthcare Permit or rights thereunder to any Person (other than Client or Lender) or to any location other than a Licensed Location approved by Lender in advance in writing;

(ii)     any pledge or hypothecation of any Healthcare Permit as collateral security for any indebtedness other than indebtedness to Lender or to a creditor under a Subordination Agreement;

(iii)     any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit without Lender's prior written consent, including, without limitation, (I) any change to the authorized units/beds capacity of any Licensed Location and/or the number of units/beds approved by the

applicable Governmental Authority, and (II) any transfer all or any part of any Licensed Location's authorized units or beds to another site or location;

(iv)     any voluntary transfer of any resident of any Licensed Location to any other facility, unless such transfer is at the request of the resident (without economic incentives being given to the resident by an Affiliate of Licensed Operator) or its payor or is for reasons relating to non-payment or the health, required level of medical care or safety of the resident to be transferred;

(v)     without Lender's prior written consent, the provision by Licensed Operator of regulated services in addition to those required by Healthcare Permits at any Licensed Location, including, without limitation, medical services; or

(3)     cause all Healthcare Permits and any other agreements necessary for the use and operation of the Licensed Location or as may be necessary for participation in Third Party Payor Programs to remain in effect without reduction in the number of licensed beds or beds authorized for use in applicable Third Party Payor Programs;

(4)     following the occurrence and during the continuance of any Event of Default, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender all resident deposits (and any interest theretofore earned thereon) with respect to the Licensed Locations, to be held by Lender subject to the terms of their related agreements;

(5)     provide to Lender upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Licensed Operator; and

(6)     maintain a corporate health care regulatory compliance program ("**CCP**") which includes at least the following components and allows Lender and/or any outside consultants from time to time to review such CCP: (A) standards of conduct and procedures that describe compliance policies regarding Laws with an emphasis on prevention of fraud and abuse; (B) specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (C) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including, without limitation, fraud and abuse Laws and illegal billing practices; (D) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including, without limitation, publicizing a report system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (E) disciplinary guidelines and consistent enforcement of compliance policies including, without limitation, discipline of individuals responsible for the failure to detect violations of the CCP; and (F) mechanisms to immediately respond to detected violations of the CCP.

(b)     If any Licensed Location is currently accredited by JCAHO, Licensed Operator shall (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to JCAHO a plan of correction for any deficiencies listed on any JCAHO accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such JCAHO accreditation.

(c)     If required under applicable Healthcare Laws, Client has and shall maintain in full force and effect a valid CON for no less than the number of beds and units in the Licensed Locations as of the date of this Agreement.

(d)     Client shall maintain any applicable CON free from restrictions or known conflicts which would materially impair the use or operation of each Licensed Location for its current use, and shall not permit any CON to become provisional, probationary or restricted in any way.

**2.7    Crediting Payments**. The receipt of any item of payment by NEWTEK for credit to Client's account, shall for purposes of interest calculation, be credited by NEWTEK to Client's account three (3) Business Days following the date NEWTEK actually receives such item of payment. Notwithstanding anything to the contrary contained herein, payments received by NEWTEK after 11:00 a.m. Eastern time shall be deemed to have been received by NEWTEK as of the opening of business on the immediately following Business Day.

**2.8    Minimum Charges**. Commencing on the 91st day of this Agreement, in the event that the rolling three month average of Advances made and outstanding in any three (3) month period is less than $250,000.00 (the *"Minimum"*), Client shall pay NEWTEK the following fees: (a) a fee calculated by multiplying the difference between the Minimum and the actual average of the daily Advances during the three month period of calculation (the *"Minimum Difference"*) by (i) the average daily interest rate (inclusive of the default rate if such is then in effect) during such three month period and (ii) the actual number of days during the three month period in question, and (b) a Monitoring Charge calculated by multiplying (iii) the Minimum Difference by (iv) seventy (0.70%) basis points (but if there shall exist an Event of Default at the time of calculation then the basis points for this calculation shall increase to two hundred basis points (2.0%), by (v) the number of actual days in the three month period of calculation.

**2.9    Field Examination Fee**. Client shall pay NEWTEK a fee (the *Field Examination Fee*) in an amount equal to NEWTEK's standard fee, then in effect, charged for such purpose (which as of the date of this Agreement is our customary fee in such regard, and which may be subject to change without prior announcement, is One Thousand Dollars ($1,000) per day per examiner), plus out-of-pocket expenses for each examination of Client's Books or the other Collateral performed by NEWTEK or its designee.

**2.10    Monthly Statements**. NEWTEK may render monthly statements to Client of all Obligations, including statements of all Advances, interest and NEWTEK Expenses, and Client shall have fully and irrevocably waived all objections to such statements and the contents thereof unless, within thirty (30) days after receipt, Client shall deliver to NEWTEK, by registered, certified or overnight mail as set forth in Section 12 hereof, written objection to such statement specifying the error or errors, if any, contained therein.

**2.11    Processing Fee**. Client shall pay NEWTEK a processing fee equal to NEWTEK's standard processing fee then in effect per transaction (which fee as of the date of this Agreement, and which may be subject to change, is thirty-five cents ($0.35 per transaction), whether by check, ACH, wire, cash or credit card received by NEWTEK from Client's customers in payment of any of Client's Accounts Receivable.

**2.12    Collateral Monitoring Fee**. In consideration of monitoring, ledgering and other administrative functions undertaken by NEWTEK in connection with the Purchased Accounts Receivable, Client shall pay NEWTEK a monthly Collateral Monitoring Fee calculated by multiplying (i) seventy basis points (0.70%) (except during the existence of an Event of Default at which time it shall be one (1%) percent) by (ii) the average amount of the outstanding Advances during the calendar month preceding the month for which the calculation is made. The Collateral Monitoring Fee shall be charged to Client's account at the end of each calendar month.

**2.13    Line Fee.** Upon the execution of this Agreement and approval thereof by the Bankruptcy Court and upon each anniversary date of this Agreement during which this Agreement is in effect, Client shall pay NEWTEK a fee of one and one-half (1.5%) percent of the Advance Limit.

**2.13    Collections and Lockbox Account**.

(a)    If any of the Account Debtors are Governmental Account Debtors, Client shall establish and maintain additional lockboxes (also herein referred to collectively in the singular as the "**Lockbox**") and related Lockbox Accounts with the Lockbox Bank, subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Restriction Agreement and such other agreements related to such Lockbox as Lender may require. Client shall ensure that all collections of Accounts due from Governmental Account Debtors are paid directly from such Account Debtors into the applicable Lockbox and/or Lockbox Account established pursuant to this subsection for deposit into the Lockbox Account established pursuant to this subsection.

(b)          All funds deposited into a Lockbox Account shall be transferred into the Payment Account by the close of each Business Day; provided, however, that all funds deposited into a Lockbox Account that is subject (or required to be subject) to a Deposit Account Restriction Agreement shall be transferred into either (at Lender's option) (i) the Payment Account by the close of each Business Day, or (ii) the Lockbox Account established pursuant to Section 2.15(a) which such transfer shall be made via an automatic immediate intrabank transfer, and then transferred to the Payment Account by the close of each Business Day.

