# Chiron
## Advisory Services LLC

March 27, 2019

Capstone Pediatrics, PLLC
1420 Donelson Pike, Suite B17
Nashville, TN 37217
Attention: Dr. Gary Griffieth, Chief Executive Officer

Dr. Gary Griffieth
1420 Donelson Pike, Suite B-17
Nashville, TN 37217

Dr. Winnie Toler
1420 Donelson Pike, Suite B-17
Nashville, TN 37217

Dear Dr. Griffieth and Dr. Toler:

This agreement ("Engagement Agreement") will serve as the contract between Capstone Pediatrics, PLLC (the "Company") and Chiron Advisory Services LLC ("CAS") regarding the retention of Jim Davis as chief restructuring officer and CAS as financial advisors and exclusive investment bankers to the Company (the "Engagement Agreement"). As described herein, Mr. Davis as CRO shall have responsibility for restructuring the affairs of the Company and creating and executing upon a business plan to maximize value for relevant stakeholders.
As described herein, CAS's responsibilities shall include providing financial advisory services and investment banking services to the Company, on an exclusive basis, focusing primarily on: (i) private placement debt and equity financing alternatives ("Financing"), (ii) restructuring of the Company's balance sheet with existing stakeholders ("Restructuring") and/or the sale of all or part of the Company's assets or equity (a "Sale").

Contemporaneously with, or substantially contemporaneously with, this Engagement Agreement, the Company is expected to file a voluntary petition under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Tennessee Nashville Division (the "Bankruptcy Court"), instituting a chapter 11 bankruptcy proceeding (the "Bankruptcy Case") and, with consent from relevant stakeholders, operating in bankruptcy as a debtor-in-possession . Upon execution of this letter, and entry of an order by the Bankruptcy Court approving this Engagement Agreement (the "Approval Order"), this letter shall constitute an agreement between the Company and CAS (the "Agreement") of each of the terms and conditions set forth herein. The Company has indicated a need for, *inter alia*, independent involvement in chapter 11 plan formation and execution, which will likely include exit financing and/or selling the assets pursuant to Section 363 of the Bankruptcy Code (a "363 Sale").

## A. Description of Services:

1. <u>CRO Duties and Powers</u>. By and through Jim Davis, CAS shall provide services in the role of Chief Restructuring Officer ("CRO") of the Company, including supervision and oversight of the daily operation of the Company, preparation of a plan of reorganization, oversight of information preparation on the Company for use by prospective lenders including a debtor-in-possession ("DIP") lender, investors, and buyers, and negotiation with third-party exit financing sources and/or prospective purchasers in connection with a 363 Sale (and control over all aspects thereof within the allowable limits of the Bankruptcy Code, as authorized by the Bankruptcy Court). In the capacity as CRO, CAS will, upon approval by the Bankruptcy Court, have the authority to:

(a) open and close bank accounts for the Company;
(b) write checks for the Company and transfer funds of the Company;
(c) monitor and insure timely payment of all payroll and other taxes due to applicable taxing authorities;
(c) cause the Company to modify, amend, terminate and/or enforce any of its any contractual rights;
(d) cause the Company to enter into any agreement or contract that is reasonably necessary to the completion of the 363 Sale or exit financing;
(e) cause the Company to comply with all Guidelines of the Office of the United States Trustee;
(f) cause the Company to pursue, settle or compromise any litigation, controversy or other dispute involving the Company;
(g) make employment-related decisions following consultation with the Company's counsel;
(h) collect, account for, and pay all taxes as required by applicable law, including 26 U.S.C. §§ 3102 and 3402, and assume responsibility for such tax payments during the course of the CRO's approved engagement, as set forth by applicable law including 26 U.S.C. § 6672;
(i) cause the Company to exercise the Company's rights under the Company's agreements and other agreements in favor of the Company;
(j) negotiate and enter into agreements with potential DIP lenders; (k) complete a 363 Sale of the Company's assets and/or secure exit financing;
(l) act on behalf of the Company, as may be specifically ordered by the Bankruptcy Court, including with respect to having the sole authority to write checks, otherwise make payments, and schedule accounts receivable in official reports filed in the Bankruptcy Court and any other reports provided to relevant stakeholders;
(k) cause the Company to prepare one or more plans of reorganization;
(l) take all such other acts as may be reasonably necessary and appropriate in the management or operation of the Company or its bankruptcy estate;
(m) use additional personnel as may be necessary at its discretion ("Additional Personnel").

