IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| In re: | ) |
| | ) **Case No. 3:19-bk-1971** |
| **CAPSTONE PEDIATRICS, PLLC,** | ) |
| | ) **Chapter 11** |
| | ) **Judge Mashburn** |
| Debtor. | ) |

**EXPEDITED SECOND MOTION TO REQUIRE PERFORMANCE AND ALLOW
ASSUMPTION OF EXECUTORY CONTRACT WITH PRACTICESUITE, INC.**

Capstone Pediatrics, PLLC ("Debtor"), files this Expedited Second Motion to Require Performance of Executory Contract with Practicesuite, Inc.(this "Motion") pursuant to 11 U.S.C. § 365 and Rules 6004, 6006, 7065 & 9014 of the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules" or "Bankruptcy Rule"), for entry of an order requiring Practicesuite, Inc., a Delaware corporation ("Vendor") to restore services to Debtor and under a certain *Professional Services Agreement* dated May 29, 2018 (including all addendums, exhibits, schedules, and attachments thereto, and as may be amended or restated from time to time, the "Contract"),[1] and preventing Vendor from terminating the Contract or the services provided thereunder until such time as Debtor assumes or rejects said Contract.

### I. COMPLIANCE WITH LBR 9075-1

1. **Expedited Relief Requested**: That this Court enter an order (i) requiring the Vendor to immediately reinstate all services provided and/or to be provided under the Contract (ii) granting Debtor's request to assume the Contract, pay the Arrearage (as defined herein) and provide Vendor with adequate assurance of future performance.

---

[1] A copy of the Contract is attached as Exhibit A to the First Motion (as defined below.)

1

2. **Basis for Urgency**: Since the filing of the first expedited motion related to the Practicesuite issue (DE# 62) (the "First Motion"), despite being provided with a copy of the First Motion, as well as being notified of the automatic stay, Vendor nonetheless terminated the Contract and ceased providing critical services to Debtor on April 8, 2019. Vendor provides critical services to the Debtor wherein the Vendor, among other services provided, handles the Debtor's medical coding, billing, accounts receivable, and related accounting functions. Specifically, the Vendor has exclusive access to a software interface program ("Interface") that provides reporting information which, ultimately, the Debtor's DIP lender utilizes in providing funding under the DIP loan facility. Without such reporting, the DIP lender has indicated it will not continue to fund the bankruptcy case. In addition to the above, without the services provided under the Contract, the Debtor will be unable to bill patients, insurance companies, and government payers for the services rendered by the Debtor; payments will be delayed and/or the third-party payers may refuse to make payment; and the cash flow of the Debtor will be greatly diminished if not ceased all together. Additionally, Debtor fears that it will lose additional medical providers, as the frustration of losing their electronic medical record system may prove to be the proverbial straw sufficient to break the camel's back. Although the Court has set a hearing on the First Motion for April 16, 2019, based on Practicesuite's termination of services, the Debtor fears it will be unable to operate its business in the ordinary course and believes its opportunity to reorganize will be jeopordized without the restoration of the Practicesuite services this week.

3. **Notice**: This Motion has been served on: (i) all parties consenting to electronic service via the Court's CM/ECF system, (ii) the Office of the United States Trustee via email, (iii) the 20 largest unsecured creditors and all secured creditors via email, fax, or U.S. mail. This

2
33237326 v1
Case 3:19-bk-01971    Doc 66    Filed 04/10/19    Entered 04/10/19 09:21:55    Desc Main
Document    Page 2 of 18

motion has also been emailed to all parties asserting a security interest in the Debtor's collateral. The Debtor has notified the Vendor by email and will also attempt notification via telephone.

4. **<u>Suggested Hearing Date</u>**: The Debtor respectfully requests that the Court reset the hearing at the earliest possible time in Courtroom 1, Customs House, 701 Broadway, Nashville, Tennessee 37203.

