## ASSET PURCHASE AGREEMENT

### DATED AS OF JUNE ___, 2020

BY AND AMONG

AMERICA CARES TRUST (ACT) DBA CARENATION, AS BUYER

AND

CAPSTONE PEDIATRICS, PLLC, AS SELLER

34180697 v9

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 1 of 37

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ..................................................................................................... 5

ARTICLE II PURCHASE AND SALE ................................................................................... 13

    Section 2.01 Purchase and Sale of Assets .......................................................................... 13

    Section 2.02 Excluded Assets ............................................................................................ 15

    Section 2.03 Assumed Liabilities ...................................................................................... 16

    Section 2.04 Excluded Liabilities ...................................................................................... 17

    Section 2.05 Assignment and Assumption of Contracts ................................................... 17

    Section 2.06 Further Assurances ....................................................................................... 19

    Section 2.07 Purchase Price ............................................................................................... 20

ARTICLE III CLOSING ....................................................................................................... 21

    Section 3.01 Closing .......................................................................................................... 21

    Section 3.02 Closing Deliverables ..................................................................................... 21

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ........................... 22

    Section 4.01 Corporate Capacity, Authority and Consents ............................................... 22

    Section 4.02 Binding Agreement ....................................................................................... 23

    Section 4.03 Assets ............................................................................................................ 23

    Section 4.04 Material Contracts ......................................................................................... 23

    Section 4.05 [Reserved.] .................................................................................................... 23

    Section 4.06 Insurance ....................................................................................................... 23

    Section 4.07 Employees and Employee Matters ............................................................... 24

    Section 4.08 Seller's Plans and ERISA ............................................................................ 24

    Section 4.09 Third Party Reimbursement ......................................................................... 24

    Section 4.10 [Reserved.] .................................................................................................... 24

    Section 4.11 Absence of Changes ...................................................................................... 24

    Section 4.12 Environmental Laws ....................................... Error! Bookmark not defined.

    Section 4.13 Full Disclosure .............................................................................................. 24

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ............................. 24

    Section 5.01 Capacity, Authority and Consents ................................................................ 25

    Section 5.02 Binding Agreement ....................................................................................... 25

Case 3:19-bk-01971   Doc 230-1   Filed 06/29/20   Entered 06/29/20 19:39:59   Desc
Exhibit A- Asset Purchase Agreement   Page 2 of 37

Section 5.03 Litigation and Proceedings .................................................................... 25

Section 5.04 Availability of Funds .......................................................................... 25

Section 5.05 Brokers and Finders .......................................................................... 25

Section 5.06 Statements True and Correct ............................................................. 25

ARTICLE VI COVENANTS ................................................................................. 26

Section 6.01 Conduct of Business Prior to the Closing ......................................... 26

Section 6.02 Access and Due Diligence Review .................................................... 26

Section 6.03 Supplement to Schedules .................................................................. 26

Section 6.04 Negative Covenants .......................................................................... 26

Section 6.05 Bankruptcy Court Approval; Executory Contracts; Sale Procedures; and Stalking Horse Provisions ................................................................................ 27

Section 6.06 Approvals. ......................................................................................... 28

ARTICLE VII CONDITIONS TO CLOSING ...................................................... 28

Section 7.01 [Reserved.] ........................................................................................ 28

Section 7.02 Conditions to Obligations of Buyer ................................................. 28

Section 7.03 Conditions to Obligations of Seller .................................................. 29

ARTICLE VIII TERMINATION ........................................................................... 29

Section 8.01 Termination ....................................................................................... 29

Section 8.02 Effect of Termination. ...................................................................... 30

ARTICLE IX ADDITIONAL AGREEMENTS ..................................................... 30

Section 9.01 Post-Closing Filings and Access to Information ............................... 30

Section 9.02 Employee Matters ............................................................................. 31

Section 9.03 Medical Staff ..................................................................................... 32

Section 9.04 Misdirected Payments; Refunds and Remittances ............................ 32

Section 9.05 Waiver of Bulk Sales Law Compliance ............................................ 33

Section 9.06 Medicare Bad Debts ........................................... Error! Bookmark not defined.

ARTICLE X GENERAL PROVISIONS ............................................................... 33

Section 10.01 Survival .......................................................................................... 33

Section 10.02 Additional Assurances ................................................................... 33

Section 10.03 Consents, Approvals, and Discretion ............................................. 33

Section 10.04 Choice of Law; Venue .................................................................... 33

34180697 v9                                          3

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 3 of 37

**Section 10.05 Benefit, Assignment, and Third-Party Beneficiaries** ...................................................33

**Section 10.06 Cost of Transaction** ..................................................................................................34

**Section 10.07 Waiver of Breach** .....................................................................................................34

**Section 10.08 Notices** ......................................................................................................................34

**Section 10.09 Severability** ...............................................................................................................35

**Section 10.10 Interpretation** ...........................................................................................................35

**Section 10.11 Public Disclosure** .....................................................................................................36

**Section 10.12 Entire Agreement, Amendments and Counterparts** ..................................................36

**Section 10.13 Personal Liability** .....................................................................................................36

**Section 10.14 Disclosure Generally** ................................................................................................36

**Section 10.15 Time of Essence** ........................................................................................................36

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 4 of 37

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of June __, 2020 (the "**Agreement Date**"), is entered into by and between Capstone Pediatrics, PLLC, a Tennessee professional limited liability company ("**Seller**") and America Cares Trust (ACT) dba CareNation, a Tennessee Nonprofit Corporation("**Buyer**"). Seller and Buyer are together referred to as the "**Parties**," and each individually as a "**Party**".

## RECITALS

**WHEREAS**, as is set forth in detail on Exhibit A hereto, Seller, as of the Agreement Date, owns and operates three (3) locations, each of which provide pediatric care medical services to pediatric patients (collectively, the "**Practice**");

**WHEREAS**, Seller filed a voluntary petition (the "**Bankruptcy Case**") pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Tennessee (the "**Bankruptcy Court**") on March 28, 2019. Seller is operating as a debtor-in-possession under sections 1107 and 1108 of the Bankruptcy Code. The chapter 11 case is being administered under Case No. 3:19-bk-01971;

**WHEREAS**, Seller has determined that it is in its best interests to sell the Practice via the sale of certain assets thereof, and Buyer desires to purchase the Practice via purchase of those certain assets, on the terms and conditions stated herein, subject to the approval of the Bankruptcy Court; and

WHEREAS, the parties acknowledge and agree that, CDS Business Services, Inc. d/b/a Newtek Business Credit ("CDS"), being the senior secured lender in all assets to be sold herein and whose debt will not be satisfied by said sale, has the right to block any proposed sale and is therefore the intended third party beneficiary of all rights obtained by Seller hereunder;

**WHEREAS**, in accordance with the bidding procedures previously approved by the Bankruptcy court, as well as Sections 105, 363, and 364 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Seller desires to sell to Buyer all of the Acquired Assets and to assign to Buyer all of the Assumed Liabilities, Buyer desires to purchase from Seller all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, and to ensure that the entirety of the Purchase Price is to be paid to CDS, and to ensure that CDS is afforded all rights and remedies of Seller upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the promises, covenants, representations and warranties hereinafter set forth, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"**Accounts Receivable**" means all accounts, notes, interest and other receivables of Seller of any kind, and all claims, rights, interests and proceeds related thereto, generated or accrued before the Closing Date, billed and unbilled, recorded and unrecorded (including any accounts previously written off or

34180697 v9                    5

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 5 of 37

charged off as bad debts), whether payable by any source, including, but not limited to the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients of the Practice relating to Medicare, Medicaid, TRICARE and other third party patient claims of Seller due from beneficiaries or governmental third partiesincluding without limitation the seller's rights to PCMH payments in which Seller is vested, generated or accrued at the time of closing of the sale.

"**Actions**" means any pending claim, cause of action, litigation, action, suit, arbitration, proceeding, or right in action that has been brought by any Person.

"**Acquired Assets**" has the meaning set forth in Section 2.01.

"**Affiliate**" or "**Affiliates**" means, with respect to any Person, (a) any Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with such Person, (b) any officer, director, general partner, member, manager or trustee of such Person, or (c) any Person who is an officer, director, general partner, member, manager or trustee of any Person described in clauses (a) or (b) of this definition.

"**Agreement**" has the meaning set forth in the Preamble to this Agreement.

"**Agreement Date**" has the meaning set forth in the Preamble to this Agreement.

"**Alternative Transaction**" has the meaning set forth in Section 6.05(c) of this Agreement.

"**Ancillary Transaction Documents**" means each of the other agreements and documents to be executed and delivered by any of the Parties in connection with the transactions contemplated by this Agreement.

"**Approval**" means any approval, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Governmental Authority.

"**Approved Collateralized Obligations**" has the meaning set forth in the Cash Collateral Order.

"**Assets**" means any or all of the assets or equity interests held by Seller, which with the exceptions discussed herein, may be offered for sale through the Bidding Procedures Order.

"**Assumed Contracts**" has the meaning set forth in Section 2.05(a)(i) of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 2.03 of this Agreement.

"**Assumption Agreement**" has the meaning set forth in Section 3.02(a)(ii) of this Agreement.

"**Auction**" shall have the meaning set forth in the Bidding Procedures Order.

"**Available Contracts**" has the meaning set forth in Section 2.05(a)(i) of this Agreement.

"**Avoidance Action**" means any claim, right or cause of action of Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 6 of 37

"**Bankruptcy Case**" has the meaning set forth in the Recitals to this Agreement.

"**Bankruptcy Code**" means Title 11 of the United States Code, Sections 101, *et. seq*.