(c)          Notwithstanding anything in any lockbox agreement or Deposit Account Control Agreement or Deposit Account Restriction Agreement to the contrary, Client agrees that they shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox and the Lockbox Account, and that Lender shall have no liability therefor. Client hereby indemnifies and agrees to hold Lender harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and expenses, arising from or relating to actions of Lender or the Lockbox Bank pursuant to this Section or any lockbox agreement or Deposit Account Control Agreement or Deposit Account Restriction Agreement other than actions by Lender or the Lockbox Bank which constitute gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(d)          Lender shall apply, on a daily basis (subject to subsection (j) below), all funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Revolving Loans in such order of application as Lender shall elect or as otherwise provided in this Agreement. If as the result of collections of Accounts pursuant to the terms and conditions of this Section a credit balance exists with respect to the Payment Account, such credit balance shall not accrue interest in favor of Client, but shall be available to Client upon request of Client at any time or times for so long as no Default exists.

(e)          To the extent that any collections of Accounts or proceeds of other Collateral are not sent directly to the Lockbox but are received by Client, such collections shall be held in trust for the benefit of Lender pursuant to an express trust created hereby and immediately remitted, in the form received, to applicable Lockbox and Lockbox Account. No such funds received by Client shall be commingled with other funds of the Client.

(f)          Client acknowledges and agrees that compliance with the terms of this Section is essential, and that Lender will suffer immediate and irreparable injury and have no adequate remedy at law, if Clients, through acts or omissions, cause or permit Account Debtors to send payments other than to the Lockbox, or if Client fails to immediately deposit collections of Accounts or proceeds of other Collateral in the applicable Lockbox Account as herein required. Accordingly, in addition to all other rights and remedies of Lender hereunder, Lender shall have the right to seek specific performance of the Client's obligations under this Section, and any other equitable relief as Lender may deem necessary or appropriate, and Client waives any requirement for the posting of a bond in connection with such equitable relief.

(g)          Client shall not, and Client shall not suffer or permit Client to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral. Client shall, and shall cause each Client to, cooperate with Lender in the identification and reconciliation on a daily basis of all amounts received in or required to be deposited into the Lockbox Accounts.

(h)          For purposes of calculating interest, all funds transferred from the Payment Account for application to any Revolving Loans shall be subject to a three (3) Business Day clearance period.

(i)          If any Client breaches its obligation to direct payments of the proceeds of the Collateral to the applicable Lockbox Account, Lender, as the irrevocably made, constituted and appointed true and lawful attorney for Client, may upon reasonable prior notice to Client, by the signature or other act of any of Lender's officers (without requiring any of them to do so), direct any Account Debtor to pay proceeds of the Collateral to Client by directing payment to the Lockbox Account.

3.          TERM

**3.1     Term and Renewal Date**. This Agreement shall become effective upon execution by both Client and NEWTEK and shall continue in full force through the Initial Term and (if Client is still under the jurisdiction of the Bankruptcy Court then subject to Bankruptcy Court Approval) from year to year thereafter (a "Renewal Term") if NEWTEK, at its option, in writing agrees to extend the Term for one (1) year(s) from the then Termination Date, provided that Client has not exercised its termination right in accordance with this Section 3.1. Client may terminate this Agreement on the Termination Date (then in effect) by giving NEWTEK at least sixty(60) days prior written notice by registered or certified mail, return receipt requested. In addition, NEWTEK shall have the right to terminate this Agreement at any time upon thirty (30) days prior written notice delivered to Client by mail, e-mail or facsimile or immediately at any time upon the occurrence of an Event of Default.  No such termination shall relieve or discharge Client of its duties, Obligations and covenants hereunder, until all Obligations have been paid and performed in full, and NEWTEK's continuing security interest in the Collateral and its other rights hereunder and under applicable law shall remain in effect until the Obligations have been fully and irrevocably paid and satisfied in cash or cash equivalent. On the  Termination Date of this Agreement, the Obligations shall be immediately due and payable in full to Newtek , and after such termination any credit balance  in Client's favor shall continue to be held by Newtek, without interest, until a final accounting is rendered unless Client shall furnish Newtek with an undertaking satisfactory to Newtek against any items chargeable to Client hereunder.

**3.2     Termination Fee**.

1)     NEWTEK shall have the right to terminate this Agreement at any time upon not less than thirty (30) days' prior written notice or by e-mail or fax or immediately upon any Event of Default, as defined herein below. In addition, this Agreement shall terminate immediately without notice, and all Obligations shall become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived solely by Client, upon the commencement of any voluntary or involuntary proceeding under any bankruptcy (other than the Client's existing Chapter 11 bankruptcy proceeding or any other insolvency law against Client or any guarantor of any of your Obligations, or in the event client's current Chapter 11 proceeding is converted to a case under Chapter 7 or any other Chapter of the US Bankruptcy Code.

2)     In the event of Client's early termination of this Agreement prior to the first or any subsequent anniversary hereof, whether by virtue of a default hereunder or at Client's election as set forth hereinabove, Client agrees to pay Newtek in cash or other immediately available funds, and in addition to all other  Obligations, an early termination fee as and for Newtek's liquidated damages resulting from such early termination in   an amount equal to the Minimum Charge as calculated under Section 2.8(i) above for each three month period (or part thereof) then remaining through the end of the Term to the Termination Date calculated on the basis of the  rolling three month average daily balances made and outstanding in each three (3) month period being Zero ($0.00)  Dollars.

## 4.     CREATION OF CONTINUING SECURITY INTEREST

**4.1     Grant of Continuing Security Interest**. Client hereby grants to NEWTEK, its subsidiaries and affiliates, a continuing first priority lien and security interest in all presently existing and hereafter acquired or arising Accounts Receivable and other Collateral in order to secure prompt repayment of all of the Obligations of the Client arising from and after the Client's filing of its March, 2019 petition under Chapter 11 of the U.S. Bankruptcy Code ,  and in order to secure prompt performance by Client of each and all of its covenants and Obligations under the  Purchase Documents and otherwise. NEWTEK's continuing security interest in the Collateral shall attach to all  Collateral without further act on the part of NEWTEK or Client.

## 5.     REPRESENTATIONS AND WARRANTIES AND COVENANTS

Client represents and warrants to NEWTEK, and covenants, the following and acknowledges:

**5.1     No Prior Encumbrances; Security Interests**. Client has good and marketable title to the Collateral, free and clear of liens, claims, security interests or encumbrances, except for the security interests disclosed on Schedule 5.1 annexed hereto. Other than those expressly permitted by this Agreement, Client will not

create or permit to be created any security interest, lien, pledge, mortgage or encumbrance on any Collateral or any of its other assets.