2. <u>Communication with Company Lenders and Lessors</u>. In furtherance of the objectives of this Engagement Agreement, the Company agrees that its primary lenders and lessors (collectively the "Creditors"), in their role as lenders and lessors to the Company, will

be able to communicate with CAS in its role as CRO for the Company. CAS shall have the sole authority to schedule accounts receivable to lenders, including those against which advances are to be requested, and shall have sole authority to request advances from lenders. The Creditors shall have reasonable access to Company records and documents that are appropriate for disclosure to the Creditors, including reports generated by the CRO.

3. <u>Financial Services and Investment Banking Services</u>. CAS's investment banking services will include the following:

- Preparing an information memorandum describing the Company, its historical performance and prospects, including existing contracts, marketing and sales, labor force, management, and financial projections;

- Assisting the Company in establishing a data room containing any necessary and appropriate documents related to Financing, Restructuring, and/or Sale;

- Assisting the Company in developing a lists of potential lenders, investors, and/or purchasers, as appropriate, who will be contacted on a discreet and confidential basis after approval by the Company;

- Coordinating the execution of confidentiality agreements for potential lenders and investors wishing to review the information memorandum;

- Assisting the Company in coordinating site visits for interested lenders and investors and work with the Company's management team to develop appropriate presentations for such visits;

- Soliciting competitive offers from potential lenders, investors, and/or buyers;

- Advising and assisting the Company in structuring any Financing, Restructuring, or Sale and negotiating the relevant agreements;

- Otherwise assisting the Company and its other professionals, as necessary, through closing on a best efforts basis.

In performing the services described above, the Company will furnish or cause to be furnished to CAS on a confidential basis such information as CAS reasonably believes appropriate to the execution of its engagement hereunder (all such information so furnished being the "Information"). References to confidentiality above shall not include the Company's lenders, which shall be advised of all relevant Information and shall be advised should CAS discover any material inaccuracy as to any of the Information. The Company represents to CAS that all Information furnished by it or its agents will be complete and correct in all material respects, to the best of its knowledge, and that until the expiration of CAS's engagement hereunder, the Company will notify CAS immediately of the occurrence of any event or any other change known by the Company or its agents that results in the Information ceasing to be complete and correct in all material respects. The Company recognizes and confirms that CAS: (a) will use and rely primarily on the Information and on information provided to it or made available to it from the Company and available from generally recognized public sources in performing the services contemplated hereby without having independently verified any of the same; (b) does not assume responsibility

for accurateness or completeness of the Information and such other information, unless CAS knew or should have known (from its duties hereunder) of the inaccuracy of the information; and (c) will not make an appraisal of any of the assets or liabilities of the Company.

The Company acknowledges that no reliance shall be placed on draft reports, conclusions or advice, whether oral or written, issued by CAS as the same may be subject to further work, revision and other factors which may result in such drafts being substantially different from any final report or advice issued.

The Company agrees that CAS shall be its exclusive investment banker in connection with any Transaction undertaken with respect to the Company during the Engagement Term, as defined below, of this Engagement Agreement. The Company agrees that, during the Engagement Term, CAS shall have the exclusive authority to initiate and conduct discussions and assist and advise the Company in its negotiations with all prospective lenders, purchasers and investors. In that regard, the Company agrees to identify to CAS: (a) all prospective lenders, purchasers and investors who have been in contact with the Company prior to the date hereof and (b) all prospective lenders, purchasers and investors who come in contact with the Company during the Engagement Term.

CAS will consult with and advise the Company with respect to the financial aspects of any proposed Transaction, including price, terms and conditions of a Transaction. CAS will have authority to bind the Company with respect to any proposed Transaction subject to approval by the Bankruptcy Court, with reasonable collaboration with and due notice to relevant stakeholders.