5. **<u>Supporting Argument</u>**: Debtor supports this Motion as set forth below, and as set forth in the First Motion, which is incorporated by reference as though restated verbatim herein. Debtor is requesting relief akin to a temporary restraining order and is prepared to file a full complaint and seek a restraining order through the initiation of an adversary proceeding. However, given the change in circumstances and the urgency, the Debtor files this Second Motion to update the Court and seek more immediate relief.

## II. <u>JURISDICTION</u>

6. This Court has jurisdiction over this case pursuant 28 U.S.C. § 1334.

7. The subject matter of this Motion is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (M).

8. Venue is proper with this Court pursuant to 28 U.S.C. §§ 1408 and/or 1409.

## III. <u>FACTS</u>

9. On March 28, 2019 ("<u>Petition Date</u>"), the Debtor commenced this case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

10. The Debtor is in possession of its property and is managing its affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108. No Trustee has been appointed, nor has a committee of unsecured creditors been appointed.

11. Debtor is a pediatric and healthcare operation with multiple locations and a sizeable committed patient base.

12. Under the Contract, Vendor provides the following, among other, critical services to the Debtor (collectively, the "RCM Services"):

(a) <u>Charge Entry and Demographic Entry</u>. Charge and demographic entry is a critical component of the Debtor's revenue management cycle because it assigned the amount to be charged for the medical services provided by the Debtor. Without such charge or demographic entry, the Debtor cannot be reimbursed for its services.

(b) <u>Reporting on A/R and Access to Interface</u>. Vendor has exclusive access to the Interface wherein the Vendor provides accounts receivable information to a third-party, which such third-party verifies and then reports to the DIP lender. Without access to the Interface and the reporting that stems from it, the DIP lender has indicated it may cease funding the bankruptcy case.

(c) <u>Post of Payments and Insurance Adjustments</u>. The posting of payments is the manner in which the Debtor makes a claim against the third-party payors (e.g., insurance, Medicare, Medicaid, etc.) for the repayment of the services rendered.

(d) <u>Posting of Explanation of Benefits ("EOBs")</u>. EOBs explain what payments were paid by the third-party payors. It is critical for the Debtor to know what amounts were paid by the third-party payors so that the Debtor can attempt to recoup any shortfall from the patients.

(e) <u>Posting of Patient Payments</u>. The Vendor is required to report to the Debtor what payments have been made by the patient directly.

4
33237326 v1
Case 3:19-bk-01971    Doc 66    Filed 04/10/19    Entered 04/10/19 09:21:55    Desc Main
Document    Page 4 of 18

(f) <u>Key Accounting and other Billing Functions</u>. The Vendor is required to provide a monthly reconciliation report for payments posted, required to track insurance eligibility verification and prior authorizations, and follow up with certain payors regarding unpaid claims.

13. Vendor alleges that Debtor owes it approximately $20,195.63 in pre-petition debt. The Debtor does not dispute that it owes the Vendor a pre-petition debt; however, the amount owed is under further review and accounting prior to any assumption. As used herein, the pre-petition arrearage owed to Vendor which may be mutually agreed upon by the Debtor and the Vendor shall be referred to herein as the "<u>Arrearage</u>."

14. On April 5, 2019, Counsel for Debtor received communications from Vendor indicating they intended to cut off the RCM Services to Debtor within the next 48 to 72 hours unless Debtor paid it approximately $20,195.63 in pre-petition debt, plus a security deposit going forward.

15. By email dated April 5, 2019 (the "April 5 Email") and telephone, Debtor's counsel informed Vendor that Debtor had filed for bankruptcy, and that an automatic stay was in place that would prevent Vendor from terminating the Contract or services provided thereunder. Debtor's counsel further explained to Vendor that, as was being requested by Vendor, Debtor intended to pay the Arrearage, pay the monthly fee owed for April 2019, and would be able to provide Vendor with adequate assurance going forward of payment, but that due to the bankruptcy Petition, it could not pay the Arrearage until the Court granted its Motion. Debtor further informed Vendor that if it ceased providing services to Debtor as threatened, it could force Debtor out of business completely.