"**Bankruptcy Court**" has the meaning set forth in the Recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Bid Deadline**" has the meaning set forth in the Bidding Procedures.

"**Bidding Procedures**" means bid procedures set forth in the Bidding Procedures Order .

"**Bidding Procedures Order**" means the Order of the Bankruptcy Court attached hereto as Exhibit B, entered by the Bankruptcy Court on May 27, 2020 [Doc 216].

"**Business**" means the business and operations of Seller (wherever such business and operations are situated or conducted) related to the Acquired Assets, including the business and operations related to the Practice and the ownership of facilities where these services are rendered.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Nashville, Tennessee are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the Preamble to this Agreement.

"**Buyer's Subsidiary**" has the meaning set forth in Section 10.06 of this Agreement.

"**Capstone**" has the meaning set forth in the Preamble to this Agreement.

"**Cash Collateral**" has the meaning set forth in the Cash Collateral Order.

"**Cash Collateral Order**" means the Interim Agreed Order Granting Debtor's Motion to Provide Adequate Assurance to Utilities (1) Authorizing the Debtor to Obtain Post-Petition Financing on a Senior Secured Superpriority Basis, (2) Authorizing Use of Cash Collateral and Granting Adequate Protection, (3) Setting and Prescribing Form and Manner of Notice for Final Hearing and (4) Granting Related Relief [Doc 50], as may be further extended or amended.

"**CDS**" means CDS Business Services, Inc., d/b/a Newtek Business Credit, the debtor-in-possession lender in the Bankruptcy Case, with the senior secured lien in all assets of Seller contemplated to be sold in this Agreement, and the intended third party beneficiary of the entirety of the Purchase Price to be paid herein, subject only to such applicable remaining carve-outs as may exist under the Bankruptcy Code and in any financing orders entered by the Bankruptcy Court.

"**Certificate of Need**" means a written statement issued by a Governmental Authority evidencing community need for a new, converted, expanded, relocated, or otherwise significantly modified health care facility or health service.

"**Change of Ownership**" or "**CHOW**" has the meaning in Section 6.06 of this Agreement.

"**Claim**" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against Seller.

"**Closing**" has the meaning set forth in Section 3.01 of this Agreement.

"**Closing Date**" has the meaning set forth in Section 3.01 of this Agreement:

"**Closing Date Balance Sheet**" has the meaning used in Section 2.07(d) of this Agreement.

"**CMS**" means the Center for Medicare and Medicaid Services.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"**Contract**" means any legally binding oral or written commitment, contract, license, sublicense or other agreement or arrangement of any kind relating to the Assets and the Practice or the operation thereof to which Seller or any of its Affiliates is a party or by which any of the Assets are bound.

"**Cure Amounts**" means all monetary liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"**Cure Costs**" means all monetary liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order.

"**Data Room**" means the electronic documentation site established by Chiron Advisory Services LLC on behalf of Seller containing the documents set forth in the index included in the Disclosure Schedules.

"**Deposit**" has the meaning set forth in Section 2.07(a) of this Agreement.

"**Determination Date**" has the meaning set forth in Section 2.05(a)(i) of this Agreement.

"**Disclosure Schedules**" means the disclosure schedules attached hereto, dated as of the date hereof, delivered or made available by Seller to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Section 6.03 of this Agreement.

"**Effective Time**" has the meaning set forth in Section 3.01 of this Agreement.

"**Employee**" means any individual employed by Seller on either a full-time or part-time basis in the operations of the Practice between the Agreement Date and the Closing Date.

"**Employee Benefit Plan**" has the meaning set forth in Section 4.08 of this Agreement.

"**Encumbrance**" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, security interest, encumbrance, easement, condition, reservation, Lien (statutory or otherwise), mechanics Lien, Claim, covenant, encroachment, lease, right of use or possession, or other similar third-party interest, or other survey defect, charge, hypothecation, deemed trust, action, easement, right-of-way or covenant on real property, other than any license of Intellectual Property, whether imposed by Contract, Legal Requirement, equity or otherwise.

"**Environmental Laws**" means all Laws relating to pollution or the environment, including the Comprehensive Environmental Recovery, Compensation, and Liability Act, as amended, 42 U.S.C. § 9601, et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 9601, et seq., the Clean Air Act, 42 U.S.C. § 7401; and all other Laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, pesticides, or industrial, infectious, toxic or Hazardous Materials or wastes into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the processing, generation, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, infectious, toxic, or Hazardous Materials or wastes.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and including all regulations and published interpretations thereunder.

"**Excluded Assets**" has the meaning set forth in Section 2.02 of this Agreement.

"**Excluded Benefits**" has the meaning set forth in Section 2.04(b) of this Agreement.

"**Excluded Contracts**" has the meaning set forth in Section 2.05(a)(i) of this Agreement.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04 of this Agreement.

"**Extended Contract Period**" has the meaning set forth in Section 2.05(a)(i) of this Agreement.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"**Financial Statements**" means the income statement, balance sheet and statement of cash flows of Seller, all prepared in accordance with historical past practices.

"**Governmental Authority**" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign, and any self-regulatory organization.

"**Hazardous Materials**" any chemicals, pollutants, petroleum, petroleum products or oil, infectious waste material, medical waste, human tissue, syringes, needles, any material contaminated with bodily fluids of any type, character or nature, friable asbestos, toxic mold and poly-chlorinated biphenyls.

"**Insurance Policies**" has the meaning set forth in Section 4.06(a) of this Agreement.

"**Intellectual Property**" has the meaning set forth in Section 2.01(n) of this Agreement.

"**Interim Period**" has the meaning set forth in Section 6.02(b) of this Agreement.

"**Inventory**" means all usable inventory and supplies held or used by Seller in the Practice.

"**Knowledge of Seller**" or "**Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of those Persons listed on Exhibit C.

"**Law**" means any constitutional provision, statute, law, rule, regulation, code, ordinance, resolution, Order, ruling, promulgation, policy, treaty directive, interpretation, or guideline adopted or issued by any Governmental Authority.

"**Legal Requirements**" means any federal, state, provincial, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated, issued or applied by any Governmental Authority or other similar authority.

"**Lease**" has the meaning set forth in the definition of "**Leased Real Property**."

"**Leased Real Property**" means the interests in real property let, leased or subleased by Seller, as tenant, subtenant, lessee or sublessee, or in which a Seller has been granted a possessory interest or right to use or occupy all or any portion of the same (the "**Lease**" or "**Leases**").

"**Liability**" or "**Liabilities**" means any direct or indirect obligation, duty or liability, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured or otherwise.

"**Lien**" or "**Liens**" means any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other) or preference, priority, right, easement, covenant, restriction, title defect, lease, encroachment, or other survey defect, security interest, Liability, obligation, preferential arrangement, or encumbrance of any kind or nature whatsoever.

"**Material Adverse Effect**" means any event, circumstance, fact, state of facts, occurrence, result, change or effect that individually or in the aggregate is, or would reasonably be likely to have, a material adverse effect on the Acquired Assets, the Practice and/or Seller's financial condition, results of operations and/or prospects.

34180697 v9

10

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 10 of 37

"**Medicaid**" means that certain program of medical assistance, funded jointly by the federal government and the States, for impoverished individuals who are aged, blind and/or disabled, and/or members of families with dependent children, which program is more fully described in Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) and the regulations promulgated thereunder.

"**Medicare**" means that certain federal program providing health insurance for eligible elderly and other individuals, under which physicians, hospitals, skilled Facilities, home health care and other providers are reimbursed for certain covered services they provide to the beneficiaries of such program, which program is more fully described in Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq.) and the regulations promulgated thereunder.

"**Net Profit Payment**" means EBIDTA of Buyer (earnings before interest, taxes and depreciation and amortization) related to the Business of the Practice acquired.

"**Order**" means any judgment, order, writ, injunction, decree, determination, or award of any Governmental Authority.

"**Ordinary Course of Business**" means, with respect to any Person, the ordinary and usual course of normal day-to-day operations of such Person and its business, consistent with its past practice; provided that in the case of Seller, "Ordinary Course of Business" shall take into account the business and operating practices that have been utilized by Seller since the commencement of the Bankruptcy Case.

"**Party**" or "**Parties**" means any one or more of the Buyer and Seller, as applicable.

"**Permit**" means any accreditation, license, permit, certification or Certificate of Need required to be issued or granted by any Governmental Authority, including, without limitation, Medicare, Medicaid, TRICARE and/or TennCare.

"**Permitted Encumbrances**" means Encumbrances specifically permitted by the Sale Order.

"**Person**" means any individual, firm, agency, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority, self-regulatory organization, non-governmental regulatory authority or other entity of any kind, and shall include any successor, by merger or otherwise, of such entity.

"**Practice**" has the meaning set forth in the Recitals to this Agreement.

"**Previously Omitted Contract**" has the meaning set forth in Section 2.05(b)(i) of this Agreement.

"**Previously Omitted Contract Designation**" has the meaning set forth in Section 2.05(b)(i) of this Agreement.

"**Previously Omitted Contract Notice**" has the meaning set forth in Section 2.05(b)(ii) of this Agreement.

"**Purchase Price**" means (1)Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) payable as follows: (a) $20,000.00 cash due within one (1) Business Day following the Agreement Date, plus (b) $30,000.00 cash due at Closing, plus (c) $50,000.00 due six months from the Closing Date, plus (d) $50,000.00 due on the one year anniversary of the Closing Date, plus (d) $200,000.00 cash due on

July 15, 2021 , (2) the total of the Net Profit Payments as discussed in Section 2.07 and (3) Buyer's obligation to service the Accounts Receivable of Debtor pursuant to section 2.07

"**Qualified Bid**" has the meaning set forth in the Bidding Procedures.