5.2 **Bona Fide Accounts Receivable**. All Accounts Receivable represent bona fide sales or leases of goods and/or services for which Client has an unconditional right to payment and as to which the goods have been delivered to the customer and/or the services rendered, as applicable. None of the Accounts Receivable are subject to any rights of offset, counterclaim, cancellation or contractual rights of return.

5.3 **Location of Inventory and Equipment**. The Inventory and Equipment is not now and shall not at any time or times hereafter be stored with a bailee, warehouseman, processor, or similar party unless, the Inventory and Equipment is located at a premises not owned by Client, Client has caused the landlord of such premises, or other party having an interest in said premises, to execute and deliver to NEWTEK a landlord waiver and subordination, or similar agreement, satisfactory in form and substance to NEWTEK.. Client shall keep the Inventory and Equipment only at its address set forth on the first page hereof and at the locations set forth in the perfection certificate annexed hereto.

5.4 **Inventory Records**. Client now keeps and hereafter at all times shall keep correct and accurate records itemizing and describing the kind, type, quality and quantity of the Inventory and Client's cost of said items and none of Client's Inventory contains any labels, trademarks, trade-names or other identifying characteristics which are the properties of third parties.

5.5 **Retail Accounts Receivable**. No Accounts Receivable arise from the sale of goods or rendition of services for personal, family, consumer, household or otherwise non-commercial purposes.

5.6 **Relocation of Chief Executive Office**. The chief executive office of Client and the location of all books and records of Client relating to the Collateral is at the address indicated on the first page of this Agreement and Client will not, without thirty (30) days' prior written notice to NEWTEK and compliance with Section 5.4 hereof, relocate such office.

5.7 **Due Formation and Qualification**. Client is, and shall at all times hereafter, be a professional limited liability company duly organized and existing under the Laws of the state of its formation as set forth on the first page hereof, and Client is, and shall at all times hereafter be, qualified and licensed to do business and is in good standing in any state in which the conduct of its business or its ownership of assets requires that it be so qualified. Client's organizational identification number (if any) as issued by the state in which it is incorporated is set forth in the perfection certificate annexed hereto.

5.8 **Actual and D/B/A Name**. Client's exact name is set forth on the first page hereof and except as set forth in the perfection certificate annexed hereto Client has not changed its name within the last five (5) years. Client is conducting its business under the trade or fictitious name(s) set forth in the perfection certificate annexed hereto, and no others. Client has complied with the fictitious name Laws of all jurisdictions in which compliance is required in connection with its use of such name(s).

5.9 **Permits and Licenses**. Client holds all licenses, permits, franchises, approvals and consents required for the conduct of its business and the ownership and operation of its assets.

5.10 **Due Authorization**. Client has the right and power and is duly authorized to enter into the Purchase Documents to which it is a party.

5.11 **Compliance with Articles; Operating Agreement**. The execution by Client of this Agreement and other related agreements to which it is a party does not constitute a breach of any provision contained in Client's certificate or articles of formation or its operating agreement, nor does it constitute an event of default under any material agreement to which Client is now or may hereafter become a party.

5.12 **Litigation**. There are no actions, proceedings or claims pending by or against Client, whether or not before any court or administrative agency and Client has no knowledge or notice of any pending, threatened or imminent litigation, governmental investigations, or claims, complaints, actions, or prosecutions

involving Client, except for ongoing collection matters in which Client is the plaintiff. If any such actions, proceedings or claims presently exist or arise during the Term, Client shall promptly notify NEWTEK in writing and shall, from time to time, notify NEWTEK of all material events relating thereto.

5.13  **Accuracy of Information and No Material Adverse Change in Financial Statements**. All information furnished by Client to NEWTEK, and all statements made by Client to NEWTEK, including, without limitation, information set forth in any application, client profile, and in the annexed perfection certificate, are true, accurate and complete in all respects and do not contain any misstatement of fact or omit to state any facts necessary to make the statements or information contained therein not misleading. All financial statements relating to Client which have been or may hereafter be delivered to NEWTEK (i) have been prepared in accordance with GAAP; (ii) fairly present Client's financial condition as of the date thereof and Client's results of operations for the period then ended; and (iii) disclose all contingent obligations of Client. In addition no Material Adverse Change in the financial condition of Client has occurred since the date of the most recent of such financial statements.

5.14  Client shall at all times maintain, at its sole cost and expense, books and records showing all sales and all claims, allowances, disputes and similar information with respect to the Accounts Receivable and the Goods and services relating thereto. NEWTEK or its representative, shall have the right at any time during normal business hours to examine all of Client's books which may pertain to merchandise or Accounts Receivable.

5.15  **Solvency**. Client shall be at all times through the Term, able to pay its debts (including trade debts) as they mature.

5.16  **Environmental Laws and Hazardous Materials**. Client has complied, and at all times through the Term will comply, with all Environmental Laws. Environmental Law means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, the Resource Conservation and Recovery Act of 1976, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, the regulations pertaining to such statutes, and any other safety, health or environmental statutes, Laws, regulations or ordinances of the United States or of any state, county or municipality in which Client conducts its business or the Collateral is located.

5.17  **Tax Compliance**. Client has filed all tax returns required to be filed by it and has paid all taxes due and payable on said returns and on any assessment made against it or its assets.

5.18  **Reliance by NEWTEK; Cumulative**. Each warranty, representation and agreement contained in this Agreement shall be automatically deemed repeated by Client with each request for an Advance and shall be conclusively presumed to have been relied on by NEWTEK regardless of any investigation made or information possessed by NEWTEK. The warranties, representations and agreements set forth herein shall be cumulative and in addition to any and all other warranties, representations and agreements which Client shall now or hereafter give, or cause to be given, to NEWTEK.

**Use of Proceeds**.  The proceeds of Advances will be used by Client solely for its working capital purposes.

5.19  **Government Receivables**. Except with respect to Accounts Receivable on which the account debtor is a Governmental Account Debtor making payments under Medicare, Medicaid or TRICARE, and except as set forth on Schedule 5.20, no Client has any item of Collateral that is a claim against any Governmental Authority, including, without limitation, the federal government of the United States or any instrumentality or agency thereof, the assignment of which claim is restricted by any applicable Law, including, without limitation, the federal Assignment of Claims Act and any other comparable Law.

5.20  **Bankruptcy Court Approval**. This Agreement and the Client's entry into this Agreement and all agreements related thereto have been approved by a final order of the Bankruptcy Court.