B.  **Compensation**

As compensation for providing investment banking services, CAS shall receive the following fees and reimbursements:

1.  <u>CRO Financial Advisory Fees</u>    Jim Davis, as representative and Director of CAS, will act as the CRO of the Company. Due to the small size of the Company and the Company's limited liquidity, he will discount his normal hourly rate of $535 by 30% to $375 per hour (the "CRO Compensation"). The CRO Compensation will be capped at 80 hours per month, for a maximum monthly billing of $30,000, unless otherwise approved by the Bankruptcy Court upon a showing of cause for increasing same; provided, however, any monthly CRO Compensation that exceeds the maximum monthly amount may be carried forward and charged to any subsequent month during the term of this engagement, not to exceed the $30,000 capped amount for such month. Additionally, CAS understands that the Company does not have the requisite personnel to complete certain book-keeping and related financial and reporting tasks. Accordingly, analysts and/or associates at CAS will assist the CRO and the Company's bankruptcy counsel with, among other things, (a) preparation of bankruptcy schedules, (b) preparation of monthly operating reports, (c) preparation of liquidation analyses, (d) regular budget reconciliation, (e) review of proofs of claim and make recommendations as to objections, (f) preparation of a waterfall analysis for a 363 Sale, (g) preparation of financial statements required for preparing tax returns and other state returns, (h) contracting and coordination with a payroll provider; (i) coordination and execution of distributions approved by the Bankruptcy

Capstone Pediatrics, PLLC
March 27, 2019
Page 5

Court, (j) preparation of final reports and related documents to complete the Bankruptcy Case, and (k) preparation of exhibits as necessary to support debtor's counsel (collectively, the "Financial Services"). All such Financial Services shall be completed by CAS personnel, separate and apart from the duties and charges of the CRO, at a billing rate of $275 per hour. Adequate allowance shall be made to compensate CAS for these Financial Services, and CAS will collaborate with the Company, the DIP lender, the United States Trustee, and other relevant stakeholders to reasonably allocate funds for payment of such Financial Services (in addition to the CRO Fee) in the relevant cash collateral and/or DIP financing budgets. Invoices for the hourly fees of the CRO and other CAS advisory services will be provided weekly and shall be payable by the Company, by and through the CRO, via ACH or wire transfer promptly, as authorized in the Approval Order.

2.  Initial Investment Banking Fee. Prior to the filing of the Chapter 11 petition, the Company paid to Chiron Financial LLC, the parent company of CAS, an initial investment banking fee of $6,250, plus $11,250 received on March 19, 2019. No further investment banking fees are due prior to the completion of a Transaction.

3.  DIP Financing Fee. Upon the closing of a debtor-in-possession financing, CAS shall be paid a DIP Financing Fee of $25,000 in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such DIP Financing. The success-based DIP fee is predicated upon the closing of financing after negotiation and significant modeling done for the lender and the Company. The DIP Financing Fee shall be payable upon approval of the DIP Financing by order of the Court, including any interim order

4.  Sale Fee. Upon the consummation of a Sale (as defined below) to any party, CAS shall be entitled to the balance of the Initial Fee owed, if any, and a fee (the "Sale Fee"), payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Sale, equal to (a) 12% of the Total Consideration up to and including $3 million in such consideration and (b) 5% of the Total Consideration exceeding $3 million of such consideration. Provided however, any Sale Fee shall equal to a minimum of $100,000, which, in light of the existing facts and circumstances, represents a significant reduction of CAS's 2018 minimum sale fee of approximately $400,000 for transactions under $10 million in total consideration. If there is a sale (or sales) of substantially all assets, whether through a confirmed bankruptcy plan or otherwise, there will be no Restructuring Fee (as defined below). For the avoidance of doubt, the Sale Fee is in addition to the Initial Fee and any DIP fee.

5.  Financing Fee. Upon the closing of any Financing (as defined below) other than a DIP financing, CAS shall be entitled to the balance of the Initial Fee owed, if any, as well as a fee ("Financing Fee") equal to the greater of $100,000 or 4.0% of the aggregate amount of the Financing, in federal funds via wire transfer or certified check. In the event of more than one non-DIP Financing, each with different terms or from different sources, the minimum Financing Fee will be incurred only once, but the percentage Financing Fee will apply to all Financing transactions. For the avoidance of doubt, the Financing Fee is in addition to the Initial Fee.