16. In response, on April 8, 2019, Debtor received an email from Vendor (the "April 8 Email") stating that "*while [Vendor was] respectful of the bankruptcy procedure; as such we are*

*not required to provide services on an ongoing basis without payment*." True and correct copies of the April 5 Email and April 8 Email are attached hereto as ***Exhibit A***.

17. Vendor further advised that its "*executive team will offer [Debtor] until end of business [April 8, 2019], 5 P.M. EDT, to provide a security deposit covering the total amount due and assurance (in writing) of timely ongoing monthly payment until your proceedings are complete.*" (Ex. A.)

18. Debtor attempted to communicate with Vendor multiple times on April 8, 2019, again explaining that it intended to pay all fees being requested by Vendor, but could not pay the Arrearage until further order of this Court. Debtor also provided Vendor with a copy of the First Motion, attempting to confirm to Vendor that indeed, Debtor was attempting to provide Vendor with what Vendor was demanding.

19. Vendor ceased all communications with Debtor and as Vendor previously threatened, terminated all RCM Services to Debtor on April 8, 2019.

20. Vendor's termination of RCM Services will require the Debtor to obtain a new provider. The process of entering into an agreement with a new RCM Services provider involves new software and implementation fees, training and hardware costs, new personnel to build and design the system, and integration costs. In addition, the disruption of the Debtor's revenue cycle and the potential for coding or billing errors through the implementation of a new system will lead to an additional financial impact on the Debtor's business, including a decline in cash collections.

21. Debtor's operating budget has little room for error or deviation. As a result, the Debtor's business is likely to shut down and cease operations if the Debtor is unable to continue using Vendor's RCM services and is required to expend resources on transitioning to a new RCM provider.

6
33237326 v1
Case 3:19-bk-01971    Doc 66    Filed 04/10/19    Entered 04/10/19 09:21:55    Desc Main
Document    Page 6 of 18

22. As set forth in the First Motion, the RCM Services are essential to the ongoing operations of Debtor, and unless Vendor is ordered to reinstate services and prevented from terminating services until the Debtor assumes or rejects the Contract, Debtor may be forced to cease operations.

23. Indeed, as noted above, Debtor's DIP Financing is crucial to its survival. Debtor's DIP Financing, however, is dependent and conditioned upon its lender CDS' ability to verify Debtor's accounts receivable ("AR"). Without Vendor's RCM Services, this verification process cannot be completed, and CDS has indicated it will not fund Debtor's operations without verification of the AR.

24. Moreover, the Vendor's RCM Services are critical to the Debtor's operations because this allows for a steady, consistent processing of billing and management of the Debtor's A/R. Interruption of those services will paralyze the Debtor's operations, ultimately causing a reduction in cash collections and other financial disruption.

25. Finally, and not to be discounted, as this Court has heard through testimony of the Debtor, Debtor cannot sustain the loss of any further medical providers, especially if that loss occurred *en masse*. Here, the services provided by Vendor are essential to the efficient functioning of medical providers, as they allow Debtor to electronically track the encounters between Debtor's medical providers and patients, code the encounters, and submit the same for payment proposes to third-party payors, and the loss of the same could indeed be the circumstance that simply overwhelms Debtor's medical providers such that they determine they can no longer work under such deteriorating circumstances.

7

26. As set forth below, Debtor will be irreparably harmed in the absence of an Order compelling performance by Practicesuite and such order will not harm others, and the public interest will best be served by the issuance of the requested order.

27. Accordingly, Debtor requests that this Court enter an order (i) requiring Vendor to reinstate the RCM services it provides to the Debtor and preventing the Vendor from terminating such services until further order of this Court and (ii) allowing the Debtor to cure the Arrearage and provide adequate assurance of payment under the Contract in the form a security deposit in the amount $20,000.00 ("Security Deposit") to be utilized for further monthly charges.