"**Required Governmental Approvals**" shall have the meaning set forth in Section 7.02(b) of this Agreement.

"**Sale Hearing**" means the hearing to consider the entry of the Sale Order.

"**Sale Order**" means a Final Order of the Bankruptcy Court approving, *inter alia*, (a) the sale of the applicable Acquired Assets to the applicable Buyer free and clear of any Encumbrances (other than Permitted Encumbrances), and (b) the assumption and assignment of the Assumed Contracts by the applicable Buyer. Buyer, CDS and Seller shall agree to a form of Sale Order which shall be attached as Exhibit D hereto prior to or in connection with execution of this Agreement.

"**Sale Procedures Order**" means a Final Order of the Bankruptcy Court approving the procedures for the sale of the Acquired Assets. Buyer and Seller shall agree to a form of the Sale Procedures Order which shall be attached as Exhibit E hereto prior to or in connection with execution of this Agreement.

"**Schedule Supplement**" has the meaning set forth in Section 6.03 of this Agreement.

"**Seller's Plan**" or "**Seller's Plans**" has the meaning set forth in Section 4.08 of this Agreement.

"**Seller**" has the meaning set forth in the Preamble to this Agreement.

"**Seller's Bad Debts**" has the meaning set forth in Section 9.06 of this Agreement.

"**Tax**" or "**Taxes**" means any and all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, ad valorem, hospital, provider, transfer, franchise, profits, license, lease, rent, service, service use, withholding, payroll, employment, excise, severance, privilege, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties, escheat, abandoned property, unclaimed property, or other taxes, fees, assessments or charges in the nature of a tax, together with any interest and any penalties, additions to tax or additional amounts with respect thereto.

"**Termination Date**" has the meaning set forth in Section 8.01(a)(iv) of this Agreement.

"**Transferred Employees**" has the meaning set forth in Section 9.02 of this Agreement.

"**Transferred Permit**" has the meaning set forth in Section 2.01(bb) of this Agreement.

"**TRICARE**" means, collectively, the program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Department of Defense, Health and Human Services and Transportation, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

Case 3:19-bk-01971   Doc 230-1   Filed 06/29/20   Entered 06/29/20 19:39:59   Desc
Exhibit A- Asset Purchase Agreement   Page 12 of 37

# ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all of Seller's right, title and interest in, to and under the following assets, properties and rights of Seller, to the extent that such assets, properties and rights exist as of the Closing Date and relate to the Business (collectively, the "**Acquired Assets**")[1]:

(a)    all personal property of any kind whatsoever, including, without limitation, furniture, fixtures, equipment, machinery, instruments, Inventory and/or other supplies;

(b)    all of the Practice's inventory of vaccines, medical and other supplies;

(c)    all of the medical and other equipment used by Seller in operation of the Practice;

(d)    all computers and other digital devices, including all related software or software licenses, used by Seller in the operation of the Practice;

(e)    all of the rights, title, claims and interests of Seller in, to and under the Assumed Contracts;

(f)    to the maximum extent transferrable under applicable Law, all patient and medical staff records held and/or used by Seller;

(g)    to the maximum extent transferrable under applicable Law, all Permits and Approvals held by Seller that are set forth on <u>Schedule 2.01(k)</u>;

(h)    to the maximum extent transferrable under applicable Law, all provider Contracts with commercial and/or Governmental Authority payors;

(i)    any claims, causes of action or rights against any Person related to the Acquired Assets and/or the Practice, whether statutory, contractual and/or otherwise, arising before or after the Closing;

(j)    all of the rights, title, claims and interest of Seller in, to and under all databases and other intellectual property including, without limitation, (i) domestic and foreign patents, patent applications, trademarks, trademark applications and registrations, service marks, service mark applications and registrations, copyrights, copyright applications and registrations and trade names of Seller, (ii) proprietary data and technical know-how and information, and all materials, embodying such information, of Seller, (iii) developments, discoveries, inventions, processes and know-how, licenses, ideas and trade secrets of Seller, (iv) names and logos of Seller, (v) websites, domain names, email addresses and other similar assets, (vi) all software, source code, documentation, manual and computer processes, and (vii) all other intangible rights owned or licensed by any Seller (collectively, the "**Intellectual Property**");

---

[1] Buyer to confirm final list of Acquired Assets, Excluded Assets, Assumed Liabilities, and Excluded Liabilities upon completion of due diligence review.

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 13 of 37

(k)     other than minute books and corporate records of Seller, all books and records of Seller with respect to operation of the Practice, including without limitation all financial statements, credit records, payroll records, computer records, operating manuals, clinical and administrative policy and procedure manuals, marketing and promotional materials, schedules of the Assets (as hereinafter defined), correspondence, books of account, files, papers, books and any and all other public and confidential business records, in all cases whether the same are in hard copy or are electronically stored;

(l)     all of Seller's right, title and interest in, to and under all telephone numbers, including all extensions thereto;

(m)     all proceeds and products of any and all of the foregoing Acquired Assets, except to the extent related to the Excluded Assets or the Excluded Liabilities;

(n)     all goodwill of Seller arising out of, relating to and/or resulting from the Acquired Assets and/or the Practice;

(o)     to the maximum extent transferrable, any and all certifications, authorizations, or other government or insurance related licenses required for the operation of the clinics of the Practice;

(p)     to the maximum extent transferrable, any other relationships with insurance carriers, with governmental medical insurance providers, or other third-party payers for medical services;

(q)     any and all mailing lists and related data base information concerning either current, past, or prospective patients of the Practice;

(r)     any designs, writings, or concepts for promotional materials, photographs, text, or graphics used by the Practice in its operations;

(s)     the interest of Seller in the Internet website located at CapstonePediatrics.com, including the site address, the site design and related software, related e-mail addresses, and any and all intellectual property or rights to such property which relate to the development, operation, or functions of any website used, or to be used, by Seller;

(t)     all lists of pharmaceutical and medical equipment suppliers, as well as any other vendors serving the Practice, including all correspondence, purchase orders, contracts, agreements, and files including the assignment of any pharmaceutical or other supply agreements;

(u)     employee records; employment, non-compete, or other agreements with employees or independent contractors; and all other correspondence, performance reviews, and employee files;

(v)     the name "**Capstone Pediatrics**" and any and all other trade names together with their related logos or other identifying marks used in the sale or promotion of its pediatric services or other products or services provided by the Practice;

(w)     all other intangible assets which, together with the above, represent all intangible assets owned by Seller and which would be used or useful in connection with or related to the operation of the Practice subsequent to the Closing; and

(x)     all Permits and licenses held by Seller, including those identified on Schedule 2.01(bb) (the "**Transferred Permits**"), provided, that Schedule 2.01(bb) and the definition of "Transferred Permits," shall be deemed, updated, and amended to exclude, without further action by either Party, any Permit that relates to an Excluded Asset;

(y)     all assets of any kind whatsoever which are not Excluded Assets and which are owned and/or held by Seller with respect to the Practice, as listed on Schedule 2.01(bb).

**Section 2.02    Excluded Assets.** Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and Seller shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "**Excluded Assets**" shall consist of only the following items, assets, and properties (whether or not such assets are otherwise described in Section 2.01);

(a)     all leasehold title to and leasehold improvements on or in the real property leased pursuant to the Leases;

(b)     all Accounts Receivable;

(c)  all cash, cash equivalents, and short term investments on hand or on deposit and held by Seller on the Closing Date for purposes and the benefit of the Practice;

(d)  all prepaid expenses, deposits and other current assets of Seller with respect to the Practice;

(e)  all security and other deposits of Seller with respect to the Practice;

(f)  rights of Seller to any discounts, rebates, premiums, or other payments from suppliers or others earned prior to, but due or payable after the Closing Date;

(g)     the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, and other records of Seller; provided, however, that copies of the foregoing items have been made available by Seller to Buyer;

(h)     documents that Seller is required by Legal Requirements to retain and documents subject to attorney-client privilege or other work product privilege;

(i)     any Contract that is not an Assumed Contract;

(j)     insurance policies and all rights under or arising out of insurance policies to the extent not set forth in Section 2.01(v);

(k)     any prepaid deposits related to professional fee retainers and Cash Collateral securing Approved Collateralized Obligations;

(l)      all current and prior director and officer insurance policies of Seller and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(m)      any rights, claims or causes of action of Seller under this Agreement or any other Ancillary Transaction Document;

(n)      subject to Section 2.01(k) and 2.01(bb), any Permits and licenses held by Seller that are not assignable or transferrable;

(o)      assets and liabilities under medical malpractice risk pools, workers compensation, and employee retirement programs;

(p)      the commitments, contracts, leases and agreements of Seller that (i) relate to the Excluded Liabilities or the Excluded Assets, (ii) do not relate to either the Acquired Assets; (iii) are not Assumed Contracts; or (iv) that are listed on Schedule 2.02(n);

(q)      all minute books and organizational records relating to Seller and all other books and records that a Seller is required by Law to retain in its possession;

(r)      those pharmaceuticals that cannot, by Law, be sold by Seller to Buyer;

(s)      all claims, rights, interests and proceeds with respect to state or local tax payments, refunds, and credits (including but not limited to property tax refunds and charity tax credits) related to the operations of Seller or the Acquired Assets with respect to periods ending prior to the Effective Time;

(t)      all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Seller with respect to periods prior to the Effective Time, and any payments, awards or other proceeds resulting therefrom, specifically including, but not limited to all Avoidance Actions arising under the Bankruptcy Code;

(u)      peer review materials and any writings, documents and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, in each case, except to the extent related to the Assumed Liabilities;

(v)      the rights of Seller under this Agreement; and

(w)      other assets set forth in Schedule 2.02(u).