6.  **AFFIRMATIVE COVENANTS**

Client covenants and acknowledges that during the Term Client shall comply with all of the following:

**6.1     Collateral and Other Reports**. Client shall, with each Advance request and on the first Business Day of each calendar month, furnish to NEWTEK a borrowing base report satisfactory in form and substance to NEWTEK, and report to NEWTEK all sales and services and Accounts Receivable arising since its most recent report to NEWTEK and shall execute and deliver to NEWTEK, no later than the fifteenth (15th) day of each month during the Term, a detailed aging of the Accounts Receivable, a reconciliation statement and a summary aging, by vendor, of all accounts payable of Client and any book overdraft. Client shall deliver to NEWTEK, as NEWTEK may from time to time require, collection reports, sales journals, invoices, original delivery receipts, customers' purchase orders, shipping instructions, bills of lading and other documentation respecting shipment arrangements, and other matters requested by NEWTEK. Absent such a request by NEWTEK, copies of all such documentation shall be held by Client as custodian for NEWTEK. Client shall at all times provide NEWTEK with all current "passwords" or similar access requirements relative to all computer systems available to Client with its account debtors so as to enable NEWTEK to have access to said computer systems so as to verify the status of Accounts Receivable owing to Client from said account debtors.

**6.2     Returns and Allowances**. Returns and allowances, if any, as between Client and any account debtors, shall be permitted on the same basis and in accordance with the usual customary practices of Client as they exist at the date of the execution and delivery of this Agreement. If at any time prior to the occurrence of an Event of Default any account debtor returns any Inventory to Client, Client shall promptly determine the reason for such return or allowance and, if Client accepts such return or allowance, issue a credit memorandum (with a copy to be sent to NEWTEK) in the appropriate amount to such account debtor. Client shall promptly notify NEWTEK of all returns, allowances and recoveries and of all disputes and claims.

**6.3     Financial Statements, Reports, Certificates**. Client shall deliver to NEWTEK: (a) as soon as available, but in any event within thirty (30) days after the end of each month during the Term, a balance sheet and profit and loss statement prepared by Client covering Client's operations during such period; and (b) as soon as available, but in any event within ninety (90) days after the end of each of Client's fiscal years, financial statements of Client for each such fiscal period, prepared on a review basis by independent certified public accountants acceptable to NEWTEK. Such financial statements shall include a balance sheet and profit and loss statement, and the accountants' management letter, if any, and shall be prepared in accordance with GAAP, consistently applied. Together with the above, Client shall also deliver Client's Form 10-Qs, 10-Ks or 8-Ks, if any, as soon as the same become available, and any other report reasonably requested by NEWTEK relating to the Collateral and the financial condition of Client and a certificate signed by its chief financial officer to the effect that all reports, statements or computer prepared information of any kind or nature delivered or caused to be delivered to NEWTEK under this Section 6.3 fairly present its financial condition and that there exists on the date of delivery of such certificate to NEWTEK no condition or event which constitutes an Event of Default.

**6.4     Tax Returns, Receipts**. Client shall deliver to NEWTEK copies of each of its future federal income tax returns, and any amendments thereto, within thirty (30) days of the filing thereof. Client further shall promptly deliver to NEWTEK, upon request, satisfactory evidence of Client's payment of all withholding and other taxes required to be paid by it.

**6.5     Guarantor Reports**. Client agrees to cause each Guarantor to deliver to NEWTEK (a) its annual financial statements as soon as available and in any event within ninety (90) days of each fiscal year end, demonstrating among other things, such guarantor's net worth, accompanied by supporting documentation related to any assets or liabilities listed on such financial statement and (b) copies of all federal and state income tax returns as soon as the same are available and in any event no later than thirty (30) days after the same are required to be filed by law.

**6.6     Title to Equipment**. Upon NEWTEK's request, Client shall immediately deliver to NEWTEK, properly endorsed, any and all evidences of ownership of, certificates of title, or applications for title to any items of Equipment.

**6.7     Maintenance of Equipment**. Client shall keep and maintain the Equipment in good operating condition and repair, and shall make all necessary replacements thereto so that its value and operating efficiency shall at all times be maintained and preserved. Client shall not permit any item of Equipment to become a fixture to real estate or an accession to other property, and the Equipment is now and shall at all times remain Client's personal property.

**6.8** **Taxes**. All Federal, state and local assessments and taxes, whether real, personal or otherwise, due or payable by, or imposed, levied or assessed against Client or any of its assets or in connection with Client's business shall hereafter be paid in full, before they become delinquent or before the expiration of any extension period. Client shall make due and timely payment or deposit of all federal, state and local taxes, assessments or contributions required of it by law, and will execute and deliver to NEWTEK, on demand, appropriate certificates attesting to the payment or deposit thereof. Client shall deliver to NEWTEK proof of all payroll and other taxes as and when due and paid by Client.

**6.9** **Insurance**. Client, at its expense, shall keep and maintain insurance to protect the Collateral against all risk of loss covered under a Special property form (If any of the tangible Collateral is located in a flood zone, Client must also have flood insurance. The coverage shall be written on a replacement cost basis. The property limit(s) shall be no less than those necessary to satisfy the coinsurance requirement contained in the insurance policy. The Client, at its expense, shall keep and maintain Business Income Coverage. The Business Income Coverage shall insure against loss covered under a Special policy form. The limit must contemplate a benefit period of no less than twelve months and meet the minimum limit needed to satisfy the coinsurance requirement contained in the policy. The Business Income coverage can be written on an agreed amount basis, or with a coinsurance percentage from 80% to 100%. All policies of insurance covering business personal property and business income shall contain a NEWTEK's Loss Payable endorsement in a form satisfactory to NEWTEK. All policies insuring real property on which NEWTEK has a mortgage or other lien shall contain a Mortgagee endorsement in form satisfactory to NEWTEK. Either, or both, form(s) shall contain a waiver of warranties. All proceeds payable under such policies shall be payable to NEWTEK and applied to the Obligations. Client shall cause to be delivered to NEWTEK a properly executed Evidence of Property Insurance form along with a copy of the NEWTEK's Loss Payable and/or Mortgagee endorsement(s) as applicable, in advance of the first Advance to be made under this Agreement and thereafter at least thirty (30) days prior to the expiration date(s) of the policy(ies). All Mortgagee and NEWTEK's Loss Payable endorsements shall contain the following address for notification purposes, or such other address as NEWTEK may, from time to time, notify Client:

NEWTEK BUSINESS CREDIT a d/b/a for CDS Business Services, Inc.
1981 Marcus Avenue, Suite 130
Lake Success, New York 11422
Attn: Frank Bertelle,
Chief Operating Officer
Phone: (212) 356-9520
Email: fbertelle@newtekone.com

Client, at its expense, shall keep and maintain Commercial General Liability Coverage insuring against all risks relating to or arising from Client's ownership and use of the Collateral and its other assets, its products, and its operations. NEWTEK, its directors, officers and employees shall be named as additional insureds for Commercial General Liability on Client's policy. Client shall cause to be delivered to NEWTEK a properly executed Certificate of Insurance, containing the required additional insured wording, before the first Advance is made under this Agreement and thereafter at least thirty (30) days prior the expiration date of the policy. Along with the Certificate of Insurance, Client shall also deliver a copy of the General Liability endorsement whereby NEWTEK, et. al., are added to the policy as additional insureds.

All required policies shall be in such form, with such companies and in such amounts as may be satisfactory to NEWTEK. All policies shall contain a 30 day notice for cancellation or non-renewal. NEWTEK reserves the right on a reasonable basis to change insurance specifications in a reasonable manner at any time.