6.  Restructuring Fee. Upon the closing of a Restructuring (as defined below), CAS shall be entitled to the balance of the Initial Fee owed, if any, and a fee ("Restructuring Fee")

Case 3:19-bk-01971    Doc 30-1    Filed 04/01/19    Entered 04/01/19 17:08:41    Desc
Exhibit A- Engagement Agreement    Page 5 of 13

payable in cash, in federal funds via wire transfer or certified check, at and as a condition of closing of such Restructuring equal to the greater of $30,000 or 5.0% of restructured liabilities and/or equity including the value of leases and the gross liability of all law suits and claims settled. For the avoidance of doubt, the Restructuring Fee is in addition to the Initial Fee.

7. <u>Out of Pocket Expenses</u>. In addition to the foregoing Monthly Fees, Financing Fee, Sale Fee and Restructuring Fee noted above and the Financial Advisory Fee noticed below, whether or not a Transaction is consummated, CAS will be entitled to reimbursement for all of CAS's reasonable out-of-pocket expenses incurred in connection with the subject matter of this Engagement Agreement, including but not limited to legal fees (including reimbursement for legal fees incurred in connection with this Engagement Agreement and pre-bankruptcy retention, which shall be capped at $8,000), reasonable travel expenses, reasonable out-of-town lodging, automobile mileage and parking, duplications, computer research, messenger and telephone charges, and legal costs. Out of pocket expenses shall be paid on a monthly basis within thirty (30) days of the Company's receipt of an invoice reflecting such expenses, subject to the Approval Order. CAS shall first setoff the remaining funds held by CAS in the Expense Retainer for any and all approved expenses hereunder.

8. <u>Billing</u>. CAS will bill the Company on a weekly basis and will keep time tracks broken into 15 minute segments.

9. <u>Limited Carve Out</u>. As a condition to CAS accepting this engagement, the Company shall obtain approval from its existing lenders and, as necessary, the Bankruptcy Court for a carve-out of the lenders' collateral sufficient to satisfy any and all fees earned by CAS hereunder, including the Initial Fee, any Monthly Fees, out of pocket expenses, financial advisory Fees and/or investment banking fees (the "Carve-Out"); provided, however, that the Carve-Out for the Transaction Fee will not be available if and to the extent that the Company has other unencumbered or less than fully encumbered assets available to pay CAS's fees when such fees are approved by the Court for payment by a final, and non-appealable order. For the avoidance of doubt, the Carve-Out shall apply to and encumber any proceeds resulting from any Transaction.

C. **Definitions**

For the purpose of this Engagement Agreement:

**"Financing"** means any debt and/or equity investment in the Company including refinancing of existing investments and funds received by the Company from:

1. Any form of loan or debt, including any senior secured or unsecured debt including, but not limited to, debtor-in-possession financing, revolving credit facilities, notes, term loans, lines of credit, offering lines, purchase and sale of accounts receivable facilities, any lease including a sale-leaseback, or any other type of credit facility, for which the Company is obligated to repay the funds on a fixed schedule with interest on the unpaid balance thereof at a fixed interest rate or a floating interest rate, and any junior or subordinated debt, with or without associated participation in the profits of the Company and/or some other type of

income enhancement (whether realized through equity warrants conversions of the debt to equity, or otherwise). Regarding a revolving credit facility and/or factoring of the Company's accounts receivable or other multiple draw facility, the Advisor's Financing Fee calculation is tied to a one-time Financing Fee calculated on the Financing facility amount at the Financing Closing from the financing source, and not multiple Financing Fees ties to multiple draw downs on the revolving credit facility or multiple sale of receivables; and

2. Any form of equity or profit participation interest, including but not be limited to, common stock, preferred stock, convertible preferred stock, limited liability company and partnership interests, warrants or other rights to acquire equity interests, and the proceeds from any joint venture agreement, including contributions by a joint venture partner involving cash, stock, property, plant and equipment or any other assets, or asset sale. The amount of any such equity related Financing shall be the amount of the Financing facility.

**"Sale"** means and includes any transaction or group of transactions involving the sale or transfer, change of title directly or indirectly, of some or all of the assets, debt, other obligations, or equity interests of Company, including a Section 363 sale or sales of substantially all of the Company's assets through a plan of reorganization.