28. By this Motion, Debtor requests entry of an order, pursuant to 11 U.S.C. § 365, and Bankruptcy Rules 6004, 6006 & 9014, (i) requiring Vendor to reinstate the RCM services it provides to the Debtor and preventing the Vendor from terminating such services until further order of this Court; (ii) assuming the Contract on the terms stated herein and in the Contract, and (iii) waiving Bankruptcy Rule 6004(h), which contains an automatic fourteen (14) day stay of orders authorizing the use of property.

### IV. LAW AND ARGUMENT

The Debtor is seeking an order akin to a temporary restraining order and preliminary injunction and asserts that such relief is warranted under the circumstances and that the Court, pursuant to Section 105(a) and the other authorities cited herein, has authority to enter an order granting the relief requested.

**A. Standard for Preliminary Injunction.**

29. The four elements to be considered when a movant seeks a temporary restraining order and preliminary injunction are (1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant has shown that an

8
33237326 v1
Case 3:19-bk-01971    Doc 66    Filed 04/10/19    Entered 04/10/19 09:21:55    Desc Main
Document    Page 8 of 18

irreparable injury will occur absent an injunction; (3) whether the preliminary injunction would harm others; and (4) whether the public interest would be served by the issuance of a preliminary injunction. *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985).

30. The four considerations are factors to be balanced or weighed. They are to guide the discretion of the court. *Sandison v. Michigan High School Athletic Ass'n.*, 64 F.3d 1026, 1030 (6th Cir. 1995).

31. A movant's initial burden is to demonstrate its entitlement to preliminary injunctive relief by showing a strong likelihood of success on the merits. *NAACP v. City of Mansfield*, 866 F.2d 162, 167 (6th Cir. 1989). The court must then balance the apparent strength of the movant's showing on this initial point against the irreparable harm the movant would suffer in the absence of injunctive relief, the harm which would be caused to others by the issuance of a preliminary injunction, and whether the public interest would be served by an injunction. *Id.*

**B.  Debtor is Entitled to a Temporary Restraining Order and Preliminary Injunction Requiring Vendor to Restore Services and Preventing Vendor From Terminating Services Until Debtor Assumes or Rejects the Contract.**

32. Here, all four of the above factors weigh in favor of granting a temporary restraining order and preliminary injunction in favor of Debtor, ordering Vendor to restore services immediately and preventing Vendor from terminating services until such time as Debtor accepts or rejects the Contract.

> *(i)  There is a substantial likelihood that Debtor will succeed on the merits of its claim against Vendor because Vendor must continue to perform until the Debtor rejects or assumes the Contract, and Debtor has a valid basis to assume the Contract with Vendor.*

33. An executory contract is enforceable *by* a debtor in possession prior the assumption or rejection of that contract under 11 U.S.C. § 365(a)." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 540 (1984).

34. The majority of courts, applying *Bildisco*, have held that the non-debtor party to an executory contract must perform prior to a debtor's decision whether to assume or reject a contract. *See In re Pittsburgh-Canfield Corp.*, 283 B.R. 231, 238 (Bankr. N.D. Ohio 2002) ("[T]he non-debtor party cannot unilaterally elect to cease performance on an executory contract prior to its assumption or rejection.") (internal quotations omitted); *see also In re Rhodes, Inc.*, 321 B.R. 80, 91 (Bankr. N.D. Ga. 2005); *In re El Paso Refinery LP*, 196 B.R. 58 (Bankr. W.D. Tex. 1996).

35. A pre-*Bildisco* decision from the Seventh Circuit is instructive on the issue in this matter. In *Matter of Whitcomb & Keller Mortg. Co., Inc.*, the debtor – a mortgage servicing company – sought a restraining order from the bankruptcy court after a service provider discontinued computer services based upon the debtor's prepetition defaults. 715 F.2d 375, 377 (7th Cir. 1983). The termination of computer services paralyzed the debtor's operations. *Id.* The bankruptcy court issued the TRO and ultimately issued a restraining order in order to "preserve the status quo" until the debtor made its decision to assume or reject the contract at issue. *Id.* at 378.

36. Here, the Vendor's RCM Services are critical to the Debtor's operations because this allows for a steady, consistent processing of billing and management of the Debtor's A/R. Interruption of those services will paralyze the Debtor's operations, ultimately causing a reduction in cash collections and other financial disruption.