**Section 2.03    Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due any and all liabilities and obligations of Seller arising out of or relating to the Business or the Acquired Assets on or after the Closing, other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including, without limitation, the following:

(a)      all liabilities and obligations arising under or relating to the Assigned Contracts;

(b)      capitalized or other equipment lease obligations;

34180697 v9          16

Case 3:19-bk-01971   Doc 230-1   Filed 06/29/20   Entered 06/29/20 19:39:59   Desc
Exhibit A- Asset Purchase Agreement   Page 16 of 37

(c)     all liabilities and obligations of Buyer or its Affiliates relating to employee benefits, compensation or other arrangements with respect to any Transferred Employee arising on or after the Closing;

(d)     all liabilities and obligations for Taxes relating to the Business, the Acquired Assets or the Assumed Liabilities for any taxable period ending after the Closing Date;

(e)     all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Acquired Assets on or after the Closing; and

**Section 2.04     Excluded Liabilities.** Buyer shall not assume and shall not be responsible to pay, perform or discharge any of the following liabilities or obligations of Seller (collectively, the "**Excluded Liabilities**"):

(a)     all trade accounts payable of Seller to third parties in connection with the Business that accrued post-petition and remain unpaid as of the Closing Date;

(b)     expenses, salaries, overtime, unused paid time off, and other employee compensation accrued in the Ordinary Course of Business and payable as of the Closing Date;

(c)     those specific Liabilities of Seller (if any) related to Employees as identified on Schedule 2.04(b) (such schedule to be provided to Seller by Buyer not later than five (5) Business Days prior to the Bid Deadline) and (ii) the sponsorship of, and Liabilities under, each Seller's Plan (collectively, the "**Excluded Benefits**");

(d)     any Liabilities with respect to any Taxes that are not expressly assumed by Buyer pursuant to Section 2.03(e); and

(e)     except as expressly provided herein, all Liabilities with respect to any Excluded Asset;

**Section 2.05     Assignment and Assumption of Contracts.**

(a)     Available Contracts.

(i)     Schedule 2.05(a) sets forth a list of all executory Contracts (excluding all Leases) relating to the Business or the Acquired Assets to which Seller is a party (the "**Available Contracts**") which Schedule 2.05(a) may be updated from time to time to add or remove any Contracts inadvertently included or excluded from such schedule. On or before July 6, 2020 (such date, the "**Determination Date**"), Buyer shall designate in writing which Available Contracts from Schedule 2.05(a) relating to the Business or the Acquired Assets that Buyer wishes to "**Assume**" (the "**Assumed Contracts**"). All Contracts of Seller that are listed on Schedule 2.05(a) and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Acquired Assets and shall automatically be deemed "**Excluded Contracts**" (and for the avoidance of doubt, Buyer shall not be responsible for any related Cure Costs); provided, however, that if an Available Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and Seller prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and

Seller, (B) one hundred twenty (120) days following the Closing Date, (C) the date on which such Available Contract is deemed rejected by operation of 11 U.S.C. § 365(d)(4) or (D) the date required by the Bankruptcy Court and set forth in either the Bidding Procedures Order or the Sale Order (the "**Extended Contract Period**"). If such Available Contract is not expressly assumed by Buyer in writing by the end of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Contract. Buyer shall be responsible for any obligations or Liabilities arising during any Extended Contract Period relating to any Available Contract that has not been assumed or rejected as of the Determination Date as provided in this Section 2.05(a). For the avoidance of doubt, except as set forth in Section 2.03 and other than as provided in the preceding sentence, Buyer shall not assume or otherwise have any Liability with respect to any Excluded Contract.

(ii)     Each of Seller and Buyer, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Contracts to Buyer, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Buyer shall use commercially reasonable efforts to comply with all of the requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment.

(iii)     If, prior to the Closing Date, there are Available Contracts that have not been designated as an Assumed Contract or an Excluded Contract, Seller shall not assume or reject any such Available Contract pursuant to Section 365 of the Bankruptcy Code and any order of the Bankruptcy Court, until the earlier of (A) the date Buyer so directs Seller or (B) the end of the Extended Contract Period, if applicable (which assumption shall be at Buyer's sole cost and expense); provided, that Buyer shall be responsible for any obligations or Liabilities arising during any Extended Contract Period.

(iv)     At Closing, (A) Seller shall, pursuant to the Sale Order and the Assumption Agreement, assume and assign, or cause to be assigned, to Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned and (B) Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assumption Agreement.

(b)     Previously Omitted Contracts.

(i)     If prior to or following Closing, it is discovered that a Contract should have been listed on Schedule 2.05(a) but was not listed on Schedule 2.05(a) and has not been rejected by Seller (any such Contract, a "**Previously Omitted Contract**"), Seller shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Seller, no later than five (5) Business Days following notification of such Previously Omitted Contract from Seller, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**"). A Previously Omitted Contract designated in accordance with this Section 2.05(b)(i) as "Rejected," or with respect to which Buyer fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)     If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.05(b)(i), Seller shall serve a notice (the "**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Seller's intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.05. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to Seller and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties,

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 18 of 37

Seller and Buyer are unable to reach a consensual resolution with respect to the objection, Seller shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on Seller and Buyer, Seller shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract. Buyer shall be responsible for all Cure Costs relating to such "Assumed" Previously Omitted Contracts and for any obligations or Liabilities relating to such "Assumed" Previously Omitted Contracts arising during the Extended Contract Period.

(c)      Non-Assignment of Contracts and Permits. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a violation of a Legal Requirement or a breach of such Contract or Permit. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Seller, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Seller, nor Buyer shall be in breach of this Agreement, nor shall the Purchase Price be adjusted, nor shall the Closing be delayed in respect of the Assumed Contracts or the Permits (but subject to Buyer's termination right set forth in Section 8.01); provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained, from and after the Closing for a period of no more than six (6) months, Seller shall reasonably cooperate, at Buyer's sole cost and expense, with Buyer in any reasonable arrangement that Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or Transferred Permit, including enforcement for the benefit of Buyer of any and all rights of Seller against any party to the applicable Assumed Contract or Transferred Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or Transferred Permit, from and after the Closing, Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assumed Contract or Permit had been assigned or transferred at Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.05(c) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. Notwithstanding anything to the contrary contained herein, Buyer shall reimburse, indemnify and hold harmless Seller and/or its Affiliates from any and all Liabilities incurred by Seller and/or its Affiliates in connection with any action taken by Seller at Buyer's or its Affiliates' request pursuant to this Section 2.05(c).

**Section 2.06      Further Assurances**.

(a)      Except as otherwise provided herein and subject to the terms and conditions of this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, from and after the Agreement Date, Seller and Buyer shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated by this Agreement, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other

third party that are necessary, proper or advisable to consummate the transactions contemplated by this Agreement, in each case, after giving effect to the Sale Order.

**Section 2.07** [Reserved]**Purchase Price.**

Buyer shall pay the cash portion of the Purchase Price, and perform the other consideration constituting the balance of the Purchase Price, as follows:

(a) Buyer shall deposit Twenty Thousand Dollars ($20,000.00) within one (1) Business Day following the Agreement Date (the "**Deposit**") into an escrow account pursuant to the instructions provided by Seller. At the Closing, the Deposit shall be credited towards payment of the Purchase Price and paid to Seller or as otherwise directed by the Bankruptcy Court in the order approving the sale. If the Closing does not occur and this Agreement is terminated pursuant to Section 8.01(a)(iii), the Deposit shall be paid to Seller pursuant to directions provided by Seller. If the Closing does not occur and this Agreement is terminated for any reason other than those described in this Section 2.07(a), the Deposit shall be returned to Buyer.

(b) At the Closing, Buyer shall (i) make a cash payment of Thirty Thousand Dollars ($30,000.00) to CDS as set forth in wiring instructions provided by CDS to Buyer, and (ii) cause the Deposit to be released and paid to CDS.

(c) On or before the six month anniversary of the Closing Date Buyer shall make a cash payment of Fifty Thousand Dollars ($50,000.00) to CDS payable in immediately available funds by wire transfer to the account of CDS.

(d) On or before the one year anniversary of the Closing Date Buyer shall make a cash payment of Fifty Thousand Dollars ($50,000.00) to CDS payable in immediately available funds by wire transfer to the account of CDS.

(e) On or before July 15, 2021 Buyer shall make a cash payment of Two Hundred Thousand Dollars ($200,000.00) to CDS payable in immediately available funds by wire transfer to the account of CDS.

(f) Thereafter, for a period of 60 calendar months commencing on the first day of the first month following the closing, Buyer shall remit to CDS monthly payments in an amount equal to five percent (5.00%) of Buyer's Net profits (the "Net Profit Payments") from operation of the Practice. The first Net Profit payment shall be due thirty (30) days following the first full month after the Closing Date. Net Profit Payments shall by made by Buyer to CDS each month thereafter for 60 months.