**6.10** **NEWTEK Expenses**. Client shall immediately and without demand reimburse NEWTEK for all NEWTEK Expenses and Client hereby authorizes the payment of such NEWTEK Expenses.

**6.11** **Compliance With Law**. Client shall comply with the requirements of all applicable Laws, rules, regulations and orders of governmental authorities, of any material nature, relating to Client and the conduct of its business.

**6.12** **Accounting System**. Client at all times hereafter shall maintain a standard and modern system of accounting in accordance with GAAP with ledger and account cards or computer tapes, disks, printouts

and records pertaining to the Collateral containing such information as may from time to time be requested by NEWTEK.

       **6.13**     **Special Notices to Lender**. Client shall notify Lender within five (5) Business Days (but in any event prior to Client submitting any requests for any Revolving Loans and/or advances of reserves or escrows, if applicable), following the occurrence of any of the following facts, events or circumstances, whether threatened, existing or pending, together with such supporting data and information as shall be necessary to fully explain to Lender the scope and nature of the fact, event or circumstance, and shall provide to Lender within five (5) Business Days of Lender's request, such additional information as Lender shall request regarding such disclosure:

           (i)     A Licensed Operator or Client, has become subject to any federal, state, local governmental or private payor civil or criminal investigations, inquiries, validation review, program integrity review or reimbursement audits or statement of deficiencies involving and/or related to its compliance with Healthcare Laws (including, without limitation, an inquiry or investigation of any Person having "ownership, financial or control interest" in any Client (as that phrase is defined in 42 C.F.R. § 420.201 *et seq.*)) which, if adversely determined, could reasonably be expected to have a Material Adverse Change;

           (ii)     that an owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in a Licensed Operator or Client: (A) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b) or is the subject of a proceeding seeking to assess such penalty; (C) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; or (D) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729-3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 *et seq.*;

           (iii)     any claims, actions or appeals before any commission, board or agency charged with administering Healthcare Laws or programs operated under Healthcare Laws (including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of the Center for Medicare Services) with respect to any state or federal Medicare or Medicaid cost reports or claims filed by any Licensed Operator, or any disallowance by any commission, board or agency in connection with any audit of such cost reports;

           (iv)     any validation review, program integrity review or reimbursement audits related to any Licensed Operator by any commission, board or agency in connection with the Medicare or Medicaid programs, other than ordinary course audits relating to PIP Adjustments;

           (v)     any restrictions, deficiencies, required plans of correction actions or other such remedial measures with respect to Medicare and Medicaid certifications or state or local licensure of a Licensed Operator;

           (vi)     any liability in respect of amounts received by Client or any Subsidiary or any Licensed Operator for the purchase or improvement of any real property under restricted or conditioned grants or donations, including, without limitation, monies received under the Public Health Service Act, 42 U.S.C. § 291 *et seq.*;

           (vii)     the voluntary disclosure by Client or any Licensed Operator to the Office of the Inspector General of the United States Department of Health and Human Services, a Medicare fiscal intermediary or any state's Medicaid program of a potential overpayment matter involving the submission of claims to such payor by any Licensed Operator;

           (viii)     receipt by Client or Licensed Operator of any notice or communication from the Joint Commission on Accreditation of Healthcare Organizations that a Licensed Location is (A) subject to or is required to file a plan of correction with respect to any accreditation survey, or (B) in danger of losing its accreditation due to a failure to comply with a plan of correction;

(ix)     any charges of patient abuse or licensing violations involving the Licensed Operator;

(x)     any health care survey report related to licensure or certification (including, without limitation, an annual or biannual Medicare or Medicaid certification survey report) which includes any statement of deficiencies pertaining to any Licensed Operator or any of the Licensed Locations (whether via CMS 2567 form or otherwise) at a Level G or higher or characterized as potentially imposing immediate jeopardy to residents;

(xi)     without duplication, any failure of Client or Licensed Operator to materially comply with any covenants or conditions in this Article 6;

(xii)     any revocation, suspension, termination, probation, restriction, limitation, denial, or nonrenewal affecting any Licensed Operator with respect to any Medicare and/or Medicaid participation or provider agreement, certification, billing number, assignment (via CMS 855 forms or otherwise), billing agent or electronic funds transfer instruction, including, without limitation, any denial of payment for new admissions; and/or any revocation, suspension, termination, probation, restriction, limitation, denial or nonrenewal affecting any Licensed Operator with respect to any participation or provider agreement with any Third Party Payor other than Medicaid or Medicare, including, without limitation, Blue Cross and/or Blue Shield, and any other private commercial insurance, healthcare service contractor, provider network, managed care program and employee.

**6.14     Power of Attorney**. Client hereby designates and appoints NEWTEK and its designees or agents as attorney-in-fact of Client, irrevocably and with power of substitution, with authority to endorse the name of Client on any notes, acceptances, checks, drafts, money orders or other evidences of payment or proceeds of the Collateral that my come into NEWTEK's possession; to sign the name of Client on any invoices, documents, drafts against and notices to account debtors of Client, assignments and requests for verification of accounts; to execute proofs of claim and loss; to execute any endorsements, assignments, or other instruments of conveyance or transfer, to adjust and compromise any claims under insurance policies; to execute releases; during the existence of an Event of Default to receive, open and dispose of all mail addressed to Client and to notify the U.S. Post Office authorities to change the address for delivery of mail addressed to Client to such address as NEWTEK may designate; and to do all other acts and things necessary and advisable in the sole discretion of NEWTEK to carry out and enforce this Agreement. All acts of said attorney or designee are hereby ratified and approved and said attorney or designee shall not be liable for any acts of commission or omission (other than by reason of gross negligence or willful misconduct of NEWTEK determined by a court of competent jurisdiction in a final non-appealable judgment), nor for any error of judgment or mistake of fact or law. This power of attorney being coupled with an interest is irrevocable while any Obligations shall remain outstanding.

**6.15     Chief restructuring Officer/Operating Trustee. A**t all times during the Term of this Agreement (unless expressly waived by Newtek in writing) the business operations of the Client shall be managed by a Chief Restructuring Officer or an Operating Trustee, in each case acceptable to Newtek and approved by the Bankruptcy Court who shall have, among other duties, the sole check writing authority for the Client and shall be the sole party who may report accounts receivable to, and request Advances from, Newtek on behalf of Client.

**7.     NEGATIVE COVENANTS**

Client covenants and acknowledges that during the Term Client shall not undertake any of the following:

**7.1     Extraordinary Transactions and Disposal of Assets**. (A) Enter into any transaction not in the ordinary and usual course of its business as conducted on the date hereof, including but not limited to the sale, lease, disposal, movement, relocation or transfer, whether by sale or otherwise, of any its assets other than sales of Inventory in the ordinary and usual course of its business as presently conducted; (B) grant a lien on any of its assets except (i) in favor of NEWTEK, or (ii) the continuing security interests, if any, set forth on Schedule 5.1.