**"Total Consideration"** shall mean the purchase price paid at the time of the effective date of the Sale after giving effect to the Sale Transaction for the equity, assets or any portion of either, plus the assumption, dismissal, or payoff of indebtedness (secured and unsecured and including operating and capital leases) and/or payables, equipment leases (operating and capitalized), real estate leases (operating and capitalized) as well as the value of any asset left behind in the estate including cash.

For purposes of computing any fees payable to CAS hereunder, non-cash consideration shall be valued as follows: (a) publicly traded securities shall be valued at the average of their closing prices (as reported in The Wall Street Journal) for the five (5) trading days prior to the closing of the Sale Transaction; and (b) any other non-cash consideration shall be valued at the fair market value thereof as determined in good faith by the Company and CAS. If such aggregate consideration may be increased by contingent payments such as an "earn-out" or other monetary agreement in the transaction, the portion of CAS's fee relating thereto shall be calculated and paid when and as such contingent payments or other monetary amounts are received.

**"Restructuring"** shall mean and include any restructuring of existing and prospective Company stakeholder claims, including but not limited to, the Company's secured lenders, unsecured creditors and claims, shareholder interests or other party in interest claims either through a Plan of Reorganization, a structured dismissal or any other transaction, and the amount of Restructuring is the amount of the stakeholder claim prior to Restructuring. A Restructuring shall not include a sale or sales or substantially all of the Company's assets.

**"Transaction"** shall mean and include any Financing, or Sale, or Restructuring, as determined above.

**"Transaction Fee"** shall mean and include any Financing Fee, any Sale Fee or Restructuring Fee.

D. **Term of Engagement**

This Engagement Agreement will commences effective as of March 18, 2019, and shall remain in force (the "Engagement Term") for a period of six (6) months from the date of signing this Engagement Agreement and will continue for each month thereafter unless terminated by order of the Bankruptcy Court, provided however, that either party may terminate this Engagement Agreement as provided below. Upon termination, all fees and expenses due to CAS through the effective date of such termination shall be applied to the remaining balance of the retainer to the extent a balance exists, and then any additional fees and expenses shall be remitted promptly (including fees and expenses that accrued prior to but were invoiced subsequent to such termination) to CAS. The Company understands that CAS and its professionals have spent time on the engagement beginning on March 18, 2019, and such time is billable under the Engagement Agreement.

The Company may terminate the Engagement Agreement at any time for Cause (hereinafter defined) by giving 10 days prior written notice to CAS, the Internal Revenue Service, the Company's principal lender, the U.S. Trustee's office and thereafter obtaining the approval of such termination from the Bankruptcy Court. CAS may terminate the Engagement Agreement at any time for Good Reason (hereinafter defined) by giving 10 days prior written notice to CAS, the IRS, the Company's principal lender, the U.S. Trustee's office and the Bankruptcy Court and obtaining the approval for such termination from the Bankruptcy Court. Upon any such termination, the Company shall be relieved of all of its financial advisory services payment obligations under this Engagement Agreement, except for the payment of fees and expenses through the effective date of termination (including fees and expenses that accrued prior to but were invoiced subsequent to such termination) and its obligations under paragraph 8. For the purposes of this Engagement Agreement, "Cause" shall mean if (i) the CRO is convicted of, admits guilt in a written document filed with a court of competent jurisdiction to, or enters a plea of nolo contendere to, an allegation of fraud, embezzlement, misappropriation or any felony; or (ii) a material breach of any of my material obligations under this Engagement Agreement which is not cured within 30 days of the Company's written notice thereof to CAS describing in reasonable detail the nature of the alleged breach. For the purposes of this Engagement Agreement, termination for "Good Reason" shall mean termination caused by a breach by the Company of any of its material obligations under this Engagement Agreement that is not cured within 5 days of written notice of such breach to the Company describing in reasonable detail the nature of the alleged breach.

Upon the termination of this Engagement Agreement, neither party shall have any further obligations to the other except that: (a) termination of the Engagement Agreement shall not affect CAS's right to indemnification under the Indemnification paragraph below; (b) the Company shall remain obligated to pay CAS any unpaid Monthly Fees and to reimburse CAS for any expenses incurred through the date of the termination of the Engagement Agreement; and (c) if a Transaction is consummated within twelve (12) months ("Trailer Term") of the termination of this Engagement Agreement which is the result of CAS's efforts, the Company shall remain obligated to pay a Financing Fee, Sale Fee or Restructuring Fee, as calculated above. Sections B, D, E, F and G (entitled Compensation, Term of Engagement, Indemnification, Miscellaneous, and Scope of the CAS's Duties, respectively) of this Engagement Agreement shall survive the expiration or termination of this Engagement Agreement indefinitely.