37. Further, as set forth in this Motion, the Debtor presumes to cure the entirety of the prepetition Arrearage and to assume the Contract. During the period between entry of an order requiring the Vendor to continue providing RCM services under the Contract and the entry of an order regarding the assumption of the Contract, the vendor is unlikely to suffer harm or prejudice by allowing the Debtor to using services and a platform it has been using for a nearly a year.

38. 11 U.S.C. § 365(a) provides that a debtor, "subject to the court's approval, may assume or reject an executory contract or an unexpired lease." The assumption or rejection of an unexpired lease or executory contract by a debtor is subject to review under the business judgment standard. *See, Group of Inst'l Investors v. Chicago, Milwaukee, St. Paul, & Pacific R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 120-121 (Bankr. D. Del. 2001); *Wheeling-Pittsburgh Steel Corp. v. W. Penn. Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 845-846 (Bankr. W.D. Pa. 1987).

39. If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989) (stating that the debtor's decision to assume or reject an executory contact should not be disturbed if the decision was reasonably made to benefit the estate); *Summit Land Co. v. Allen (In re Summit Land Co.)* 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course.").

40. Here, the proposed assumption of the Contract is well within the sound business judgment of the Debtor because without assumption, unless the Debtor timely finds a replacement RCM Services vendor, the billing and collection activities of the Debtor will cease and the required reporting to the DIP lender will not occur. Without such key functions, this bankruptcy case will fail, and the Debtor will be unable to sell its business as a going concern.

41. 11 U.S.C. § 365(b)(1) requires, as a condition precedent to the assumption of an executory contract that the Debtor:

> (A) Cures, or provides adequate assurance that the [debtor] will promptly cure, such default other than a default that is a breach of a provision relating to

the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under a n unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption…

(B) Compensates, or provides adequate assurance that the [debtor] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) Provides adequate assurance of future performance under such contract or lease.

42. The Debtor's proposed assumption of the Contract meets all three (3) conditions.

43. First, the only defaults under the Contract (excluding any defaults related to any *ipso facto* clauses and those defaults referenced in 11 U.S.C. § 365(b)(2)) that Debtor is aware of are monetary defaults. The monetary default will be cured by the payment of the Arrearage.

44. Debtor is not aware of any actual pecuniary loss caused by the default under the Contract.

45. Debtor proposes to provide more than sufficient adequate assurance of future performance with the posting of the $20,000.00 Security Deposit, which will provide at least 2.5 months of security for the RCM Services rendered by Vendor under the Contract.

46. Indeed, there is no basis to believe Debtor cannot or should not be allowed to assume the Contract.

47. Accordingly, Debtor is likely to succeed on its Complaint to assume the Contract and this factor weighs in favor of granting the TRO and preliminary injunction sought by Debtor.

> *(ii)* ***Debtor Will Be Irreparably Harmed if Vendor is Not Immediately Order to Restore RCM Services to Debtor and Restrained and Enjoined from Terminating the Contract or RCM Services until such time as the Debtor assumes or rejects the Contract.***

48. "The essential inquiry in deciding whether there is a substantial threat of irreparable harm to a movant seeking a TRO and preliminary injunction is whether the movant's injury could be compensated by money damages." *Union Nat'l Life Ins. Co. v. Tillman*, 143 F. Supp. 2d 638, 643 (N.D. Miss. 2000). "Irreparable harm exists 'even where economic rights are involved, when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative.'" *Id.* at 645.

49. Here, money damages will not suffice to compensate the injury that Debtor will suffer if Vendor is not ordered to reinstate the Contract and prevented from terminating services going forward, as Debtor's business will likely cease operations, dozens of employees will be without a job, and over twenty-five thousand (25,000) patients, most of whom are on the TennCare program, will be left without a medical provider, and any goodwill enjoyed by Capstone will be destroyed.