(e) Commencing on the Closing Date, and continuing for a period of twelve (12) months (unless terminated earlier in writing by CDS on ten (10) days' notice), Buyer shall collect, as agent for Seller and for the benefit of CDS as the owner of same, the Accounts Receivable. A schedule of the then outstanding Accounts Receivable shall be delivered by Seller to Buyer on the Closing Date, with a copy of same provided at the same time to CDS. Buyer agrees to use commercially reasonable efforts in the ordinary course of business (but without the responsibility to institute legal or collection proceedings) to collect the Accounts Receivable and will remit all payments, less a handling fee of 5% of same, along with a complete accounting, to CDS as set forth in wiring instructions provided by CDS to Buyer. In the event that Buyer collects payment from an account debtor who, after the closing date, is in contractual privity with Buyer, and that account debtor was included among the Accounts Receivable as of the Closing Date,

Buyer shall apply such monies to the oldest outstanding balance due on the account, unless the payment in question is specifically marked as being in payment of an invoice for services rendered by Buyer. The foregoing rule will not apply in the case of a "disputed" account receivable. For purposes of this section, a "**Disputed Account Receivable**" means on which the account debtor refuses to pay because it asserts that the money is not owed or the amount is incorrect. In the case of such a disputed account, Buyer shall immediately return the account to Seller (or, if directed by CDS, to CDS). If Buyer returns a disputed account to Seller or CDS, Buyer shall have no further responsibility for its collection and may accept payment from the account debtor for services rendered by Buyer to the account debtor after the Closing Date. At the end of the 12 month period following the Closing Date, Buyer will turn back to Seller (or, if directed by CDS, to CDS) all of the Accounts Receivable as of the Closing Date owing to Seller which have not yet been collected, and Buyer will thereafter have no further responsibility with respect to the collection of such receivables. During the 12 month period following the Closing Date, and in addition to the above referenced monthly accounting, Buyer shall afford Seller and CDS reasonable access to the accounts receivable "aging list." Buyer acknowledges and agrees that it is acting as collection agent hereunder, and acquires no ownership interest in the Accounts Receivable, other than the handling fee set forth herein.

## ARTICLE III
## CLOSING

**Section 3.01    Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated pursuant to this Agreement (the "**Closing**") shall take place electronically on (a) the last Business Day of the month on which all of the conditions to Closing set forth in Article VII (other than those conditions which are to be satisfied at Closing, but subject to such conditions being satisfied at the Closing) are satisfied or waived, or (b) such other date as the Parties may mutually agree upon (the "**Closing Date**"). The Closing shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (determined by reference to the local time zone in which the Practice is located) on the first calendar day of the month after the Closing Date (the "**Effective Time**"). The Closing will take place remotely by electronic mail or other electronic exchange of documents, among and between the Parties and/or their respective counsel.

**Section 3.02    Closing Deliverables.**

(a)    At the Closing, Seller shall deliver to Buyer the following:

(i)    A Bill of Sale and Assignment in the form attached as Exhibit F (each, a "**Bill of Sale**") executed by each applicable Seller in favor of Buyer;

(ii)    An Assignment and Assumption Agreement in the form attached as Exhibit G (each, an "**Assumption Agreement**") executed by each applicable Seller in favor of Buyer;

(iii)    Certificates of existence and good standing of each Seller from the state of its incorporation or formation, each dated prior to the Closing Date;

(iv)    Certificates of title with respect to any vehicles included in the Acquired Assets duly executed by the applicable Seller;

(v)    Certificate of an officer of Seller certifying the satisfaction of the conditions to Closing set forth in Section 7.03;

(vi)     Certificate of incumbency for the officers of Seller executing this Agreement or making certifications for the Closing dated as of the Closing Date; and

(vii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)     At the Closing, Buyer shall deliver to Seller (or, in the case of the portion of the purchase Price to be paid at closing, to CDS if ordered by the Bankruptcy Court in the order approving the sale)  the following:

(i)     The above referenced portion of the Purchase Price by wire transfer of immediately available funds to an account designated in the order approving the Sale;

(ii)    A Bill of Sale executed by Buyer;

(iii)   An Assumption Agreement executed by Buyer;

(iv)    Copies of resolutions duly adopted by the Board of Directors (or similar governing body) of Buyer authorizing and approving such Party's execution and delivery of this Agreement and the consummation of the transactions by this Agreement certified by an officer of Buyer;

(v)     Certificates of existence and good standing of Buyer from the state of its incorporation or formation, each dated prior to the Closing Date;

(vi)    Certificates of an officer of Buyer certifying the satisfaction of the conditions to Closing set forth in Section 7.02;

(vii)   Certificates of incumbency for the respective officers of Buyer executing this Agreement or making certifications for the Closing dated as of the Closing Date; and

(viii)  A certified copy of the Sale Order.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except to the extent a representation or warranty speaks as of another date, as of the Agreement Date and as of the Closing Date, when read in light of any Schedules to this Article IV ("**Article IV Schedules**") that are updated prior to the Closing in accordance with the provisions of this Agreement, Seller represents and warrants to Buyer the following:

**Section 4.01     Closing. Corporate Capacity, Authority and Consents**. Seller is duly organized and validly existing under the Laws of the state of its formation or incorporation with the requisite organizational power and, subject to approval by the Bankruptcy Court, has authority to enter into this Agreement, and to perform its respective obligations hereunder. Subject to the entry of the Sale Procedures Order or any Sale Order, the execution, delivery and performance of this Agreement and all other agreements referenced herein to which Seller is or will become a party and the actions to be taken by Seller in connection with the consummation of the transactions contemplated herein:

(a)     are within the organizational powers of Seller, are not in contravention of applicable Law or the terms of the applicable Governing Documents;

Case 3:19-bk-01971   Doc 230-1   Filed 06/29/20   Entered 06/29/20 19:39:59   Desc
Exhibit A- Asset Purchase Agreement   Page 22 of 37

(b)    except as otherwise expressly herein provided or as set forth in Schedule 4.01(b), do not require any approval or consent of, or filing with, any Governmental Authority; and

(c)    will not violate any Law to which Seller is subject.

**Section 4.02    Binding Agreement**.  Subject to the entry of the Sale Order, this Agreement and all agreements to which Seller is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Seller, and are and will be enforceable against Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**Section 4.03    Assets.**

(a)    Seller owns valid title to, or possesses valid leasehold interests in, all of the Acquired Assets.  Seller has sole custody and control of all of the Acquired Assets, except with respect to any Permitted Encumbrances or as otherwise set forth on Schedule 4.03(a).

(b)    Subject to the entry of the Sale Order, the Acquired Assets are free and clear of all Encumbrances except Permitted Encumbrances.

**Section 4.04    Material Contracts**. Schedule 4.04 sets forth a list of the following commitments, contracts, leases and agreements of Seller, in each case relating to the Practice: contracts involving the lease of equipment or personal property that require payments by Seller of greater than $50,000 during the remaining term or on an annual basis (the "**Material Contracts**").  Seller has made available to Buyer copies of all of the Material Contracts.

**Section 4.05    Reserved.**

**Section 4.06    Insurance.**

(a)    Seller maintains policies of insurance insuring the Acquired Assets and the Practice with extended coverage in amounts that are prudent, reasonable and sufficient in light of industry custom. Valid policies in such amounts have been issued, are outstanding and are in full force and effect (the "**Insurance Policies**"). All such Insurance Policies are set forth on Schedule 4.06(a). True, correct and complete copies or originals of all such Insurance Policies set forth on Schedule 4.06(a) have been delivered by Seller to Buyer. All of such Insurance Policies are in full force and effect on an occurrence basis or as otherwise noted with no premium arrearages. Except as would not have a Material Adverse Effect, no insurer has denied coverage of any claims or actions with respect to the Acquired Assets and the Practice or reserved such insurer's rights in respect of or rejected any claims with respect to the Acquired Assets and/or the Practice. Seller has not (i) received any notice or other communication from any insurer canceling or amending any of the Insurance Policies with respect to the Acquired Assets and the Practice, and no such cancellation or amendment has been threatened, or (ii) failed to give any required notice or present any claim which is still outstanding under any of such Insurance Policies with respect to the Acquired Assets and the Practice.

(b)    With respect to malpractice Insurance Policies, Seller hereby represents and warrants that each health care provider that is employed by or under Contract with Seller currently maintains malpractice Insurance Policies in amounts of not less than One Million and 00/00 Dollars

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 23 of 37

($1,000,000.00) per occurrence and Three Million and 00/100 Dollars ($3,000,000.00) in the aggregate on a "claims made" or "occurrence" basis.

**Section 4.07     Employees and Employee Matters.**  Schedule 4.07(a) sets forth a list, as of the Agreement Date, of all current employees and independent contractors of Seller and/or the Practice and each such employee's and independent contractor's (i) current base salary or base wage rates, (ii) accrued hours of paid time off, (iii) accrued hours of short-term and long-term sick leave, (iv) recognized date of hire and (v) job title or other summary of the responsibilities of such employee. Schedule 4.07(a) also indicates whether such employees are part-time, full-time, per diem or on a leave of absence and their regularly scheduled hours per week. Seller and Seller's Plans have properly classified individuals providing services to Seller and the Practice as independent contractors or employees, as the case may be. All current employees of Seller and/or the Practice are employed on an "at-will" basis unless otherwise specified in Schedule 4.07(a).

(b)     No changes in the amount and/or basis for remuneration of any employees of any Seller have been made or agreed to in writing by a Seller since January 31, 2020, except in the Ordinary Course of Business and consistent with the past practices of the Practice.**Seller's Plans and ERISA.** Schedule 4.08 lists all deferred compensation, incentive compensation, equity purchase or other equity-based, retention, change in control, severance or termination pay, hospitalization or other medical, life, dental, vision, disability or other insurance, supplemental unemployment benefits, profit-sharing, pension or retirement plans, programs, agreements or arrangements, and each other fringe or other employee benefit plan, program, agreement or arrangement (including any "**Employee Benefit Plan**" within the meaning of Section 3(3) of ERISA), sponsored, maintained or contributed to or required to be contributed to by Seller or any of its subsidiaries or by any ERISA Affiliate of Seller or any of its subsidiaries for the benefit of any current or former employee, independent contractor or director (and/or their dependents or beneficiaries) of Seller or its subsidiaries, or with respect to which Seller, its subsidiaries or any ERISA Affiliate of Seller or its subsidiaries otherwise has any liabilities or obligations (each, a "**Seller's Plan**" and, collectively, the "**Seller's Plans**").