**7.2    Change Name, etc**.  Change its name, business structure, jurisdiction of incorporation or formation as applicable, or identity, or add any new fictitious name.

**7.3    Merge, Acquire**.    Merge, acquire, or consolidate with or into any other business organization.

**7.4    Prepayments**.  Prepay any existing indebtedness owing to any third party other than trade payables.

**7.5    Change of Ownership**.  Cause, permit or suffer any change, direct or indirect, in the ownership of the equity interests of Client or any entity that directly or indirectly owns the capital stock or equity interests in Client or its parent entities, or enter into any agreement with any person or entity that provides for a payment to such person or entity based upon the income of Client.

**7.6    Consignments of Inventory**.  Consign any Inventory to any third party or obtain any Inventory on a consignment basis from any third party.

**7.7    Business Suspension**.  Suspend or go out of business.

**7.8    Compensation**.  Pay total compensation, including salaries, withdrawals, fees, bonuses, commissions, drawing accounts, management fees or other payments, whether direct or indirect, in money or otherwise, during any fiscal year to its executives, officers, shareholders, affiliates, and directors (or any relatives of the foregoing) in an aggregate amount in excess of $200,000.00.

**7.9    Loans and Advances**.  Make any loans, advances or extensions of credit to any officer, director, executive employee or shareholder of Client (or any relative of any of the foregoing), or to any entity which is a subsidiary of, related to, affiliated with or has common shareholders, officers or directors with Client.

**7.10    Capital Expenditures**.  Make any plant or fixed capital expenditure, or any commitment therefore, or purchase or lease any real or personal assets or replace Equipment in excess of $20,000.00.

**7.11    Distributions**.  Make any distribution or declare or pay any dividends (in cash or in stock) on, or purchase, acquire, redeem or retire any of its capital stock, of any class, whether now or hereafter outstanding.

**7.12**    Client shall not change or permit any Licensed Operator to change the Manager (as defined below) of any Licensed Location or make any modification, amendment, termination or cancellation of any Management Agreement (as defined below) for any Licensed Location or agreements with brokers, without the prior written consent of Lender.  Any substitute Manager shall be required to enter into an assignment and subordination of Management Agreement in form and substance reasonably satisfactory to Lender.  Client shall, and shall

cause each Licensed Operator to, cause the Licensed Locations at all times to be managed (such management services to include management, billing, administration, back office services, marketing and consulting) by the managers identified on Schedule 7.12 (collectively in the singular, the "**Manager**") pursuant to management/operating agreements approved by Lender in writing (the "**Management Agreements**"), which Management Agreements are identified on Schedule 7.12. Such restrictions and approval rights are solely for the purposes of assuring that the Licensed Locations are managed and operated in a first-class manner consistent with Healthcare Laws and the preservation and protection of the Licensed Locations as security for the Obligations and shall not place responsibility for the control, care, management or repair of the Licensed Locations upon Lender, or make Lender responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Licensed Locations.

(a)    Client shall not suffer or permit any material breach or default to occur in any of Client's obligations under any of the Operating Leases, Management Agreements or Operations Transfer Agreements, nor suffer or permit the same to terminate by reason of any failure of any Client to meet any

requirement thereof. Client shall notify Lender promptly in writing in the event a Licensed Operator commits a default under an Operating Lease, Management Agreement or Operations Transfer Agreement.

## 8. EVENTS OF DEFAULT

The occurrence of any one or more of the following events shall constitute an Event of Default by Client hereunder:

**8.1** **Failure to Pay**. Client's failure to pay when due and payable, or when declared due and payable, any portion of the Obligations (whether principal, interest, taxes, NEWTEK Expenses, or otherwise);

**8.2** **Failure to Perform**. Client's or a Guarantor's failure to perform, keep or observe any term, provision, condition, representation, warranty, covenant or agreement contained in this Agreement, in any of the Purchase Documents or in any other present or future agreement between Client, and/or a Guarantor and NEWTEK;

**8.3** **Misrepresentation**. Any misstatement or misrepresentation now or hereafter exists in any warranty, representation, statement, aging or report made to NEWTEK by, Client and/or a Guarantor or any officer, employee, agent or director thereof, or if any such warranty, representation, statement, aging or report is withdrawn by such person;

**8.4** **Material Adverse Change**. There is a material adverse change in Client's, or a Guarantor's, business or financial condition, which shall include without limitation any material adverse change in (i) Client or Licensed Operator's ability to accept, admit and/or retain patients or residents; (ii) the rate at which any Third Party Payor reimburses Client or Licensed Operator for goods or services provided by such Client; (iii) the use or scope of any Healthcare Permits; (iv) the continued participation by Client or Licensed Operator in the Medicaid or Medicare programs or any other Third Party Payor Program at then current rate certifications or levels; (iv) an impairment to the likelihood that Eligible Accounts in general will be collected and paid in the normal course of a Licensed Operator's or Clients' business and upon the same schedule and with the same frequency as Client's recent collections history; (v) the imposition of a fine against or the creation of any liability of Client to any Governmental Authority under any Healthcare Law for any violation thereof in excess of $25,000.00.;

**8.5** **Material Impairment**. There is a material impairment of the prospect of repayment of the Obligations or a material impairment of NEWTEK's continuing security interests in the Collateral;

**8.6** **Levy or Attachment**. Any material portion of Client's assets are attached, seized, subjected to a writ or distress warrant or is levied upon, or comes into the possession of any judicial officer or assignee;

**8.7** **Insolvency by Client or Guarantor**. An Insolvency Proceeding is commenced by Client (other than the Client's existing Chapter 11 bankruptcy proceeding) or by a Guarantor;

**8.8** **Insolvency Against Client or Guarantor**. An Insolvency Proceeding is commenced against Client (other than the Client's currently existing Chapter 11 proceeding) or a Guarantor which is not dismissed within 30 days of its commencement (provided that NEWTEK may choose not to make Advances during such 30 day period);

**8.9** **Injunction Against Client**. Client is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business;

**8.10** **Government Lien**. A notice of lien, levy or assessment (other than those liens filed by the IRS prior to the filing by the Client of its current Chapter 11 proceeding) is filed of record with respect to any of Client's or a Guarantor's assets by the United States Government, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency;

**8.11** **Judgment**. A judgment is entered against Client or a Guarantor;

**8.12    Default to Third Party**.  There is a default in any material agreement to which Client or a Guarantor is a party which binds Client or a Guarantor or any of their assets;

**8.13    Subordinated Debt Payments**.  Client makes any payment on account of indebtedness which has now or hereafter been subordinated to the Obligations, except to the extent such payment is allowed under any agreement entered into with NEWTEK;

**8.14    Termination of Guarantor**.  A Guarantor dies or terminates its guaranty;

**8.15    Change in Management**.  If Gary Griffieth or any retained or appointed (as the case may be) Chief restructuring Officer or operating trustee for the Client ceases to be actively engaged in the management of Client;

**8.16    Loss of License, etc**.  If any license, permit, distributor, franchise or similar agreement, necessary for the continued operation of Client's ordinary course of business is revoked, suspended or terminated.