E.   **Indemnification**

The Company hereby acknowledges and agrees to the indemnification arrangements between the parties hereto as described on Attachment A hereto, which Attachment is incorporated herein and forms an integral part hereof, and the Company agrees to indemnify CAS, its officers, directors and affiliates to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company' bylaws, its certificate of incorporation, or otherwise, and no reduction or termination in any of the benefits provided under any such indemnities shall affect the benefits provided. The provisions of this section 5 are contractual obligations and no change in applicable law or the Company' charter, bylaws, or other organizational documents or policies shall affect my rights hereunder.

F.   **Miscellaneous**

No fee payable to any other financial advisor or finder by the Company in connection with the subject matter of this Engagement Agreement shall reduce or otherwise affect any fee payable to CAS hereunder. This Engagement Agreement (together with the attached indemnity provisions): (a) shall be governed and constrained in accordance with the laws of the State of Texas, regardless of the laws that might otherwise govern under applicable principles of conflict of the laws thereof sets forth the entire understanding of the parties relating to the subject matter hereof and (b) supersedes and cancels any prior communications, understandings and agreements between the parties hereto. This Engagement Agreement cannot be modified or changed, nor can any of its provisions be waived, except by written agreement signed by both parties. The benefits of this Engagement Agreement shall inure to the respective successors and assigns of the parties hereto and of the Indemnified Parties and their respective successors, assigns and representatives, and the obligations and liabilities assumed in this Engagement Agreement by the parties hereto shall be binding upon their respective successors and assigns. CAS will prepare and administer the sources and application of funds for the closing.

This Engagement Agreement may be executed in any number of counterparts, which counterparts, taken together, shall constitute one and the same Engagement Agreement.

G.   **Scope of Duties**

The Company hereby acknowledges and agrees that: (a) it has retained CAS for the purposes set forth in the Engagement Agreement and that the rights and obligations of the parties hereto are contractual in nature, and (b) CAS has not made any warranties or guarantees of any nature with respect to the success or satisfactory conclusion of any Transaction or as to the economic, financial or other results which may be obtained or experienced by the Company as a result thereof.  Both the Company and CAS disclaim any intention to impose fiduciary duties or obligations on the other by virtue of the engagement contemplated by this Engagement Agreement and no other person or entity shall have any rights or obligations hereunder except as expressly provided herein.

H.   **Bankruptcy Court Proceedings**

Upon execution of this Engagement Agreement, the Company shall immediately seek approval of this engagement with the Bankruptcy Court and the retention of CAS under 11 U.S.C. § 363(b). The parties recognize that this engagement is subject in all respects to Bankruptcy Court

approval. In the event Bankruptcy Court approval is not obtained, CAS reserves the right to seek approval from the Bankruptcy Court for reimbursement and/or compensation for expenses incurred and/or work performed for the benefit of the Company under 11 U.S.C. § 503.

I. **Other Matters**

CAS has the right, following the Financing, Sale or Restructuring closing, to place advertisements in financial and other newspapers and journals at its own expense describing its services to the Company hereunder.

In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001), CAS may be required to obtain, verify and record information that identifies its clients, which information may include the name and address of the Company and its senior management team as well as other information that will allow CAS to properly identify its clients. Additionally, CAS maintains important disclosures on its website www.chironfinance.com. These disclosures may be updated periodically on an as-needed basis. The Company agrees to accept and receive all of these disclosures by electronically accessing the website referenced above and acknowledges that printed hard copies of these disclosures are available upon request by contacting CAS directly at (713) 929-9082.

J. **Securities Platform**

All transactions involving the sale or purchase of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under) are offered through Chiron Securities LLC ("Chiron Securities"), which is a registered Broker-Dealer in good standing with the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"). A principal of Chiron Financial LLC is a registered representative of Chiron Securities. Therefore, Chiron Securities is included collectively as "Chiron" and "CAS" with all the rights and obligations thereto under the terms of this Engagement Agreement with respect to a securities placement.