50. Accordingly, this factor weighs in favor of granting the TRO and preliminary injunction sought by Debtor.

### (iii) The harm to Debtor outweighs any potential harm to Vendor.

51. The potential irreparable harm to Debtor outlined above clearly outweighs any damage that may inure to Vendor if it is ordered to reinstate RCM Services to Capstone and enjoined from termination of the Contract or RCM Services pending assumption or rejection of the Contract by Debtor. Indeed, Capstone faces a substantial, yet incalculable, loss in revenues, as well as the loss of goodwill, including the reputation for maintaining a competitive edge over its competitors and the relationships gained in a course of dealing over many years, loss of providers, and total and complete cessation of its business, injuries where no legal remedies can be found. *See supra, Basicomputer*, 973 F.2d at 511-12; *Ferrero*, 923 F.2d at 1449.

13
33237326 v1
Case 3:19-bk-01971    Doc 66    Filed 04/10/19    Entered 04/10/19 09:21:55    Desc Main
Document    Page 13 of 18

52. In fact, where goodwill is not calculable and cannot be remedied by money damages, the loss of goodwill always outweighs the defendant's possible damages if those damages are limited to money. *Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d 463, 466 (E.D. Mich. 2001).

53. On the other hand, Vendor will not suffer any harm as a result of Debtor's requested injunctive relief. Rather, Vendor will receive the Arrearage, adequate assurance of future performance, and timely payments under the Contact going forward, and in exchange, Vendor will be required to comply with the status quo by complying with the Contract into which it voluntarily and willingly entered.

54. Indeed, any hardship Vendor will suffer upon the granting of the relief sought herein will be confined to the discontinuance of its unlawful activities taken in violation of the automatic stay imposed by this Court.

55. Accordingly, this factor weighs in favor of granting the TRO and preliminary injunction sought by Debtor.

### (iv) *The public interest weighs in favor of granting the TRO and preliminary injunction.*

56. Finally, enjoining Vendor from terminating the Contract in violation of the automatic stay imposed by § 362 of the Bankruptcy Code, and requiring the Vendor to restore RCM Services pending assumption or rejection of the Contract furthers the public interest.

57. The Sixth Circuit has made it clear in whose interest the Medicare program operates. That court has recognized on repeated occasions that Medicare-a social insurance program-was designed expressly for the benefit of elderly and disabled citizens. *See, Baptist Hosp. E. v. Secretary of Health and Human Serv.*, 802 F.2d 860, 868 (6th Cir. 1986) ("In enacting the Medicare program, Congress did not primarily seek to ensure the financial viability of individual health care institutions, but sought to ensure adequate health care for a specific group of people.");

58. TennCare is the state of Tennessee's Medicaid program that provides health care for approximately 1.3 million Tennesseans and operates with an annual budget of approximately $12 billion. TennCare members are primarily low-income pregnant women, children and individuals who are elderly or have a disability. Similar to Medicaid, TennCare, also a social insurance program – is designed expressly for the benefit is purely incidental to the program's actual aim and design as a health insurance system. https://www.tn.gov/tenncare/information-statistics/tenncare-overview.html

59. The public interests would be greatly disserved if Capstone were to cease operations suddenly due to the Vendor's termination of RCM Services to Debtor, especially where Debtor is seeking to assume the Contract, pay the Arrearage, and give Vendor adequate assurance going forward.

60. The public interest will also be served by requiring the Vendor to comply with the automatic stay imposed by § 362 of the Bankruptcy Code.

61. The automatic stay under 11 U.S.C. § 362(a) serves a two-fold purpose in bankruptcy: (1) to afford the debtor a "breathing spell" by halting the collection process, and (2) to protect creditors by preventing one creditor from obtaining payment of its claims to the detriment of other creditors so as to permit orderly resolution of all claims. *Webb Mtn, LLC v. Exec. Realty P'ship, L.P.* (*In re Webb Mtn, LLC*), 414 B.R. 308, 335 (Bankr. E.D. Tenn. 2009); *see also Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991)*; Chao v. Hosp. Staffing Services, Inc.*, 270 F.3d 374, 382-83 (6th Cir. 2001) ("The stay helps . . . prevent[ ] a 'chaotic and uncontrollable scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.'" (quoting *Holtkamp v. Littlefield* (*In re Holtkamp*), 669 F.2d 505, 508 (7th Cir. 1982))) (internal quotation marks omitted) (citations omitted).