**Section 4.09     Third Party Reimbursement.** The Practice is certified to participate in the Medicare, Medicaid and TRICARE programs with valid and current provider or supplier agreements under such programs.

**Section 4.10     Reserved.**

**Section 4.11     ;**

**Section 4.12     Full Disclosure.** No representation or warranty by any Seller in this Agreement, nor any statement, document, certificate, schedule, or exhibit furnished or to be furnished by or on behalf of any Seller pursuant to this Agreement, nor any document or certificate delivered to Buyer by any Seller pursuant to this Agreement or in connection with the transactions contemplated hereby, contains or shall contain any materially untrue statement of material fact or omits or shall omit a material fact necessary to make the statements contained therein not materially misleading.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

As of the Agreement Date and as of the Closing Date, when read in light of any Schedules to this Article V ("**Article V Schedules**"), Buyer represents and warrants to Seller that the statements contained in this are true and correct:

34180697 v9                                         24

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 24 of 37

**Section 5.01    Capacity, Authority and Consents.** Buyer is duly organized and validly existing in good standing under the Laws of the state of its incorporation or formation with the requisite power and authority to enter into this Agreement, to perform its respective obligations hereunder and to conduct its business as now being conducted. The execution, delivery and performance of this Agreement and all other agreements referenced herein to which Buyer is or will become a party and the actions to be taken by Buyer in connection with the consummation of the transactions contemplated herein:

(a)    are within the powers of Buyer, are not in contravention of applicable Law or the terms of the Governing Documents of Buyer and have been duly authorized by all appropriate action;

(b)    except as otherwise expressly herein provided or as set forth on Schedule 5.01(b), do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c)    except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of, the maturity of, or termination of, or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Buyer is a party or otherwise bound that could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement; and

(d)    will not violate any Law to which Buyer is subject.

**Section 5.02    Binding Agreement**. This Agreement and all agreements to which Buyer is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Buyer, and are and will be enforceable against Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**Section 5.03    Litigation and Proceedings**.  There are no Actions pending or, to Buyer's knowledge, threatened against Buyer, or any governing Persons thereof, at Law or in equity, or before or by any Governmental Authority, that if adversely determined could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement.

**Section 5.04    Availability of Funds**. Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

**Section 5.05    Brokers and Finders**.  There are no claims for brokerage commissions, finders' fees, financial advisors' fees or similar compensation in connection with this Agreement or the transactions contemplated hereunder, based on any Contract to which Buyer is a party or that is otherwise binding on Buyer, and no Person is entitled to any fee or commission or like payment in respect thereof.

**Section 5.06    Statements True and Correct.** The representations and warranties of Buyer contained in this Agreement and any other documents related to the transactions contemplated hereunder, the statements contained in the Schedules or certificates or other documents furnished, or to be furnished, to Seller pursuant to this Agreement do not and will not contain any untrue statement of a material fact, or omit to state any material fact necessary to make the statements or facts contained therein with respect to Buyer not misleading.

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 25 of 37

# ARTICLE VI
## COVENANTS

**Section 6.01    Conduct of Business Prior to the Closing.** From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall (a) conduct the Business in the Ordinary Course of Business; and (b) use commercially reasonable efforts to maintain and preserve intact the Business's current organization, operations and franchise and to preserve the rights, goodwill and relationships of its Employees, customers, lenders, suppliers, regulators and others having relationships with the Business. From the Agreement Date until the Closing Date, except as consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall not take any action that would cause any Material Adverse Effect to occur.

**Section 6.02    Access and Due Diligence Review.**

(a)    <u>Access</u>. From and after the Agreement Date until the Closing or the earlier termination of this Agreement, Seller shall provide Buyer and its representatives reasonable access to and, as applicable, the right to inspect the facilities, properties, books and records of the Practice; *provided, however*, that such access shall be subject to prior written approval by Seller and shall be coordinated through persons as may be designated in writing by Seller for such purpose.

(b)    <u>Due Diligence Review.</u> Within and during the thirty (30)-day period following the Agreement Date (the "**Interim Period**"), Seller shall furnish Buyer with such additional financial and operating data and other information as to the business and properties of the Practice as reasonably requested, including copies of the updated Financial Statements following each calendar month during the Interim Period.  Notwithstanding the foregoing, all disclosures of information shall be consistent with any other nondisclosure agreements or other obligations entered into between the Parties. Buyer's right of access and inspection shall be exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the Practice.

**Section 6.03    Supplement to Schedules.** From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**").

**Section 6.04    Negative Covenants**. During the Interim Period, except as required by Law or as ordered by the Bankruptcy Court, Seller shall not, with respect to the Practice, without the prior written consent of Buyer (which shall not be unreasonably withheld, conditioned or delayed):

(a)    amend or terminate any of its contracts, enter into any contract or commitment, except with respect to any such contract or commitment that is amended, terminated or entered into in the Ordinary Course of Business and that, over the terms of such contract or commitment involves less than $25,000 or can be terminated without cause by a Seller on ninety (90) days' notice or less without penalty:

(b)    increase compensation payable or to become payable, make any bonus payment to, or otherwise enter into one or more bonus agreements with, any Employee, except in the Ordinary Course of Business in accordance with existing personnel policies and consistent with prior practice or with respect to any retention bonuses which are to be paid in full prior to the Closing Date; or

(c)    sell, assign, lease or otherwise transfer or dispose of any property, plant or equipment or other asset used in connection with the operation of the Practice, except in the Ordinary Course of Business.

**Section 6.05    Bankruptcy Court Approval; Executory Contracts; Sale Procedures; and Stalking Horse Provisions.**

(a)    Seller shall use its best efforts to gain approval by the Bankruptcy Court of the purchase and sale of the Acquired Assets and the assumption and assignment of all Proposed Assumed Contracts and Assumed Liabilities contemplated hereby to the fullest extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Sale Procedures Order and Sale Order. Seller shall serve on all non-Seller counterparties to all of the Proposed Assumed Contracts a notice specifically stating that Seller may be seeking the assumption and assignment of the Available Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs stated in such notices, if any, which deadline shall not be less than ten (10) Business Days prior to the Sale Hearing.

(b)    From and after the date hereof and until the Closing Date or the termination of this Agreement, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Procedures Order or this Agreement.

(c)    This Agreement is subject to approval by the Bankruptcy Court. Following the signing of this Agreement, Seller shall not initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Acquired Assets. In addition, unless otherwise directed by the Bankruptcy Court, Seller shall not respond to or pursue any other proposed material transaction involving all or substantially all of the Acquired Assets (each an "**Alternative Transaction**") or perform any other acts related thereto.

(d)    The Sale Order shall contain the following provisions:

(i)    approval of this Agreement, including the sale of the Acquired Assets, which shall vest in Buyer all right, title, and interest of Seller to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances), Excluded Liabilities and interests pursuant to Section 363(f) of the Bankruptcy Code with payment therefor to CDS;

(ii)    a finding that Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, the contemplated transactions have been undertaken by Seller and Buyer at arm's length and without collusion, and Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(iii)    Buyer shall have no successor Liability on account of the purchase or sale of the Acquired Assets, except on account of Assumed Liabilities;

(iv)    due notice of the Sale Procedures Order, the Sale Order, and this Agreement shall have been provided;

(v)    the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement and the Sale Order in all respects.

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 27 of 37

(e)     In the event the entry of the Sale Procedures Order or Sale Order shall be appealed, Seller shall use its best efforts to defend such appeal.

**Section 6.06**     Approvals.  Prior to the Closing Date, Seller shall cooperate with Buyer in respect to any necessary actions required to transfer or vest in Buyer any and all Permits necessary to Buyer's establishment, ownership, development and operation of the Practice at Buyer's sole cost and expense (the "**Change of Ownership**" or the "**CHOW**") .

# ARTICLE VII
# CONDITIONS TO CLOSING

**Section 7.01**     **Reserved.**

**Section 7.02**     **Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Representations and Warranties; Covenants.

(i)     The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects, when read in light of any Article IV Schedules or Article V Schedules that are updated prior to the Closing Date in accordance with the this Agreement, as of the Agreement Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date; provided that this condition shall be deemed satisfied so long as the failure of such representations and warranties to be true and correct would not result in a Material Adverse Effect. All of the covenants in this Agreement to be complied with or performed by Seller on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects.

(ii)     For the avoidance of doubt, Buyer agrees that (i) Buyer shall not be excused from consummating the transactions contemplated by this Agreement and (ii) Buyer will not assert the failure or the alleged failure of a representation or warranty made by Seller to be true as a basis for not consummating the transactions contemplated by this Agreement if the conditions set forth in Sections 7.02(a)(i) are satisfied.

(b)     Required Governmental Approvals Consents. Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that the Parties have obtained the CHOW approvals from applicable Governmental Authorities the approvals and consents set forth on Schedule 7.02(b) to effect the transactions set forth in this Agreement and to enable Buyer to operate the Practice (the "**Required Governmental Approvals**").

(c)     Actions and Proceedings.  No Governmental Authority shall have issued any Order that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(d)     Material Adverse Effect.  There shall not have been any Material Adverse Effect in respect of the Practice or the Acquired Assets since the Balance Sheet Date.

(e)     Closing Deliveries.  Seller shall have executed and delivered, or caused to have been executed and delivered, to Buyer the documents and items described in Section 3.02(b).