**8.17**    The failure of the Client to file a motion for a sale of all or substantially all of its assets as a going concern under 11 USC Section 363 of the Bankruptcy Code within 45 days of the date this Agreement becomes effective.

## 9.    NEWTEK'S RIGHTS AND REMEDIES

**9.1    Rights and Remedies**.  Upon the occurrence of an Event of Default, NEWTEK, in addition to all remedies available to it under the UCC, may, at its election, without notice of such election and without demand, do any one or more of the following:

(a)    Declare all Obligations, whether evidenced by  the Purchase Documents or otherwise, immediately due and payable in full;

(b)    Cease advancing money or extending credit to or for the benefit of Client under the Purchase Documents or under any other agreement between Client and NEWTEK;

(c)    Terminate this Agreement as to any future liability or obligation of NEWTEK, but without affecting NEWTEK's rights and security interest in the Collateral and without affecting the Obligations;

(d)    Settle or adjust disputes and claims directly with account debtors for amounts and upon terms which NEWTEK considers advisable and, in such cases, NEWTEK will credit the Obligations with the net amounts received by NEWTEK in payment of such disputed Accounts Receivable, after deducting all NEWTEK Expenses;

(e)    Cause Client to hold all returned Inventory in trust for NEWTEK, segregate all returned Inventory from all other property of Client or in Client's possession and conspicuously label said returned Inventory as the property of NEWTEK;

(f)    Without notice to or demand upon Client or a Guarantor, make such payments and do such acts as NEWTEK considers necessary or reasonable to protect its security interest in the Collateral. Client shall assemble the Collateral if NEWTEK so requires and deliver or make the Collateral available to NEWTEK at a place designated by NEWTEK. Client authorizes NEWTEK to enter any premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any encumbrance, charge or lien on the Collateral which in NEWTEK's determination appears to be prior or superior to its security interest or lien, and to pay all expenses incurred in connection therewith;

(g)    Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, lease, license or other disposition, advertise for sale, lease, license or other disposition, and sell, lease, license or otherwise dispose (in the manner provided for herein or in the Code) the Collateral. NEWTEK is hereby granted a license or other right to use, without charge, Client's labels, patents, copyrights, rights of use of any name, trade secrets, trade

names, trademarks, service marks, and advertising matter, or any asset of a similar nature, pertaining to the Collateral, in completing the production of, advertising for sale, lease, license or other disposition, and sale, lease, license or other disposition of the Collateral. Client's rights under all licenses and all franchise agreements shall inure to NEWTEK's benefit;

(h)     Sell, lease, license or otherwise dispose of the Collateral at either a public or private proceeding, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Client's premises) as NEWTEK determines is commercially reasonable. It is not necessary that the Collateral be present at any such sale;

(i)     NEWTEK shall give notice of the disposition of the Collateral as follows:

(1)     To Client and each holder of a security interest in the Collateral who has filed with NEWTEK a written request for notice, a notice in writing of the time and place of public sale or other disposition or, if the sale or other disposition is a private sale or some other disposition other than a public sale is to be made, then the time on or after which the private sale or other disposition is to be made;

(2)     The notice hereunder shall be personally delivered or mailed, postage prepaid, to Client as provided in Section 12 hereof, at least ten (10) calendar days before the date fixed for the sale or other disposition, or at least ten (10) calendar days before the date on or after which the private sale or other disposition is to be made, unless the Collateral is perishable or threatens to decline speedily in value. Notice to persons other than Client claiming an interest in the Collateral shall be sent to such addresses as they have furnished to NEWTEK

(j)     NEWTEK may credit bid and purchase at any public sale:

(k)     Any deficiency that exists after disposition of the Collateral, as provided herein, shall be immediately paid by Client. Any excess will be remitted without interest by NEWTEK to the party or parties legally entitled to such excess; and

9.2     In  addition to the foregoing, NEWTEK shall have all rights  and remedies provided by law (including those set forth in the Code) and any rights and remedies contained in any Purchase Documents and all such rights and remedies shall be cumulative **No  Waiver**. No delay on the part of NEWTEK in exercising any right, power or privilege under any Purchase Document shall operate as a waiver, nor shall any single or partial exercise of any  right, power or privilege under such Purchase Documents or otherwise, preclude other or further exercise of any  such right, power or privilege.

## 10.     TAXES AND EXPENSES REGARDING THE COLLATERAL

If Client fails to pay any monies (whether taxes, assessments, insurance premiums or otherwise) due to third persons or entities, or fails to make any deposits or furnish any required proof of payment or deposit, or fails to perform any of Client's other covenants under any of the Purchase Documents, then in its discretion and without prior notice to Client, NEWTEK may do any or all of the following: (a) make any payment which Client has failed to pay or any part thereof; (b) set up such reserves in Client's account as NEWTEK deems necessary to protect NEWTEK from the exposure created by such failure; (c) obtain and maintain insurance policies of the type described in Section 6.10 hereof and take any action with respect to such policies as NEWTEK deems prudent; or (d) take any other action deemed necessary to preserve and protect its interests and rights under the Purchase Documents.  Any payments made by NEWTEK shall not constitute:  (a) an agreement by NEWTEK to make similar payments in the future or (b) a waiver by NEWTEK of any Event of Default. NEWTEK need not inquire as to, or contest the validity of, any such expense, tax, security interest, encumbrance or lien and the receipt of notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.

## 11.     WAIVERS

    **11.1**  **Demand, Protest**. Client waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, notice of intention to accelerate, notice of acceleration, and notice of nonpayment at maturity and acknowledges that NEWTEK may compromise, settle or release, without notice to Client, any Collateral and/or guaranties at any time held by NEWTEK. Client hereby consents to any extensions of time of payment or partial payment at, before or after the Termination Date.

    **11.2**  **No Marshaling**. Client, on its own behalf and on behalf of its successors and assigns hereby expressly waives all rights, if any, to require a marshaling of assets by NEWTEK or to require that NEWTEK first resort to some portion(s) of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion thereof.

    **11.3**  **NEWTEK's Non-Liability for Inventory or Equipment or for Protection of Rights**. So long as NEWTEK complies with its obligations, if any, under Section 9-207 of the Code, NEWTEK shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Inventory or Equipment; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or other person whomsoever. All risk of loss, damage or destruction of the Inventory or Equipment shall be borne by Client. NEWTEK shall have no obligation to protect any rights of Client against any person obligated on any Collateral

    **11.4**  **Limitation of Damages**. In any action or other proceeding against NEWTEK under this Agreement or relating to the transactions between NEWTEK and Client, Client waives the right to seek any consequential or punitive damages.