To the extent a Transaction Fee is payable to CAS in connection with Transaction constituting the purchase or sale of any security (as defined by the Securities Exchange Act of 1934 or the rules and regulations promulgated there under), such Transaction Fee shall be specifically paid to Chiron Securities. Under no circumstance will the Company be obligated to pay a fee in an aggregate amount in excess of the amount provided in this Engagement Agreement. Payment of the fee to Chiron Securities shall constitute and be deemed payment of the fee in this Engagement Agreement.

Any amendment, modification or other changes to this Engagement Agreement must be in writing and signed by both parties to be enforceable.

Capstone Pediatrics, PLLC
March 27, 2019
Page 11

Please indicate your acceptance of the foregoing by executing and returning the enclosed copy of this letter.

**CHIRON ADVISORY SERVICES LLC**

By: _____/s/ Scott W. Johnson_____    _____3/27/19_____
Scott W. Johnson                          Date
Managing Director


ACCEPTED:

**CAPSTONE PEDIATRICS, PLLC**, a debtor and debtor in possession


By: _____    _____
Dr. Gary Griffieth                        Date
CEO and Chief Medical Officer

## ATTACHMENT A
## INDEMNIFICATION PROVISIONS

The Company agrees to indemnify and hold harmless CAS and its affiliates, their respective partners, members, directors, officers, agents and employees (the foregoing being referred to herein individually as an "Indemnified Party" and collectively as the "Indemnified Parties") from and against any and all losses, claims, damages, liabilities or costs, as and when incurred, to which such Indemnified Party may become subject to or which are asserted against any Indemnified Party, directly or indirectly, in any way related to CAS acting for the Company under the Agreement of which this Attachment A forms a part, including, without limitation, in connection with: (a) any act or omission by CAS related to its engagement as financial advisor under the Engagement Agreement; or (b) CAS's acceptance, or its performance or non-performance, of its obligations under said Agreement (a "Claim"). The Company will reimburse the Indemnified Parties for any legal or other expenses incurred by them, as and when incurred, in connection with investigating, preparing or defending any such losses, claims, damages or liabilities or any action in respect thereof, whether or not in connection with pending or threatened litigation, and whether or not any Indemnified Party is a party thereto.

It is expressly the intention of the parties hereto that CAS shall be indemnified by the Company in the manner set forth and to the maximum extent permitted by applicable law. In the event the Company shall be obligated hereunder to pay the expenses of any Claim, the Company shall be entitled to assume the defense of such Claim with counsel approved by CAS, which approval shall not be unreasonably withheld, upon the delivery to CAS of written notice of its election to do so, and subject to the limitations stated below. After delivery of such notice, approval of such counsel by CAS and the retention of such counsel by the Company, the Company will not be liable to CAS under this Agreement for any fees of counsel subsequently incurred by CAS with respect to the same Claim; provided that (i) CAS shall have the right to employ counsel in any such Claim at CAS's expense and (ii) if (A) the employment of counsel by CAS has been previously authorized by the Company, (B) CAS shall have reasonably concluded upon advice from counsel that there is a conflict of interest between the Company and CAS in the conduct of any such defense, or (C) the Company shall not continue to retain such counsel to defend such Claim, then the fees and expenses of CAS's counsel shall be at the expense of the Company. The Company shall have the right to conduct such defense as it sees fit in its sole discretion, including the right to settle any Claim against CAS, taking full responsibility for satisfying such Claim, without the consent of CAS.

In order to provide for just and equitable contribution, if a claim for indemnification is made pursuant to said Engagement Agreement but it is found in a final judgment by a court of competent jurisdiction, not subject to further appeal, that such indemnification may not be enforced in such case, the Indemnified Parties, on the one hand, and the Company, on the other hand, shall each contribute to the amount paid or payable as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnified Parties, on the one hand, and the Company, on the other hand, and the relative benefits to the Indemnified Parties, on the one hand, and the Company, on the other hand, arising out of the particular matter or transaction which gave rise to such loss, claim, damage, liability or costs, and all other relevant equitable considerations shall also be taken into account. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation. Notwithstanding the foregoing, CAS shall not be obligated to

contribute any amount hereunder that exceeds the amount of fees previously received by CAS hereunder.

The provisions of this Attachment A shall survive any termination of said Engagement Agreement.