62. Here, after receiving notice of the automatic stay, Vendor nonetheless terminated services. The public interest are best served by enforcement for the laws of this land, as to allow complete disregard of the automatic stay would result in chaos in almost every bankruptcy case filed, and the injunction will discourage other creditors from disregarding and/or violating the automatic stay imposed by § 362 of the Bankruptcy Code.

63. Accordingly, the public interest is clearly best served by the issuance of an TRO and preliminary injunction, enforcing the automatic stay, requiring Vendor to restore RCM Services and enjoining Vendor from terminating RCM services until and unless Debtor rejects the Contract.

**C. Debtor Reserves it Rights to Request Sanctions For Vendor's Violation of the Automatic Stay.**

64. A party with knowledge of a debtor's bankruptcy case who nevertheless deliberately carries out a prohibited act outlined by § 362(a) willfully violates the automatic stay. In re Bowen, 2006 Bankr. LEXIS 1587, *18 (Bankr. E.D. Tenn. Jul. 19, 2006).

65. A specific intent to violate the stay is not required, or even an awareness by the creditor that its conduct violates the stay. It is sufficient that the creditor knows of the bankruptcy and engages in deliberate conduct that, it so happens, is a violation of the stay. Id.

66. Moreover, where there is actual notice of the bankruptcy it must be presumed that the violation was violation was deliberate or intentional. Id.

67. Satisfying these requirements itself creates strict liability. There is nothing more to prove except damages. *Printup,* 264 B.R. at 173 (quoting *In re Daniels,* 206 B.R. 444, 445 (Bankr. E.D. Mich. 1997)); *see also In re Dunning,* 269 B.R. 357, 362 (Bankr. N.D. Ohio 2001) (a willful violation of the automatic stay does not require a specific intent to violate the stay).

68. If the court determines that a willful violation occurred, and the debtor suffered any injury due to the violation, the statute mandates an award of actual damages, including costs and attorneys' fees, and "in appropriate cases, [the debtor] may recover punitive damages." U.S.C.A. § 362(h) (West 2004).

69. Here, the most important and primary purpose of this Motion is restoration of RCM Services to Debtor.

70. However, given Vendor's deliberate and willful acts taken in violation of the automatic stay, Debtor reserves its rights to seek all damages caused by Vendor's unlawful termination of RCM Services in the event a resolution is not reached in short order.

## V. **CONCLUSION**

The premise of the requested order and relief is to preserve the status quo as it existed prior to Vendor's terminating Debtor's Contract and RCM Services. Absent such an order, Debtor's business and opportunity to fully utilize the protections offered by these chapter 11 proceedings is in serious jeopardy. In order to prevent the harm that will thereafter result, Debtor respectfully seeks the equitable relief of an order akin to a temporary restraining order and preliminary injunction, together with such other further relief as this Court deems proper.

WHEREFORE, the Debtor respectfully requests entry of an order (i) granting the relief requested herein, and (ii) granting the Debtor such other and further relief as the Court deems just and proper, and reserving the issue of sanctions and or damages caused by Vendor's termination of its RCM services.

17

Respectfully submitted,

*/s/ David W. Houston, IV*
David W. Houston, IV, No. 20802
Emily C. Taube, No. 19323
Burr & Forman, LLP
222 Second Avenue South, Suite 2000
Nashville, TN  37201
615-724-32165 (phone)
615-724-3315 (fax)
dhouston@burr.com
etaube@burr.com

*Proposed Counsel for Capstone Pediatrics, PLLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically on April 10, 2019.  Notice of this filing was sent by operation of the Court's electronic filing system to all those parties specifically requesting electronic service and as indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ David W. Houston, IV*
David W. Houston, IV

18