34180697 v9                                         28

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 28 of 37

(f)     <u>Bankruptcy Court Approval</u>. Seller shall have obtained the Sale Order from the Bankruptcy Court and the Sale Order shall be in full force and effect, and no order staying, reversing or vacating the Sale Order shall be in effect.

(g)     <u>Due Diligence Review</u>.  Buyer shall have completed its due diligence review.

(h)     <u>Employment Agreements.</u>  Buyer shall have negotiated employment agreements with all clinicians, staff for terms, and/or incentives to Buyer.

**Section 7.03     Conditions to Obligations of Seller.** Notwithstanding anything herein to the contrary, the obligations of Seller to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Seller on or prior to the Closing:

(a)     <u>Pre-Closing Confirmations</u>. Seller shall have obtained documentation or other evidence reasonably satisfactory to Seller that the Parties have obtained the Required Governmental Approvals.

(b)     <u>Actions and Proceedings</u>.  No Governmental Authority shall have issued any Order that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

(c)     <u>Closing Deliveries</u>.  Buyer shall have executed and delivered, or caused to have been executed and delivered, to Seller the documents and items described in Section 3.02(a).

(d)     <u>Cure Amounts</u>.  Any and all Cure Amounts shall have been paid by Buyer except for those Cure Amounts that are to be paid in full at the Closing.

# ARTICLE VIII
# TERMINATION

**Section 8.01     Termination.**

(a)     Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i)      by the mutual written consent of Seller and Buyer;

(ii)     by Buyer, if Seller breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 7.02;

(iii)    by Seller, if Buyer breaches or fails to perform in any material respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 7.03;

Case 3:19-bk-01971   Doc 230-1   Filed 06/29/20   Entered 06/29/20 19:39:59   Desc
Exhibit A- Asset Purchase Agreement   Page 29 of 37

(iv)     by either Party after August 31, 2020 (the "**Termination Date**") if the conditions contained in Section 7.02 or Section 7.03, as applicable, to which such Party's obligations hereunder are subject, have not been fulfilled or waived; provided, however, that the right to terminate this Agreement pursuant to this Section 8.01(a)(iv) shall not be available if the failure of the Party so requesting termination to fulfill any obligation under this Agreement shall have been the cause of the failure of such condition to be satisfied on or prior to such date;

(v)     By either Party in the event the Bankruptcy Court approves an Alternative Transaction; or

(vi)     By Buyer in the event (A) Seller enters into a definitive agreement with a buyer other than Buyer for the sale of all or some of the Acquired Assets or (B) the Bankruptcy Court approves a sale of all or some of the Acquired Assets with a buyer other than Buyer.

The Party seeking to terminate this Agreement pursuant to this Section 8.01(a) (other than Section 8.01(a)(i)) shall give prompt written notice of such termination to the other Parties.

(b)     In the event of a termination of this Agreement each Party shall pay the costs and expenses incurred by it in connection with this Agreement. Subject to the provisions of this Section 8.01, the rights of termination set forth above are in addition to any other rights a terminating Party may have under this Agreement, and the exercise of a right of termination will not be an election of remedies. Notwithstanding the foregoing sentence, in the event of any termination of this Agreement by either Buyer or Seller as provided in Section 8.01(a)(i), this Agreement shall forthwith become void, and there shall be no Liability on the part of any Party or any of its Affiliates to any other Person resulting from, arising out of, relating to, or in connection with this Agreement or any other document related to the transactions contemplated herein, except that (i) nothing in this Agreement or any other document related to the transactions contemplated herein will relieve any Party from liability for any material breach of this Agreement or any other document related to the transactions contemplated hereunder prior to such termination or for fraud, intentional misrepresentation or willful or criminal misconduct, and (ii) Seller's obligations to pay Buyer the Break-Up Fee in accordance with Section 6.05(d) of this Agreement and the Sale Procedures Order shall survive any termination of this Agreement.

**Section 8.02     Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no Liability on the part of any party hereto except that nothing herein shall relieve any party hereto from Liability for any intentional breach of any provision hereof.

# ARTICLE IX
## ADDITIONAL AGREEMENTS

**Section 9.01     Post-Closing Filings and Access to Information.**

(a)     After the Closing, each Party shall promptly deliver to the other Party upon reasonable notice copies of any post-closing filings, financial statements or reports that may be required to be prepared and delivered to any Governmental Authority as a result of the consummation of the transactions described herein, in each case at the sole cost and expense of the requesting Party.

(b)     The Parties acknowledge that, subsequent to the Closing, Seller an/d or CDS may need access to information or documents in the control or possession of Buyer for the purposes of

concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third party claims. Accordingly, Buyer shall for a period of three (3) years after the Closing, and indefinitely with respect to any Governmental Authority or third party claims, maintain in accordance with retention requirements under applicable Law and make reasonably available to Seller and its respective Representatives and/or Governmental Authorities, upon written request and at the expense of Seller, such documents and information as may be available relating to the Practice for periods prior to the Closing Date to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(c)     The Parties acknowledge that subsequent, to the Closing, Buyer may need access to information or documents in the control or possession of Seller for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, the prosecution or defense of third party claims, and collection of the Accounts Receivable for the benefit of CDS as set forth in Section 2.07. Accordingly, for a period of three (3) years after the Closing, and indefinitely with respect to any Governmental Authority or third party claims, Seller shall maintain in accordance with retention requirements under applicable Law and make reasonably available to Buyer and its Representatives and/or Governmental Authorities, upon written request and at the expense of Buyer, such documents and information as may be available relating to the Practice to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(d)     Buyer acknowledges that subsequent to the Closing, CDS is entitled to such periodic auditing as may be reasonably requested in order to determine whether Buyer has correctly calculated the Net Profit Payments and the collection of the Accounts Receivable. In order to ensure Buyer's full compliance with its obligations under Section 2.07, Seller and/or CDS shall have the right to examine Buyer's books and records necessary to determine its calculation of Net Profits and Accounts Receivable collected. At any reasonable time within one (1) year after receipt of any statement furnished by Buyer to Seller and/or CDS, and upon thirty (30) days' prior written notice to Buyer, Seller and/or CDS shall each have the right to audit Buyer's books and records related to its calculation of Net Profits for the period covered by such statement. CDS and/or Seller shall take reasonable measures to prevent disruption to Buyer's business in order to inspect, examine or audit Buyer's books and accounts. Is such an audit reveals errors in record keeping, Buyer shall correct such discrepancies as soon as possible thereafter and shall inform Seller and CDS in writing o the action taken to correct such errors. If such audit reveals a deficiency in the payments to be made by Buyer, then such deficiency shall become immediately due and payable by Buyer to CDS. Any such audit shall be performed by an auditors of CDS' choosing, in its sole and absolute discretion. To the extent than any such audit reveals a discrepancy that is in excess of five percent (5%) of the actual payments made by buyer to CDS, Buyer shall be liable to CDS for the cost of such audit, as well as the costs of the next subsequent audit.

### Section 9.02    Employee Matters.

(a)     Upon the Closing Date, Seller or its Affiliates shall terminate the employment of all of the Employees currently employed by Seller or its Affiliates and Buyer, subject to satisfactory results from standard background screening conducted pursuant to Buyer's personnel policies, and in its sole discretion, may make offers of employment to, and subject to employee resignations or terminations of employees for cause, retain for a period of three (3) months following the Closing Date, all such Employees (whether in active or leave of absence status) currently in good standing into positions (including job title, reporting structure and responsibilities) with Buyer that are substantially equivalent to the positions with Seller occupied by the respective Employees on the Closing Date. Buyer may provide each Employee who

accepts such offer (collectively, the "**Transferred Employees**") with a combined level of compensation and benefits that are comparable to such Employee's combined level of compensation and benefits with Seller as of the Closing Date through the three (3)-month anniversary thereof. For purposes of this Agreement, Employees shall be considered to be in good standing if they are in compliance with Seller's standard hiring and personnel policies.

(b)     In respect of Transferred Employees employed by Buyer pursuant to offers made in accordance with Section 9.02(a), existing seniority or periods of service with Seller or its Affiliates of all such Transferred Employees shall be recognized for plan benefits purposes and credited for eligibility and vesting purposes with respect to Buyer's Employee Benefit Plans. Buyer agrees to adopt (or cause to be adopted) any necessary plan amendments to effectuate the foregoing provisions. Buyer shall cause each of its Employee Benefit Plans in which any Transferred Employee becomes eligible to participate to waive all limitations as to pre-existing conditions and waiting periods with respect to participation and cover-age requirements for any Transferred Employees and their eligible dependents. Buyer agrees to accept direct rollovers of any electing Transferred Employees from Seller's retirement savings plan and Buyer agrees to cause the account balances of any electing Transferred Employees to be rolled over in cash to Buyer's defined contribution plan which satisfies the requirements of Code Section 401(k). Buyer acknowledges and agrees that Buyer will honor the terms any employment, severance, union or other contracts between the Transferred Employees and Seller.

(c)     Buyer shall not assume any obligations of Seller related to Seller's or its Affiliates' Employee Benefit Plans.

**Section 9.03     Medical Staff.**  To ensure continuity of care in the applicable community, Buyer agrees that the medical staff members of the Practice who are in good standing as of the Closing Date shall maintain medical staff privileges at the Practice as of the Closing. After the Closing, the medical staff will be subject to the Medical Staff Bylaws of the Practice then in effect, as amended from time to time.