  **12.**  **NOTICES**

    Unless otherwise provided herein, all consents, waivers, notices or demands by any party relating to the Purchase Documents shall be in writing and (except for financial statements and other informational documents which may be sent by first class mail, postage prepaid) shall be emailed (followed up by a mailing), personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by receipted overnight delivery service to Client or to NEWTEK, as the case may be, at their addresses set forth below:

    If to Client:
    Capstone Pediatrics, PLLC, Debtor-In-Possession
    [310 25th Avenue N. Suite 201
    Nashville, TN 37203
    Attention:

**If to NEWTEK:**

    NEWTEK BUSINESS CREDIT a d/b/a for CDS Business Services, Inc. 1981 Marcus Avenue, Suite 130
    Lake Success, New York 11042 Attn: Cheif
    Executive Officer

**With a copy to:**

    Newtek Business Services Corp. Attn:
    Legal Department
    1981 Marcus Avenue, Suite 130,
    Lake Success, NY 11042
    New York, NY 10001

33165557 v1         - 25 -
Case 3:19-bk-01971  Doc 3-1  Filed 03/28/19  Entered 03/28/19 16:12:35  Desc
Exhibit A - DIP Agreement  Page 25 of 30

Any party may change the address at which it is to receive notices hereunder by notice in writing in the foregoing manner given to the other. All notices or demands sent in accordance with this Section 12 shall be deemed received on the earlier of the date of actual delivery or five (5) calendar days after the deposit thereof in the mail.

### 13. DESTRUCTION OF CLIENT'S DOCUMENTS

All documents, schedules, invoices, agings or other papers delivered to NEWTEK may be destroyed or otherwise disposed of by NEWTEK four (4) months after they are delivered to or received by NEWTEK, unless Client requests, in writing, the return of the said documents, schedules, invoices or other papers and makes arrangements, at Client's expense, for their return.

### 14. GENERAL PROVISIONS

**14.1    Effectiveness**. This Agreement shall be binding and deemed effective when executed by Client and executed and delivered by NEWTEK. It is an express condition to the effectiveness of this Agreement, unless waived in writing by Newtek, that at all times during the Term of this Agreement the Business operations of the Client shall be managed by a Chief Restructuring Officer or an Operating Trustee, in each case acceptable to Newtek and approved by the Bankruptcy Court.

**14.2    Successors and Assigns**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; **provided, however,** that Client may not assign this Agreement or any rights hereunder and any prohibited assignment shall be absolutely void. No consent to an assignment by NEWTEK shall release Client from its Obligations. Without notice to or the consent of Client, NEWTEK may assign this Agreement and its rights and duties hereunder and NEWTEK reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in NEWTEK's rights and benefits hereunder. In connection therewith, NEWTEK may disclose all documents and information which NEWTEK now or hereafter may have relating to Client or Client's business. Client hereby consents to, and authorizes NEWTEK to, prepare and distribute a "tombstone", to issue a press release, or otherwise disseminate information to newspapers, trade journals, and other sources, describing the nature of, and closing of the credit   facilities provided for herein, which may include Client's name as well as other general information about Client and   the credit facilities. Client and NEWTEK do not intend any of the benefits of the Purchase Documents to inure to  any third party, and no third party shall be a third party beneficiary hereof or thereof.

**14.3    Section Headings**.  Headings and numbers have been set forth herein for convenience only.

**14.4    Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against NEWTEK or Client, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by each party and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

**14.5    Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of such provision.

**14.6    Amendments in Writing**. This Agreement cannot be changed or terminated orally. This Agreement supersedes all prior agreements, understandings and negotiations, if any, all of which are merged into this Agreement. **THIS AGREEMENT, TOGETHER WITH THE OTHER PURCHASE DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES REGARDING THE SUBJECT MATTER HEREIN AND THEREIN, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES HERETO. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**14.7    Counterparts and Facsimile Signatures**. This Agreement may be executed in any number of counterparts each of which, when executed and delivered, shall be deemed to be an original and all of which, when taken together, shall constitute but one and the same Agreement. Any signature to a Purchase

Document delivered by a party via telecopy transmission or other electronic means shall be deemed to be an original signature.

**14.8    Indemnification**. Client hereby indemnifies, protects, defends and saves harmless NEWTEK, its affiliates and any member, officer, director, official, agent, employee, agent, consultant and attorney of NEWTEK and each of its affiliates, and their respective heirs, successors and assigns (collectively, the "Indemnified Parties"), from and against any and all losses, damages, expenses or liabilities of any kind or nature and from any suits, claims or demands, including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with the Purchase Documents and the transactions contemplated therein or the Collateral (unless caused by the gross negligence or willful misconduct of the Indemnified Parties) including, without limitation: (a) losses, damages, expenses or liabilities sustained by NEWTEK in connection with any environmental cleanup or other remedy required or mandated by any Environmental Law; (b) any untrue statement of a material fact contained in information submitted to NEWTEK by Client or a Guarantor or the omission of any material fact necessary to be stated therein in order to make such statement not misleading or incomplete; (c) the failure of Client or a Guarantor to perform any obligations required to be performed by Client or a Guarantor under the Purchase Documents; and (d) the ownership, construction, occupancy, operations, use and maintenance of any of Client's or a Guarantor's assets. The provisions of this paragraph 14.8 shall survive termination of this Agreement and the other Purchase Documents

**15.    CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER**

THE VALIDITY OF THE PURCHASE DOCUMENTS, THEIR CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THE PURCHASE DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE COURTS LOCATED IN THE STATE NEW YORK COUNTY OF NASSAU, THE FEDERAL COURTS WHOSE VENUE INCLUDES THE EASTERN DISTRICT OF NEW YORK, OR AT THE SOLE OPTION OF NEWTEK, IN ANY OTHER COURT IN WHICH NEWTEK SHALL INITIATE LEGAL OR EQUITABLE PROCEEDINGS AND WHICH HAS SUBJECT MATTER JURISDICTION OVER THE MATTER IN CONTROVERSY. <u>CLIENT AND NEWTEK EACH WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, THE RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING UNDER THE PURCHASE DOCUMENTS OR RELATING TO THE DEALINGS OF CLIENT AND NEWTEK</u> AND ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF "FORUM NON CONVENIENS" OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 15.

Client and NEWTEK have executed and delivered this Agreement at NEWTEK's place of business in Hempstead, New York, as of the date first above written.

**CAPSTONE PEDIATRICS, PLLC]**

Signed by:_____
Print Name: Gary Griffieth
Title/Capacity:<u>CEO/CMO</u>


**NEWTEK BUSINESS CREDIT a d/b/a for CDS Business Services, Inc.**

Signed by:_____

Print Name: Gary Taylor

Title/Capacity: President  & COO

33165557 v1

Schedule 2.2

Deposit Account of Client for Advances

**Account #**_____
Bank Name, address, and Wire Transfer Instructions:

**ABA #** _____

Schedule 5.1

EXISTING LIENS WHICH ARE TO CONTINUE:

33165557 v1

EXHIBIT A

33165557 v1