**Section 9.04     Misdirected Payments; Refunds and Remittances.**

(a)     At any time following Closing, to the extent there are any misdirected funds forwarded to Seller by any third parties, including but not limited to any third party payors, which misdirected funds are paid in respect of the performance of services by Buyer, Seller shall remit such misdirected funds to Buyer within five (5) Business Days after the receipt thereof, to the account(s) designated by Buyer. Seller and Buyer understand and acknowledge that all payments by third parties, including but not limited to any third party payors, in respect of licensed provider numbers for goods and services provided on or after the Closing Date shall be solely for the account of Buyer. To the extent that there are any misdirected funds forwarded to Buyer by any third parties, including but not limited to any third party payors, which misdirected funds are paid in respect of the Excluded Assets, Buyer shall remit such misdirected funds to CDS within five (5) Business Days after receipt thereof, to the account(s) designated by CDS. Buyer and Seller will cooperate with one another, and with CDS, with respect to the disclosure of receipts and inspection of books and records needed to implement the agreements and provisions set forth under this Section 9.04.

(b)     Following the Closing:  (i) if Seller or any of its Affiliates receive any refund or other amount in respect to the Practice or that constitutes an Acquired Asset in any way, or is otherwise properly due and owing to Buyer in accordance with the terms of this Agreement, Seller promptly shall remit, or shall cause to be remitted, such amount to Buyer; and (ii) if Buyer or any of its Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Seller or any of its Affiliates in accordance with the terms of this Agreement, Buyer promptly shall remit, or shall cause to be remitted, such amount to CDS.

34180697 v9                                    32

Case 3:19-bk-01971     Doc 230-1     Filed 06/29/20     Entered 06/29/20 19:39:59     Desc
Exhibit A- Asset Purchase Agreement     Page 32 of 37

(c)    For the avoidance of doubt, the Parties agree and acknowledge that the provisions of this Section 9.04 shall survive the Closing and the Parties shall take any actions and enter into any necessary agreements required to effectuate the provisions herein as reasonably requested by Buyer, Seller and/or CDs and consistent with applicable Laws and the terms of this Agreement.

**Section 9.05    Waiver of Bulk Sales Law Compliance.** Buyer hereby waives compliance by Seller with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Acquired Assets are located and all other similar laws applicable to bulk sales and transfers.

# ARTICLE X
## GENERAL PROVISIONS

**Section 10.01    Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is one (1) year from the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms.

**Section 10.02    Additional Assurances.** The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request of a Party, or of CDS the other Party or Parties shall execute such additional instruments and take such additional action as the requesting Party or CDS may deem necessary to effectuate this Agreement. In addition and from time to time after the Closing Date, Seller and Buyer shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party or CDS may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of the Acquired Assets ,to ensure the transfer of the Practice, and to ensure the full payment and performance of all aspects of the Purchase Price to CDS by Buyer

**Section 10.03    Consents, Approvals, and Discretion.** Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a Party or a Party must or may exercise discretion, such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised.

**Section 10.04    Choice of Law; Venue.** This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Tennessee, without regard to conflicts of law principles. The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction over all disagreements, disputes or claims arising out of or relating to this Agreement or the transactions contemplated hereunder that cannot be settled by the relevant Parties or CDS, including any claims for injunctive relief.  In the event the Bankruptcy Case has closed or if the Bankruptcy Court otherwise declines to exercise jurisdiction, the Parties agree that all disagreements, disputes or claims arising out of or relating to this Agreement or the transactions contemplated hereunder that cannot be settled by the relevant Parties or CDS, including any claims for injunctive relief, shall be brought in the state or federal courts sitting and located in Nashville, Davidson County, Tennessee, and the Parties agree to submit to the jurisdiction of such courts and agree to waive any claims of improper venue or *forum non conveniens* in respect of such courts.

**Section 10.05    Benefit, Assignment, and Third-Party Beneficiaries.**  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their

respective legal representatives, successors and assigns; *provided, however*, that no Party may assign this Agreement without the prior written consent of the other Party except that Buyer may assign its rights, but not its liabilities, hereunder to a wholly owned subsidiary of Buyer ("**Buyer's Subsidiary**"), that is licened or otherwise eligible to own and operate a medical practice in the state of Tennessee and Buyer may collaterally assign its rights, but not its obligations, under this Agreement to any party that provides funding for the transactions hereunder as additional security for Buyer's obligations to such party without the prior written consent of Seller.  The Parties acknowledge that Buyer may assign ownership and title to certain of the Acquired Assets to certain designees of Buyer, such that more than one entity may own the Acquired Assets at Closing.  ***The Parties acknowledge and agree that CDS is the intended third party beneficiary of Seller's rights under this Agreement, and may pursue against Buyer, its successor and assigns, in its own name, any rights or benefits conferred upon Seller by this Agreement.  In addition, Seller may not, expressly or by implication, waive any rights under this Agreement to the detriment of CDS.***

**Section 10.06   Cost of Transaction**. Except as may be provided to the contrary elsewhere herein: (a) Buyer shall pay the fees, expenses and disbursements incurred by Buyer and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto; and (b) Seller shall pay the fees, expenses and disbursements incurred by Seller and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto.

**Section 10.07   Waiver of Breach.**  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof, and under no circumstances shall any waiver of any rights by Seller be attributed to CDS.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**Section 10.08   Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) upon delivery to the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.08):

| | |
|---|---|
| If to Seller: | Capstone Pediatrics, PLLC |
| | 1420 Donelson Pike, Suite B-17 |
| | Nashville, TN 37214 |
| | Phone: (615) 339-8110 |
| | Fax: (877) 305-3637 |
| | Attention: Jim Davis, Chief Restructuring Officer |

<table>
<tr><td>with a copy to:</td><td>Burr & Forman LLP<br>222 Second Ave South, Suite 2000<br>Nashville, TN 37201<br>Phone: (615) 724-3215<br>Fax: (615) 724-3315<br>E-mail: dhouston@burr.com<br>Attention: David W. Houston, IV</td></tr>
</table>

|                  |                                                                                                                                                                                          |
|------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| with a copy to:  | Burr & Forman LLP  <br> 222 Second Ave South, Suite 2000 <br> Nashville, TN 37201 <br> Phone: (615) 724-3215 <br> Fax: (615) 724-3315 <br> E-mail: dhouston@burr.com <br> Attention: David W. Houston, IV |
|                  | Puryear Law Group, PLLC <br> 104 Woodmont Blvd, Suite 201 <br> Nashville, TN 37205 <br> Phone: (615)255-4859 <br> Fax: (615)630-6602 <br> E-Mail: dpuryear@puryearlawgroup.com <br> Attention: Daniel H. Puryear |
| If to Buyer:     | America Cares Trust (ACT) <br> 5655 Granny White Pike <br> Brentwood, TN 37027 <br> Fax: _____ <br> E-mail: _____ <br> Attention: Michael Gaw |
| with a copy to:  | Smythe Huff & Murphy, PC <br> 1222 16th Avenue South <br> Suite 301 <br> Nashville, TN  37212 <br> Phone: (615) 255-4849 <br> Fax:     (615) 255-4855 <br> E-mail: mmurphy@smythehuff.com <br> Attention: Matthew R. Murphy |

**Section 10.09   Severability**. In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms, unless the materiality of the stricken clause invalids the benefit and effect of this Agreement to the Parties and/or CDS as the intended third party beneficiary of the Seller..

**Section 10.10   Interpretation**. In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation, (b) "or" has the inclusive meaning "and/or", (c) "and/or" means "or" and is used for emphasis only, (d) "$" refers to United States dollars, (e) the singular includes the plural, and vice versa, and each gender includes each other gender, (f) captions or headings are only for reference and are not to affect the construction hereof or be considered in interpreting this Agreement, (g) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (h) "Exhibit" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (i) "Schedule" refers to a schedule to this Agreement and incorporates any attachments thereto (which are incorporated herein by

reference), unless otherwise stated in this Agreement, (j) all references to times are times in Nashville, Tennessee, (k) "day" refers to a calendar day unless expressly identified as a Business Day, and (l) "made available to Buyer" or similar phrases means information included in a virtual Data Room maintained by Seller to which Buyer and their representatives have had access prior to the Agreement Date or Closing Date, as applicable.

      **Section 10.11   Public Disclosure**. Without the prior written consent of the other party, neither party will make any public disclosure or issue any press release pertaining to this Agreement, or to the acquisition contemplated herein, excepting only those disclosures which may be compelled by court order or are made to comply with the requirements of any law, governmental order or regulation, or as necessary to enforce the terms of this agreement in any subsequent action brought by CDS.

      **Section 10.12   Entire Agreement, Amendments and Counterparts**. This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof and constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein. As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements or prior written material. All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties. This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Signatures received via facsimile or other electronic transmission shall be accepted as originals. Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each Party.

      **Section 10.13   Personal Liability**. This Agreement shall not create or be deemed to create or permit any personal Liability or obligation on the part of any direct or indirect equity holder of any Party or any officer, director, employee, investor or other Representative of any Party.

      **Section 10.14   Disclosure Generally**. Notwithstanding anything to the contrary contained in the Article IV Schedules, the Article V Schedules or in this Agreement, the information and disclosures contained in any Article IV Schedule or Article V Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Article IV Schedule or Article V Schedule for which applicability of such information and disclosure is reasonably apparent on its face. The fact that any item of information is disclosed in any Article IV Schedule or Article V Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement.

      **Section 10.15   Time of Essence**. Time is of the essence with regards with all dates and time periods set forth or referred to in this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

[SELLER NAME]

By_____

Name:

Title:

[BUYER NAME]

By_____

Name:

Title:

34180697 v9                                        37

Case 3:19-bk-01971    Doc 230-1    Filed 06/29/20    Entered 06/29/20 19:39:59    Desc
Exhibit A- Asset Purchase Agreement    Page 37 of 37