# EXHIBIT A

**Lease**

See attached.

# LEASE AGREEMENT

## BETWEEN

## FOUR PLUS CORPORATION,

## AS LANDLORD,

## AND

## CAPSTONE PEDIATRICS, PLLC,

## AS TENANT

DATED ~~SEPTEMBER~~ October 31, 2016

## SMYRNA PHYSICIANS PAVILION
## SMYRNA, TENNESSEE

## BASIC LEASE INFORMATION

| | |
|---|---|
| Lease Date: | ~~September~~ October 31, 2016 |
| Landlord: | **FOUR PLUS CORPORATION**, a New York Corporation |
| Tenant: | **CAPSTONE PEDIATRICS, PLLC**, a Tennessee professional limited liability company |
| Project: | That certain two-story building, containing approximately 35,036 rentable square feet of office area (the "**Building**") to be constructed as outlined on the site depiction attached to the Lease as EXHIBIT A and the building specifications thereof. The land on which the Building is located (the "**Land**") is described on EXHIBIT B. The term "**Project**" shall collectively refer to the Building, the Land and the driveways, parking facilities, and similar improvements and easements associated with the foregoing and located on the Land. Landlord and Tenant stipulate that the number of rentable square feet in the Building set forth above is conclusive and shall be binding upon them. |
| Tenant's Proportionate Share: | 12.92%, which is the percentage obtained by dividing (a) the number of rentable square feet in the Premises as stated above by (b) the 35,036 rentable square feet in the Building. Landlord and Tenant stipulate that the number of rentable square feet in the Premises and in the Building set forth above is conclusive and shall be binding upon them. |
| Premises: | Suite No. ___, containing approximately 4,526 rentable square feet of space within the Building as highlighted on the building floor plan provided for in EXHIBIT G. |
| Term: | Approximately 120 months, commencing on the Commencement Date and ending at 5:00 p.m. local time on the last day of the 123rd full calendar month following the Commencement Date, subject to adjustment and earlier termination as provided in the Lease. |
| Commencement Date: | The earliest of (a) the date on which Tenant occupies any portion of the Premises and begins conducting business therein, or (b) one hundred twenty (120) days after the Lease Date set forth above. |
| Basic Rent: | Basic Rent shall be the following amounts for the following periods of time: |

| Lease Month | Annual Basic Rent per Rentable Square Foot in the Premises | Monthly Basic Rent |
|---|---|---|
| 1 thru 12 | $18.00 | $6,789.00 |
| 13 thru 24 | $18.54 | $6,992.67 |
| 25 thru 36 | $19.10 | $7,203.88 |
| 37 thru 48 | $19.67 | $7,418.87 |
| 49 thru 60 | $20.26 | $7,641.40 |
| 61 thru 72 | $20.87 | $7,871.47 |

1

| | | |
|---|---|---|
| 73 thru 84 | $21.49 | $8,105.31 |
| 85 thru 96 | $22.14 | $8,350.47 |
| 97 thru 108 | $22.80 | $8,599.40 |
| 109 thru 120 | $23.49 | $8,859.65 |

As used herein, the term "**Lease Month**" shall mean each calendar month during the Term (and if the Commencement Date does not occur on the first day of a calendar month, the period from the Commencement Date to the first day of the next calendar month shall be included in the first Lease Month for purposes of determining the duration of the Term and the monthly Basic Rent rate applicable for such partial month).

Basic Rent shall be adjusted as provided in Section 4(a) hereof.

| | |
|---|---|
| Rent: | Basic Rent, Additional Rent, and all other sums that Tenant may owe to Landlord or otherwise be required to pay under the Lease. |
| Security Deposit | The sum of $6,789.00 ("**Security Deposit**"). The Security Deposit shall be paid by Tenant to Landlord contemporaneously with Tenant's execution of this Lease. |
| Permitted Use: | General medical and administrative office use, including pediatric services |
| Initial Liability Insurance Amount: | $2,000,000 |
| Amount of Construction Allowance: | $200,000.00 |
| Tenant's Address: | Capstone Pediatrics<br>310 25th Avenue North, Suite 201<br>Nashville, TN 37203<br>(615) 610-3900 Phone |
| Landlord's Address: | Four Plus Corporation<br>5251 Hampstead High Street<br>Suite 300<br>Montgomery, AL 36116<br>Attn: President<br>(334) 215-4448 Phone<br>(334) 215-4458 Fax |

The foregoing Basic Lease Information is incorporated into and made a part of the Lease identified herein. If any conflict exists between any Basic Lease Information and the Lease, then the Lease shall control.

2

# LEASE AGREEMENT

This Lease Agreement (this "**Lease**") is entered into as of September __, 2016, between **FOUR PLUS CORPORATION** ("**Landlord**"), and **CAPSTONE PEDIATRICS, PLLC** ("**Tenant**").

1. **Definitions and Basic Provisions**. The definitions and basic provisions set forth in the Basic Lease Information (the "**Basic Lease Information**") attached hereto are incorporated herein by reference for all purposes. Additionally, the following terms shall have the following meanings when used in this Lease: "**Affiliate**" means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the party in question; "**Building's Structure**" means the Building's exterior walls, roof, elevator shafts, footings, foundations, structural portions of load-bearing walls, structural floors and subfloors, and structural columns and beams; "**Building's Systems**" means the Building's HVAC, life-safety, plumbing, electrical, and mechanical systems; "**including**" means including, without limitation; "**Laws**" means all federal, state, and local laws, ordinances, rules and regulations, all court orders, governmental directives, and governmental orders and all interpretations of the foregoing, and all restrictive covenants affecting the Premises, and "**Law**" shall mean any of the foregoing; "**Tenant's Off-Premises Equipment**" means any of Tenant's equipment or other property that may be located on the grounds of the Premises (other than inside the Building); and "**Tenant Party**" means any of the following persons: Tenant; any assignees claiming by, through, or under Tenant; any subtenants claiming by, through, or under Tenant; and any of their respective agents, contractors, employees, and invitees.

2. **Lease Grant.** Subject to the terms of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises.

3. **Tender of Possession.** Landlord and Tenant presently anticipate that possession of the Premises will be tendered to Tenant in the condition required by this Lease on the date of this Lease (the "**Estimated Delivery Date**"). If Landlord is unable to tender possession of the Premises in such condition to Tenant by the Estimated Delivery Date, then (a) the validity of this Lease shall not be affected or impaired thereby, (b) Landlord shall not be in default hereunder or be liable for damages therefore, and (c) Tenant shall accept possession of the Premises when Landlord tenders possession thereof to Tenant. By occupying the Premises for business, Tenant shall be deemed to have accepted the Premises in their condition as of the date of such occupancy, subject to the performance of punch-list items that remain to be performed by Landlord, if any. Prior to occupying the Premises, Tenant shall execute and deliver to Landlord a letter substantially in the form of Exhibit E hereto confirming (1) the Commencement Date and the expiration date of the initial Term, (2) that Tenant has accepted the Premises, and (3) that Landlord has performed all of its obligations with respect to the Premises, if any (except for punch-list items specified in such letter); however, the failure of the parties to execute such letter shall not defer the Commencement Date or otherwise invalidate this Lease. Occupancy of the Premises by Tenant prior to the Commencement Date shall be subject to all of the provisions of this Lease excepting only those requiring the payment of Basic Rent, Additional Rent and Taxes (each as defined herein).

4. **Rent; Security Deposit.**

    (a) **Payment**. Tenant shall timely pay to Landlord Rent, without notice, demand, deduction or set off (except as otherwise expressly provided herein), by good and sufficient check drawn on a national or state chartered banking association at Landlord's address provided for in this Lease or as otherwise specified by Landlord and shall be accompanied by all applicable state and local sales or use taxes. The obligations of Tenant to pay Basic Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Basic Rent, adjusted as herein provided, shall be payable monthly in advance. The first monthly installment of Basic Rent shall be payable contemporaneously with the Commencement Date of this Lease; thereafter, Basic Rent shall be payable on the first day of each month beginning on the first day of the second full calendar month of the Term. The monthly Basic Rent for any partial month at the beginning of the Term shall equal the product of 1/365 of the annual Basic Rent in effect during the partial month and the number of days in the partial month and shall be due on the Commencement Date. Payments of Basic Rent for any fractional calendar month at the end of the Term shall be similarly prorated. Tenant shall pay Additional Rent at the same time and in the same manner as Basic Rent.

3

Notwithstanding the foregoing, provided Tenant is not in Default under this Lease beyond any applicable notice or cure period, if any, the stated Monthly Basic Rent for the Lease Months 1 – 24 (as set forth in the Basic Lease Information) shall be reduced by fifty percent (50%); provided, however, there shall be no reduction in Additional Rent or other charges due under this Lease, and no reduction in Monthly Basic Rent after the twenty-fourth (24th) month of the Lease Term.

(b) **Operating Costs; Taxes.**

(1) Tenant shall pay to Landlord the amount equal to Tenant's Proportionate Share of the annual Operating Costs of the Project. The term "**Operating Costs**" shall mean all expenses and disbursements (subject to the limitations set forth below) that Landlord incurs in connection with the ownership, operation, and maintenance of the Project, determined in accordance with sound accounting principles consistently applied, including the following costs: (A) wages and salaries of all employees at or below the grade of senior building manager engaged in the operation, maintenance or security of the Project, including taxes, insurance and benefits relating thereto; (B) all supplies and materials used in the operation, maintenance, repair, replacement, and security of the Project; (C) costs for improvements made to the Project which, although capital in nature, are expected to reduce the normal operating costs (including all utility costs) of the Project, as amortized using a commercially reasonable interest rate over the time period reasonably estimated by Landlord to recover the costs thereof taking into consideration the anticipated cost savings, as determined by Landlord using its good faith, commercially reasonable judgment, as well as capital improvements made in order to comply with any Law hereafter promulgated by any governmental authority or any interpretation hereafter rendered with respect to any existing Law, as amortized using a commercially reasonable interest rate over the useful economic life of such improvements as determined by Landlord in its reasonable discretion; (D) cost of all landscaping and utilities, except the cost of utilities reimbursable to Landlord by the Project's tenants other than pursuant to a provision similar to this Section 4(b); (E) insurance expenses; (F) repairs, replacements, and general maintenance of the Project; and (G) service, maintenance and management contracts with independent contractors for the operation, maintenance, management, repair, replacement, or security of the Project (including alarm service, window cleaning, and elevator maintenance). If the Project is or becomes part of a multi-building office complex (the "**Complex**"), Operating Costs and Taxes for the Complex may be prorated among the Project and the other buildings of the Complex, as reasonably determined by Landlord.

Operating Costs shall not include costs for (i) capital improvements made to the Project, other than capital improvements described in Section 4(b)(1)(C) and except for items which are generally considered maintenance and repair items, such as painting of common areas, replacement of carpet in elevator lobbies, and the like; (ii) repair, replacements and general maintenance paid by proceeds of insurance or by Tenant or other third parties; (iii) interest, amortization or other payments on loans to Landlord; (iv) depreciation; (v) leasing commissions; (vi) legal expenses for services, other than those that benefit the Project tenants generally and as a whole rather than one particular tenant (e.g., tax disputes); (vii) Taxes; (viii) federal income taxes imposed on or measured by the income of Landlord from the operation of the Premises; (ix) renovating or otherwise improving space for occupants of the Project or vacant space in the Project; (x) advertising and promotional costs associated with the leasing of the Building; and (xi) all amounts which would otherwise be included in Operating Costs which are paid to any Affiliate of Landlord, to the extent the costs of such services exceed the competitive rates for similar services of comparable quality rendered by persons or entities of similar skill, competence and experience.

(2) Tenant shall also pay to Landlord the amount equal to Tenant's Proportionate Share of Taxes for the Project for each year and partial year falling within the Term. "**Taxes**" shall mean taxes, assessments, and governmental charges or fees whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing or by others, subsequently created or otherwise, and any other taxes and assessments (including non-governmental assessments for common charges under a restrictive covenant or other private agreement that are not treated as part of Operating Costs) now or hereafter attributable to the Project (or its operation), excluding, however, penalties and interest thereon and federal and state taxes on income (if the present method of taxation changes so that in lieu of or in addition to the whole or any part of any Taxes, there is levied on Landlord a capital tax directly on the rents received therefrom or a franchise tax, assessment, or charge based, in whole or in part, upon such rents for the

4

Project, then all such taxes, assessments, or charges, or the part thereof so based, shall be deemed to be included within the term "Taxes" for purposes hereof). Taxes shall include the costs of consultants retained in an effort to lower taxes and all costs incurred in disputing any taxes or in seeking to lower the tax valuation of the Project.

(3) Tenant's Proportionate Share of Operating Expenses and Taxes for the Project are referred to herein as the "**Additional Rent**". Landlord may make a good faith estimate of the Additional Rent to be due by Tenant for any calendar year or part thereof during the Term. During each calendar year or partial calendar year of the Term, Tenant shall pay to Landlord, in advance concurrently with each monthly installment of Basic Rent, an amount equal to the estimated Additional Rent for such calendar year or part thereof divided by the number of months therein. From time to time, Landlord may estimate and re-estimate the Additional Rent to be due by Tenant and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of Additional Rent payable by Tenant shall be appropriately adjusted in accordance with the estimations so that, by the end of the calendar year in question, Tenant shall have paid all of the Additional Rent as estimated by Landlord. Any amounts paid based on such an estimate shall be subject to adjustment as herein provided when actual Operating Costs and Taxes are available for each calendar year.

(4) By April 1 of each calendar year, or as soon thereafter as practicable, Landlord shall furnish to Tenant a statement of Operating Costs and of the Taxes for the previous year (the "**Operating Costs and Tax Statement**"). If Tenant's estimated payments of Operating Costs or Taxes under this Section 4(b) for the year covered by the Operating Costs and Tax Statement exceed the cost of such items as indicated in the Operating Costs and Tax Statement, then Landlord shall promptly credit or reimburse Tenant for such excess; likewise, if Tenant's estimated payments of Operating Costs or Taxes under this Section 4(b) for such year are less than the cost of such items as indicated in the Operating Costs and Tax Statement, then Tenant shall promptly pay Landlord such deficiency.

(5) Landlord shall have the option, at its sole cost and expense, to separately meter electrical consumption in the Premises upon written notice delivered to Tenant. In such event, Tenant shall pay to Landlord (A) the actual cost of electrical consumption in the Premises, and (B) Tenant's Proportionate Share of electrical consumption in the common areas of the Project as Additional Rent pursuant to Section 4(b) above. Such amount shall be payable in monthly installments on the first day of each calendar month after installation of such separate metering. Each installment shall be based on Landlord's estimate of the amount due for each month. From time to time during any calendar year, Landlord may estimate or re-estimate such electrical costs to be due by Tenant for that calendar year and deliver a copy of the estimate or re-estimate to Tenant. Thereafter, the monthly installments of such electrical costs payable by Tenant shall be appropriately adjusted in accordance with the estimations. The cost of electrical consumption in the common areas of the Project may be determined by a submetering or engineering study undertaken by an engineer retained by Landlord, or by other reasonable means determined by Landlord.

(6) Notwithstanding the foregoing provisions of this Section 4(b) to the contrary, Tenant's obligation for payment and/or reimbursement of Tenant's Proportionate Share of annual Operating Costs and Taxes for the Project shall be fixed at $5.50 per rental square foot per year for the period from the Commencement Date through December 31, 2017.

(c) **Security Deposit**. The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of Rent or a measure of Tenant's liability for damages in case of default by Tenant. Landlord may, from time-to-time, without prejudice to any other remedy and without waiving such default, use the Security Deposit to the extent necessary to cure or attempt to cure, in whole or in part, any default of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Lease, the balance of the Security Deposit remaining after any such application shall be returned by Landlord to Tenant within thirty (30) days thereafter. If Landlord transfers its interest in the Premises during the term of this Lease, Landlord may assign the

5

Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit. Tenant agrees to look solely to such transferee or assignee or successor thereof for the return of the Security Deposit. Landlord and its successors and assigns shall not be bound by any actual or attempted assignment or encumbrance of the Security Deposit by Tenant.

5. **Delinquent Payment; Handling Charges.** All past due payments required of Tenant hereunder shall bear interest from the date due until paid at the lesser of eighteen percent per annum or the maximum lawful rate of interest (such lesser amount is referred to herein as the "**Default Rate**"); additionally, Landlord, in addition to all other rights and remedies available to it, may charge Tenant a fee equal to five percent of the delinquent payment to reimburse Landlord for its cost and inconvenience incurred as a consequence of Tenant's delinquency. In no event, however, shall the charges permitted under this Section 5 or elsewhere in this Lease, to the extent they are considered to be interest under applicable Law, exceed the maximum lawful rate of interest. Notwithstanding the foregoing, the late fee referenced above shall not be charged with respect to (1) a deficiency payment for Additional Rent payable under Section 4(b)(4), or (2) the first occurrence (but not any subsequent occurrence) during any 12-month period that Tenant fails to make payment when due, until five days after Landlord delivers written notice of such delinquency to Tenant.

6. **Services.** (a) **Landlord Services.** Landlord shall furnish to Tenant: (1) water at those points of supply provided for general use of tenants of the Building; (2) heated and refrigerated air conditioning ("**HVAC**") during Business Hours (defined below); (3) standard janitorial service to the Premises and to the common areas of the Building for Building-standard installations and such window washing as may from time to time be reasonably required, all as reasonably determined by Landlord from time to time (a list of current janitorial services is available upon request); (4) elevators for ingress and egress to the floor on which the Premises are located, in common with other tenants, provided that Landlord may reasonably limit the number of operating elevators during non-Business Hours and holidays; and (5) electrical current during Business Hours for equipment that does not require more than 240 volts and whose electrical energy consumption does not exceed the electrical capacity (watts per rentable square foot) of the Premises and the Building as contemplated by the Plans (as defined in Exhibit D). Landlord shall provide the services referred to in Section 6(a)(1) through 6(a)(5) at a level substantially similar to the level of service and maintenance that is typical in other similar class medical office buildings located in the Smyrna, Tennessee metropolitan area. Landlord shall maintain the common areas of the Building in reasonably good order and condition, except for damage caused by the negligence or willful misconduct of a Tenant Party. If Tenant desires any of the services specified in Section 6(2): (A) at any time other than between 7:00 a.m. and 7:00 p.m. on weekdays and between 9:00 a.m. and 2:00 p.m. on Saturday (in each case other than holidays) ("**Business Hours**"), or (B) on Sunday or holidays, then such services shall be supplied to Tenant upon the written request of Tenant delivered to Landlord before 3:00 p.m. on the business day preceding such extra usage, and Tenant shall pay to Landlord the cost of such services within 30 days after Landlord has delivered to Tenant an invoice therefore. The costs incurred by Landlord in providing after-hour HVAC service to Tenant shall include costs for electricity, water, sewage, water treatment, labor, metering, filtering, and maintenance reasonably allocated by Landlord to providing such service.

(b) **Excess Utility Use**. Except as otherwise set forth in this Section 6(b), Landlord shall not be required to furnish electrical current for equipment that requires more than 240 volts or other equipment whose electrical energy consumption exceeds the electrical capacity (watts per rentable square foot) of the Premises and the Building as contemplated by the Plans. If Tenant's requirements for or consumption of electricity exceed the electricity to be provided by Landlord as described in Section 6, Landlord shall, at Tenant's expense, make reasonable efforts to supply such service through the then-existing feeders and risers serving the Building and the Premises, and Tenant shall pay to Landlord the cost of such service within 30 days after Landlord has delivered to Tenant an invoice therefore. Landlord may determine the amount of such additional consumption and potential consumption by any verifiable method, including installation of a separate meter in the Premises installed, maintained, and read by Landlord, at Tenant's expense. Tenant shall not install any electrical equipment requiring special wiring or requiring voltage in excess of 240 volts unless approved in advance by Landlord, which approval shall not be unreasonably withheld. Tenant shall not install any electrical equipment requiring voltage in excess of Building capacity that materially and adversely affects the Building's Structure or the Building's Systems unless approved in advance by Landlord, which approval may be withheld in Landlord's sole discretion. The use of electricity in the Premises shall not exceed the capacity of existing feeders and risers to or wiring in the Premises (as the same may be increased per this Section 6(b) from time to time); provided, however, Landlord shall install, upon

6

Tenant's written request and at Tenant's cost, any risers or wiring required to meet Tenant's excess electrical requirements, if in Landlord's reasonable judgment, the same are necessary and shall not cause permanent damage to the Building or the Premises, cause or create a dangerous or hazardous condition, or unreasonably interfere with or disturb other tenants of the Building. If Tenant uses machines or equipment in the Premises which affect the temperature otherwise maintained by the air conditioning system or otherwise overload any utility, Landlord may install supplemental air conditioning units or other supplemental equipment in the Premises, and the cost thereof, including the cost of installation, operation, use, and maintenance, shall be paid by Tenant to Landlord within 30 days after Landlord has delivered to Tenant an invoice therefore.

(c) **Restoration of Services; Abatement**. Landlord shall use reasonable efforts to restore any service required to be provided by Landlord hereunder that becomes unavailable; however, such unavailability shall not render Landlord liable for any damages caused thereby, be a constructive eviction of Tenant, constitute a breach of any implied warranty, or, except as provided in the next sentence, entitle Tenant to any abatement of Tenant's obligations hereunder. If, however, Tenant is prevented from using the Premises because of the unavailability of any such service for a period of five consecutive business days following Landlord's receipt from Tenant of a written notice regarding such unavailability, the restoration of which is within Landlord's reasonable control, and such unavailability was not caused by a Tenant Party or a governmental directive, then Tenant shall, as its exclusive remedy be entitled to a reasonable abatement of Rent for each consecutive day (after such five-day period) that Tenant is so prevented from using the Premises.

7. **Improvements; Alterations; Repairs; Maintenance.**

(a) **Improvements; Alterations.** Improvements to the Premises shall be installed at Tenant's expense only in accordance with plans and specifications which have been previously submitted to and approved in writing by Landlord, which approval shall be governed by the provisions set forth in this Section 7(a). No alterations or physical additions in or to the Premises may be made without Landlord's prior written consent, which shall not be unreasonably withheld or delayed; however, Landlord may withhold its consent to any alteration or addition that would adversely affect (in the sole discretion of Landlord) (1) the Building's Structure or the Building's Systems (including the Building's restrooms or mechanical rooms), (2) the exterior appearance of the Building or (3) the appearance of the Building's common areas or elevator lobby areas. Tenant may install directional signage and Tenant information signage with Landlord's prior consent, which shall not be unreasonably withheld or delayed. Tenant shall not paint or install lighting or decorations or advertising media of any type visible from the exterior of the Premises without the prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion. All alterations, additions, and improvements shall be constructed, maintained, and used by Tenant, at its risk and expense, in accordance with all Laws; Landlord's consent to or approval of any alterations, additions or improvements (or the plans therefore) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable Laws, and Tenant shall be solely responsible for ensuring all such compliance.

(b) **Repairs; Maintenance.** Tenant shall maintain the Premises in a clean, safe, and operable condition, and shall not permit or allow to remain any waste or damage to any portion of the Premises. Specifically and subject to Section 14, Tenant, at its sole expense, shall repair, replace and maintain in good condition and in accordance with all Laws and the equipment manufacturer's suggested service programs, all portions of the Premises, Tenant's Off-Premises Equipment, and all areas, improvements and systems exclusively serving the Premises (other than the Building's Systems and Building Structure). Tenant shall repair or replace, subject to Landlord's direction and supervision, any damage to the Building caused by a Tenant Party. If Tenant fails to initiate such repairs or replacements within 15 days after the occurrence of such damage and diligently pursue same to completion, then Landlord may make the same at Tenant's cost. The cost of all maintenance, repair or replacement work performed by Landlord under this Section 7 shall be paid by Tenant to Landlord within 30 days after Landlord has invoiced Tenant therefore. Landlord's maintenance obligations are limited to the repair (reasonable wear and tear excepted) and replacement of the Building's Structure and Building Systems; provided, however, Landlord shall not be responsible for (1) any such work until Tenant notifies Landlord of the need therefore in writing, (2) alterations to the Building's Structure required by applicable Law because of Tenant's use of the Premises (which alterations shall be Tenant's responsibility), or (3) uninsured losses and damages caused by a Tenant Party. Landlord's liability for any defects, repairs, replacement or maintenance for which Landlord is

specifically responsible under this Lease shall be limited to the actual cost of labor and materials (including those for inspections) necessary for performing the work.

(c) **Performance of Work.** Any improvements to be constructed or installed by or on behalf of Tenant prior to Substantial Completion of the Premises shall be performed by such contractors or subcontractors as may be approved in writing by Landlord and Tenant, such approval not to be unreasonably withheld. All other work described in this Section 7 shall be performed only by Landlord or by contractors and subcontractors approved in writing by Landlord. Tenant shall cause all contractors and subcontractors to procure and maintain insurance coverage naming Landlord, Landlord's property management company, Landlord's asset management company (if any) and their respective Affiliates as additional insureds against such risks, in such amounts, and with such companies as Landlord may reasonably require. Tenant shall provide Landlord with the identities, mailing addresses and telephone numbers of all contractors performing work or supplying materials prior to beginning such construction and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable Laws. All such work shall be performed in accordance with all Laws and in a good and workmanlike manner so as not to damage the Building (including the Premises, the Building's Structure and the Building's Systems). All such work which may affect the Building's Structure or the Building's Systems must be approved by the Building's engineer of record, at Tenant's expense. All work requiring penetration of the roof of the Building must be performed by Landlord's roofing contractor if it would otherwise void or reduce the warranty on the roof.

(d) **Mechanic's Liens.** Tenant shall not permit any mechanic's liens to be filed against the Premises and/or the Project for any work performed, materials furnished, or obligation incurred by or at the request of Tenant. Upon completion of any such work, Tenant shall deliver to Landlord final lien waivers from all contractors, subcontractors and materialmen who performed such work. If such a lien is filed, then Tenant shall, within ten business days after Landlord has delivered notice of the filing thereof to Tenant (or such earlier time period as may be necessary to prevent the forfeiture of the Premises and/or the Project or any interest of Landlord therein or the imposition of a civil or criminal fine with respect thereto), either (1) pay the amount of the lien and cause the lien to be released of record, or (2) diligently contest such lien and deliver to Landlord a bond or other security reasonably satisfactory to Landlord. If Tenant fails to timely take either such action, then Landlord may pay the lien claim, and any amounts so paid, including expenses and interest, shall be paid by Tenant to Landlord within ten days after Landlord has invoiced Tenant therefore. All materialmen, contractors, artisans, mechanics, laborers and any other persons now or hereafter contracting with Tenant or any contractor or subcontractor of Tenant for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises, at any time from the date hereof until the end of the Term, are hereby charged with notice that they look exclusively to Tenant to obtain payment for same. Nothing herein shall be deemed a consent by Landlord to any liens being placed upon the Premises and/or the Project or Landlord's interest therein due to any work performed by or for Tenant.

(e) **Janitorial Services; Medical Waste.** Other than the janitorial services set forth in Section 6(a) hereof provided by Landlord, Tenant, at its sole expense, shall provide its own janitorial services to the Premises and shall maintain the Premises in a clean and safe condition based upon Tenant's business operation from the Premises. Tenant shall store all trash and garbage within the area and in receptacles designated from time to time by Landlord and pursuant to reasonable regulations, established by Landlord from time to time; provided, however, all medical waste generated from the Premises shall be specifically stored, handled, removed and disposed of by Tenant in accordance with applicable Laws, and as required, only by licensed contractors, and under no circumstances shall medical waste be disposed of on the Premises or at any location of the Project. If Tenant fails to provide janitorial services to the Premises or medical waste disposal in compliance with the foregoing, Landlord, in addition to any other rights and remedies available to it, may provide such services, and Tenant shall pay to Landlord the cost thereof within ten days after Landlord delivers to Tenant an invoice therefore.

8. **Use.** Tenant shall continuously occupy and use the Premises only for the Permitted Use and shall comply with all Laws relating to the use, condition, access to, and occupancy of the Premises and will not commit waste, overload the Building's Structure or the Building's Systems or subject the Premises to use that would damage the Premises. Tenant represents that it is (and, at all times during the Term, will be) licensed to conduct the business contemplated and carried on in the Premises and that Tenant shall maintain at all times, at Tenant's sole cost, all requisite permits and licenses. Tenant may use the Premises after Business Hours, so long as Tenant is not routinely conducting business from the Premises after Business Hours. Notwithstanding anything in this Lease to the

contrary, as between Landlord and Tenant, (1) except as expressly set forth below, Tenant shall bear the risk of complying with Title III of the Americans With Disabilities Act of 1990, any state laws governing handicapped access or architectural barriers, and all rules, regulations, and guidelines promulgated under such Laws, as amended from time to time (the "**Disabilities Acts**") in the Premises, and (2) Landlord shall bear the risk of complying with the Disabilities Acts in the common areas of the Building, as well as compliance with the Disabilities Acts (as such Disabilities Acts are codified and interpreted as of the date of this Lease) in the Premises to the extent such non-compliance was caused by a condition which existed due to the design and construction of the Premises as of the date Landlord tenders possession of the Premises to Tenant, in each case other than compliance that is necessitated by the use of the Premises for other than the Permitted Use or as a result of any alterations or additions (other than the Landlord Work), made by or on behalf of a Tenant Party (which risk and responsibility shall be borne by Tenant). The Premises shall not be used for any use which is disreputable, creates extraordinary fire hazards, or results in an increased rate of insurance on the Building or its contents, or for the storage of any Hazardous Materials (other than typical medical or office supplies and then only in compliance with all Laws). Tenant shall not use any substantial portion of the Premises for a "call center," any other telemarketing use, or any credit processing use. If, because of a Tenant Party's acts, the rate of insurance on the Building or its contents increases, then Tenant shall pay to Landlord the amount of such increase on demand, and acceptance of such payment shall not waive any of Landlord's other rights. Tenant shall conduct its business and control each other Tenant Party so as not to create any nuisance or unreasonably interfere with other tenants or Landlord in its management of the Building. Except as is customary in connection with normal medical office usage, Tenant shall not suffer, allow or permit any offensive or obnoxious vibration, noise, odor or other undesirable effect to emanate from the Premises, or any machine or other installation therein, or otherwise suffer, allow or permit the same to constitute a disturbance to other tenants or occupants of the Building.

9. **Assignment and Subletting.**

   (a) **Transfers.** Except as provided in Section 9(f), Tenant shall not, without the prior written consent of Landlord, (1) assign, transfer, or encumber this Lease or any estate or interest herein, whether directly or by operation of law, (2) permit any other entity to become Tenant hereunder by merger, consolidation, or other reorganization, (3) if Tenant is an entity other than a corporation whose stock is publicly traded, permit the transfer of an ownership interest in Tenant so as to result in a change in the current control of Tenant, (4) sublet any portion of the Premises, (5) grant any license, concession, or other right of occupancy of any portion of the Premises, or (6) permit the use of the Premises by any parties other than Tenant (any of the events listed in Section 9(a)(1) through 9(a)(6) being a "**Transfer**").

   (b) **Consent Standards.** Landlord shall not unreasonably withhold or delay its consent to any assignment of the Lease, provided that the proposed transferee (1) is creditworthy, (2) has a good reputation in the business community, (3) will use the Premises only or the Permitted Use, (4) will not use the Building or Premises in a manner that would materially increase the pedestrian or vehicular traffic to the Building or Premises, and (5) is not a governmental entity, or subdivision or agency thereof; otherwise, Landlord may withhold its consent in its sole discretion.

   (c) **Request for Consent.** If Tenant requests Landlord's consent to a Transfer, then, at least 15 business days prior to the effective date of the proposed Transfer, Tenant shall provide Landlord with a written description of all terms and conditions of the proposed Transfer, copies of the proposed documentation, and the following information about the proposed transferee: name and address; reasonably satisfactory information about its business and business history; its proposed use of the Premises; banking, financial, and other credit information; and general references sufficient to enable Landlord to determine the proposed transferee's creditworthiness and character.

   (d) **Conditions to Consent.** If Landlord consents to a proposed Transfer, then the proposed transferee shall deliver to Landlord a written agreement whereby it expressly assumes Tenant's obligations hereunder; however, any transferee of less than all of the space in the Premises shall be liable only for obligations under this Lease that are properly allocable to the space subject to the Transfer for the period of the Transfer. No Transfer shall release Tenant from its obligations under this Lease, but rather Tenant and its transferee shall be jointly and severally liable therefore. Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers. If an Event of Default occurs while the Premises or any part thereof are subject to a Transfer,

9

then Landlord, in addition to its other remedies, may collect directly from such transferee all rents becoming due to Tenant and apply such rents against Rent. Tenant authorizes its transferees to make payments of rent directly to Landlord upon receipt of notice from Landlord to do so following the occurrence of an Event of Default hereunder. Tenant shall pay for the cost of any demising walls or other improvements necessitated by a proposed subletting or assignment.

(e) **Attornment by Subtenants**. Each sublease by Tenant hereunder shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and each subtenant by entering into a sublease is deemed to have agreed that in the event of termination, re-entry or dispossession by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublandlord, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be (1) liable for any previous act or omission of Tenant under such sublease, (2) subject to any counterclaim, offset or defense that such subtenant might have against Tenant, (3) bound by any previous modification of such sublease or by any rent or additional rent or advance rent which such subtenant might have paid for more than the current month to Tenant, and all such rent shall remain due and owing, notwithstanding such advance payment, (4) bound by any security or advance rental deposit made by such subtenant which is not delivered or paid over to Landlord and with respect to which such subtenant shall look solely to Tenant for refund or reimbursement, or (5) obligated to perform any work in the subleased space or to prepare it for occupancy, and in connection with such attornment, the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such attornment. Each subtenant or licensee of Tenant shall be deemed, automatically upon and as a condition of its occupying or using the Premises or any part thereof, to have agreed to be bound by the terms and conditions set forth in this Section 9(e). The provisions of this Section 9(e) shall be self-operative, and no further instrument shall be required to give effect to this provision.

(f) **Permitted Transfers.** Notwithstanding Section 9(a), Tenant may Transfer all or part of its interest in this Lease (a "**Permitted Transfer**") to the following transferees (a "**Permitted Transferee**") without the written consent of Landlord:

(1) an Affiliate of Tenant;

(2) any corporation, limited partnership, limited liability partnership, limited liability company or other business entity in which or with which Tenant, or its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions governing merger and consolidation of business entities, so long as (A) Tenant's obligations hereunder are assumed by the entity surviving such merger or created by such consolidation; and (B) the Tangible Net Worth of the surviving or created entity is not less than the Tangible Net Worth of Tenant as of the date hereof; or

(3) any corporation, limited partnership, limited liability partnership, limited liability company or other business entity acquiring all or substantially all of Tenant's assets if such entity's Tangible Net Worth after such acquisition is not less than the Tangible Net Worth of Tenant as of the date hereof.

Tenant shall promptly notify Landlord of any such Permitted Transfer. Tenant shall remain liable for the performance of all of the obligations of Tenant hereunder, or if Tenant no longer exists because of a merger, consolidation, or acquisition, the surviving or acquiring entity shall expressly assume in writing the obligations of Tenant hereunder. Additionally, the Permitted Transferee shall comply with all of the terms and conditions of this Lease, including the Permitted Use, and the use of the Premises by the Permitted Transferee may not violate any other agreements affecting the Premises, the Building, Landlord or other tenants of the Building. No later than 30 days after the effective date of any Permitted Transfer, Tenant agrees to furnish Landlord with (A) copies of the instrument effecting any of the foregoing Transfers (including a complete copy of any sublease entered into by Tenant), (B) documentation establishing Tenant's satisfaction of the requirements set forth above applicable to any such Transfer, and (C) evidence of insurance as required under this Lease with respect to the Permitted Transferee. The occurrence of a Permitted Transfer shall not waive Landlord's rights as to any subsequent Transfers. "**Tangible Net Worth**" means the excess of total assets over total liabilities, in each case as determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), excluding, however, from the

Case 3:19-bk-01971    Doc 269-1    Filed 08/25/20    Entered 08/25/20 16:34:58    Desc
Exhibit A-Lease Agreement (part 1 of 2)    Page 12 of 18

determination of total assets all assets which would be classified as intangible assets under GAAP including goodwill, licenses, patents, trademarks, trade names, copyrights, and franchises. Any subsequent Transfer by a Permitted Transferee shall be subject to the terms of this Section 9.

**10. Insurance; Waivers; Subrogation; Indemnity.**

(a) **Tenant's Insurance.** Effective as of the earlier of (1) the date Tenant enters or occupies the Premises, or (2) the Commencement Date, and continuing throughout the Term, Tenant shall maintain the following insurance policies: (A) commercial general liability insurance in amounts of $2,000,000 per occurrence or, following the expiration of the initial Term, such other amounts as Landlord may from time to time reasonably require (and, if the Permitted Use and occupancy of the Premises include any activity or matter that is or may be excluded from coverage under a commercial general liability policy (*e.g., radioactive emissions from imaging equipment.*) Tenant shall obtain such endorsements to the commercial general liability policy or otherwise obtain insurance to insure all liability arising from such activity or matter in such amounts as Landlord may reasonably require), insuring Tenant, Landlord, Landlord's agents and their respective Affiliates against all liability for injury to or death of a person or persons or damage to property arising from Tenant's use and occupancy of the Premises and (without implying any consent by Landlord to the installation thereof) the installation, operation, maintenance, repair or removal of Tenant's Off-Premises Equipment, (B) insurance covering the full value of Tenant's property and improvements in the Premises (including Tenant's Off-Premises Equipment), (C) contractual liability insurance sufficient to cover Tenant's indemnity obligations hereunder (but only if such contractual liability insurance is not already included in Tenant's commercial general liability insurance policy), (D) worker's compensation insurance, (E) business interruption insurance and (F) an "All Risks of Physical Loss" policy for the Building's replacement value. Tenant's insurance required under this Lease shall provide primary coverage to Landlord when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstance Landlord's policy will be excess over Tenant's policy. Tenant shall furnish to Landlord certificates of such insurance and such other evidence satisfactory to Landlord of the maintenance of all insurance coverages required hereunder at least ten days prior to the earlier of the Commencement Date or the date Tenant enters or occupies the Premises, and at least 15 days prior to each renewal of said insurance, and Tenant shall obtain a written obligation on the part of each insurance company to notify Landlord at least 30 days before cancellation or a material change of any such insurance policies. All such insurance policies shall be in form, and issued by companies with a Best's rating of A+:VI or higher, reasonably satisfactory to Landlord. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord the certificates or evidence of coverage required herein, Landlord, in addition to any other remedy available pursuant to this Lease or otherwise, may, but shall not be obligated to, obtain such insurance and Tenant shall pay to Landlord on demand the premium costs thereof.

(b) **Landlord's Insurance.** Throughout the Term of this Lease, Landlord shall maintain commercial general liability insurance in an amount of not less than $2,000,000. Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary. The cost of the commercial general liability insurance (and any insurance the Landlord's Mortgagee requires Landlord to maintain in addition to or having greater coverage levels than the insurance Tenant is required to maintain) with respect to the Building shall be included in Operating Costs. The foregoing insurance policies and any other insurance carried by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control, and Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

(c) **No Subrogation.** Landlord and Tenant each waives any claim (including as to deductibles) it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property, to the extent the same is insured against under any insurance policy that covers the Building, the Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, or is required to be insured against under the terms hereof, regardless of whether the negligence of the other party caused such Loss. Each party shall cause its insurance carrier to endorse all applicable policies waiving the carrier's rights of recovery under subrogation or otherwise against the other party.

(d) **Indemnity.** Subject to Section 10(c), Tenant shall defend, indemnify, and hold harmless Landlord and its representatives and agents from and against all claims, demands, liabilities, causes of action, suits, judgments, damages, and expenses (including attorneys' fees) arising from (1) any injury to or death of any person or the damage to or theft, destruction, loss, or loss of use of any property or inconvenience (a "**Loss**"), arising from

11

any occurrence on the Premises or arising out of the installation, operation, maintenance, repair or removal of any of Tenant's Off-Premises Equipment or (2) Tenant's failure to perform its obligations under this Lease. This indemnity set forth in this Section 10(d) shall survive termination or expiration of this Lease and shall not terminate or be waived, diminished or affected in any manner by any abatement or apportionment of Rent under any provision of this Lease. If any proceeding is filed for which indemnity is required hereunder, Tenant agrees, upon request therefor, to defend Landlord in such proceeding at its sole cost utilizing counsel selected by Tenant and approved by Landlord.

(e) **Named Insureds.** The policies of insurance provided for in Section 10(a)(2)(F) shall name Landlord and Landlord's Mortgagee as the insureds and loss payees, as their respective interests may appear. Landlord and Landlord's Mortgagee shall be named as additional insureds under the policy provided for in Section 10(a)(2)(A). All other policies of insurance provided for in Section 10 shall name any Landlord's Mortgagee, Landlord and Tenant as the insureds as their respective interests may appear.

## 11. Subordination; Attornment; Notice to Landlord's Mortgagee.

(a) **Subordination**. This Lease shall be subordinate to any deed of trust, mortgage, or other security instrument (each, a "**Mortgage**"), that now or hereafter covers all or any part of the Premises (the mortgagee under any such Mortgagor, beneficiary under any such deed of trust, is referred to herein as a "**Landlord's Mortgagee**"). Any Landlord's Mortgagee may elect, at any time, unilaterally, to make this Lease superior to its Mortgage or other interest in the Premises by so notifying Tenant in writing. The provisions of this Section shall be self-operative and no further instrument of subordination shall be required; however, in confirmation of such subordination, Tenant shall execute and return to Landlord (or such other party designated by Landlord) within ten days after written request therefore such documentation, in recordable form if required, as a Landlord's Mortgagee may reasonably request to evidence the subordination of this Lease to such Landlord's Mortgagee's Mortgage (including a subordination, non-disturbance and attornment agreement) or, if the Landlord's Mortgagee so elects, the subordination of such Landlord's Mortgagee's Mortgage to this Lease.

(b) **Attornment**. Tenant shall attorn to any party succeeding to Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease, or otherwise, upon such party's request, and shall execute such agreements confirming such attornment as such party may reasonably request.

(c) **Notice to Landlord's Mortgagee**. Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written notice by certified mail, return receipt requested, specifying the default in reasonable detail, to any Landlord's Mortgagee whose address has been given to Tenant, and affording such Landlord's Mortgagee a reasonable opportunity to perform Landlord's obligations hereunder.

(d) **Landlord's Mortgagee's Protection Provisions.** If Landlord's Mortgagee shall succeed to the interest of Landlord under this Lease, Landlord's Mortgagee shall not be: (1) liable for any act or omission of any prior lessor (including Landlord); (2) bound by any rent or additional rent or advance rent which Tenant might have paid for more than the current month to any prior lessor (including Landlord), and all such rent shall remain due and owing, notwithstanding such advance payment; (3) bound by any security or advance rental deposit made by Tenant which is not delivered or paid over to Landlord's Mortgagee and with respect to which Tenant shall look solely to Landlord for refund or reimbursement; (4) bound by any termination, amendment or modification of this Lease made without Landlord's Mortgagee's consent and written approval, except for those terminations, amendments and modifications permitted to be made by Landlord without Landlord's Mortgagee's consent pursuant to the terms of the loan documents between Landlord and Landlord's Mortgagee; (5) subject to the defenses which Tenant might have against any prior lessor (including Landlord); and (6) subject to the offsets which Tenant might have against any prior lessor (including Landlord) except for those offset rights which (A) are expressly provided in this Lease, (B) relate to periods of time following the acquisition of the Building by Landlord's Mortgagee, and (C) Tenant has provided written notice to Landlord's Mortgagee and provided Landlord's Mortgagee a reasonable opportunity to cure the event giving rise to such offset event. Landlord's Mortgagee shall have no liability or responsibility under or pursuant to the terms of this Lease or otherwise after it ceases to own an interest in the Building. Nothing in this Lease shall be construed to require Landlord's Mortgagee to see to the application of the

12

Case 3:19-bk-01971   Doc 269-1   Filed 08/25/20   Entered 08/25/20 16:34:58   Desc
Exhibit A-Lease Agreement (part 1 of 2)   Page 14 of 18

proceeds of any loan, and Tenant's agreements set forth herein shall not be impaired on account of any modification of the documents evidencing and securing any loan.

12. **Rules and Regulations.** Tenant shall comply with the rules and regulations of the Building which are attached hereto as Exhibit C. Landlord may, from time to time, change such rules and regulations for the safety, care, or cleanliness of the Building and related facilities, provided that such changes will not unreasonably interfere with Tenant's use of the Premises. Tenant shall be responsible for the compliance with such rules and regulations by each Tenant Party.

13. **Condemnation.**

(a) **Total Taking**. If the entire Building or Premises are taken by right of eminent domain or conveyed in lieu thereof (a "**Taking**"), this Lease shall terminate as of the date of the Taking.

(b) **Partial Taking - Tenant's Rights**. If any part of the Building becomes subject to a Taking and such Taking will prevent Tenant from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Taking for a period of more than 180 days, then Tenant may terminate this Lease as of the date of such Taking by giving written notice to Landlord within 90 days after the Taking, and Basic Rent and Additional Rent shall be apportioned as of the date of such Taking. If Tenant does not terminate this Lease, then Rent shall be abated on a reasonable basis as to that portion of the Premises rendered untenantable by the Taking.

(c) **Partial Taking - Landlord's Rights**. If any material portion, but less than all, of the Building becomes subject to a Taking, or if Landlord is required to pay any of the proceeds arising from a Taking to a Landlord's Mortgagee, then Landlord may terminate this Lease by delivering written notice thereof to Tenant within 30 days after such Taking, and Basic Rent and Additional Rent shall be apportioned as of the date of such Taking. If Landlord does not so terminate this Lease, then this Lease will continue, but if any portion of the Premises has been taken, Rent shall abate as provided in the last sentence of Section 13(b).

(d) **Award**. If any Taking occurs, then Landlord shall receive the entire award or other compensation for the Land, the Building, and other improvements taken; however, Tenant may separately pursue a claim (to the extent it will not reduce Landlord's award) against the condemnor for the value of Tenant's personal property which Tenant is entitled to remove under this Lease, moving costs, loss of business, and other claims it may have.

14. **Fire or Other Casualty.**

(a) **Repair Estimate**. If the Premises or the Building are damaged by fire or other casualty (a "**Casualty**"), Landlord shall, within 90 days after such Casualty, deliver to Tenant a good faith estimate (the "**Damage Notice**") of the time needed to repair the damage caused by such Casualty.

(b) **Tenant's Rights**. If a material portion of the Premises is damaged by Casualty such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Casualty and Landlord estimates that the damage caused thereby cannot be repaired within 210 days after the commencement of repairs (the "**Repair Period**"), then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.

(c) **Landlord's Rights**. If a Casualty damages the Premises or a material portion of the Building and (1) Landlord estimates that the damage to the Premises cannot be repaired within the Repair Period, (2) the damage to the Premises occurs during the last two years of the Term and within 30 days of Landlord's written request to Tenant to extend the Term of the Lease, either (A) Tenant fails to exercise a renewal option as provided in Exhibit G or (B) Landlord and Tenant fail to reach agreement on the terms of a renewal of the Lease if the renewal option periods in Exhibit G have both been exercised, (3) regardless of the extent of damage to the Premises, Landlord makes a good faith determination that restoring the Building would be uneconomical, or (4) Landlord is

13

required to pay any insurance proceeds arising out of the Casualty to a Landlord's Mortgagee, then Landlord may terminate this Lease by giving written notice of its election to terminate within 30 days after the Damage Notice has been delivered to Tenant.

(d) **Repair Obligation**. If neither party elects to terminate this Lease following a Casualty, then Landlord shall, within a reasonable time after such Casualty, begin to repair the Premises and shall proceed with reasonable diligence to restore the Premises to substantially the same condition as they existed immediately before such Casualty; however, Landlord shall only be required to reconstruct the Premises to the extent of any improvements existing therein on the date of the damage that were installed by Landlord as part of the Landlord's Work (if any) pursuant to Exhibit D ("**Landlord's Contribution**"), and Landlord's obligation to repair or restore the Premises shall be limited to the extent of the insurance proceeds actually received by Landlord for the Casualty in question. Tenant shall be responsible for repairing or replacing its furniture, equipment, fixtures, alterations and other improvements which Landlord is not obligated to restore, and shall use the proceeds of its insurance for such purpose. Tenant may adjust the quality and/or quantity of the improvements for which it has responsibility from the condition as they existed immediately before such Casualty, provided they comply with the requirements of Applicable Law and are sufficient to permit a certificate of occupancy to be issued for the Premises. Tenant shall pay the difference between the total cost of reconstructing the Premises and Landlord's Contribution ("**Tenant's Contribution**"). Prior to Landlord's commencement of reconstruction, Tenant shall furnish Landlord commercially reasonable assurances of payment of Landlord's estimate of Tenant's Contribution or if required by Landlord's Mortgagee, Tenant shall place Landlord's estimate of Tenant's Contribution in escrow with Landlord.

(e) **Abatement of Rent**. If the Premises are damaged by Casualty, Rent for the portion of the Premises rendered untenantable by the damage shall be abated on a reasonable basis from the date of damage until the completion of Landlord's repairs (or until the date of termination of this Lease by Landlord or Tenant as provided above, as the case may be), unless a Tenant Party caused such damage, in which case, Tenant shall continue to pay Rent without abatement.

15. **Personal Property Taxes.** Tenant shall be liable for all taxes levied or assessed against personal property, furniture, or fixtures placed by Tenant (or any sub-tenant of Tenant) in the Building or on the Premises. If any taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of such personal property, furniture or fixtures and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord, within 30 days following written request, the part of such taxes for which Tenant is primarily liable hereunder; however, Landlord shall not pay such amount if Tenant notifies Landlord that it will contest the validity or amount of such taxes before Landlord makes such payment, and thereafter diligently proceeds with such contest in accordance with Law and if the non-payment thereof does not pose a threat of loss or seizure of the Premises or interest of Landlord therein or impose any fee or penalty against Landlord.

16. **Events of Default.** Each of the following occurrences shall be an "**Event of Default**":

(a) **Payment Default**. Tenant's failure to pay Rent within five (5) days after Landlord has delivered written notice to Tenant that the same is due; however, an Event of Default shall occur hereunder without any obligation of Landlord to give any notice if Tenant fails to pay Rent when due and, during the 12 month interval preceding such failure, Landlord has given Tenant written notice of failure to pay Rent on two or more occasions;

(b) **Estoppel**. Tenant fails to provide any estoppel certificate after Landlord's written request therefor pursuant to Section 23(e) and such failure shall continue for five days after Landlord's second written notice thereof to Tenant;

(c) **Insurance**. Tenant fails to procure, maintain and deliver to Landlord evidence of the insurance policies and coverages as required under Section 10(a);

(d) **Mechanic's Liens**. Tenant fails to pay and release of record, or diligently contest and bond around, or otherwise satisfy and secure the release of any mechanic's lien filed against the Premises for any work performed, materials furnished, or obligation incurred by or at the request of Tenant, within the time and in the manner required by Section 7(d);

14

(e) **Other Defaults**. Tenant's failure to perform, comply with, or observe any other agreement or obligation of Tenant under this Lease and the continuance of such failure for a period of more than 30 days after Landlord has delivered to Tenant written notice thereof; however, if such failure cannot be cured within such 30-day period (thus excluding, for example, Tenant's obligation to provide Landlord evidence of Tenant's insurance coverage) and Tenant commences to cure such failure within such 30-day period and thereafter diligently pursues such cure to completion, then such failure shall not be an Event of Default unless it is not fully cured before the earlier of an additional 120 days after the expiration of the 30-day period or (2) the expiration of the Term; and

(f) **Insolvency**. The filing of a petition by or against Tenant (the term "Tenant" shall include, for the purpose of this Section 16(f), any guarantor of Tenant's obligations hereunder) (1) in any bankruptcy or other insolvency proceeding; (2) seeking any relief under any state or federal debtor relief law; (3) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; or (4) for the reorganization or modification of Tenant's capital structure; however, if such a petition is filed against Tenant, then such filing shall not be an Event of Default unless Tenant fails to have the proceedings initiated by such petition dismissed within 90 days after the filing thereof.

17. **Remedies.** Upon any Event of Default, Landlord may, in addition to all other rights and remedies afforded Landlord hereunder or by law or equity, take any one or more of the following actions:

(a) **Termination of Lease**. Terminate this Lease by giving Tenant written notice thereof, in which event Tenant shall pay to Landlord the sum of (1) all Rent accrued hereunder through the date of termination, (2) all amounts due under Section 18(a), and (3) an amount equal to (A) the total Rent that Tenant would have been required to pay for the remainder of the Term discounted to present value at a per annum rate equal to the "Prime Rate" as published on the date this Lease is terminated by *The Wall Street Journal*, Southwest Edition, in its listing of "Money Rates" minus one percent, minus (B) the then present fair rental value of the Premises for such period, similarly discounted;

(b) **Termination of Possession**. Terminate Tenant's right to possess the Premises without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall pay to Landlord (1) all Rent and other amounts accrued hereunder to the date of termination of possession, (2) all amounts due from time to time under Section 18(a), and (3) all Rent and other net sums required hereunder to be paid by Tenant during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during such period, after deducting all costs incurred by Landlord in reletting the Premises. If Landlord elects to proceed under this Section 17(b), Landlord may remove all of Tenant's property from the Premises and store the same in a public warehouse or elsewhere at the cost of, and for the account of, Tenant, without becoming liable for any loss or damage which may be occasioned thereby. Landlord shall use reasonable efforts to relet the Premises on such terms as Landlord in its sole discretion may determine (including a term different from the Term, rental concessions, and alterations to, and improvement of, the Premises); however, Landlord shall not be obligated to relet the Premises before leasing other portions of the Building and Landlord shall not be obligated to accept any prospective tenant proposed by Tenant unless such proposed tenant meets all of Landlord's leasing criteria. Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or to collect rent due for such reletting. Tenant shall not be entitled to the excess of any consideration obtained by reletting over the Rent due hereunder. Reentry by Landlord in the Premises shall not affect Tenant's obligations hereunder for the unexpired Term; rather, Landlord may, from time to time, bring an action against Tenant to collect amounts due by Tenant, without the necessity of Landlord's waiting until the expiration of the Term. Unless Landlord delivers written notice to Tenant expressly stating that it has elected to terminate this Lease, all actions taken by Landlord to dispossess or exclude Tenant from the Premises shall be deemed to be taken under this Section 17(b). If Landlord elects to proceed under this Section 17(b), it may at any time elect to terminate this Lease under Section 17(a);

(c) **Perform Acts on Behalf of Tenant**. Perform any act Tenant is obligated to perform under the terms of this Lease (and enter upon the Premises in connection therewith if necessary) in Tenant's name and on Tenant's behalf, without being liable for any claim for damages therefor, and Tenant shall reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease (including, but not limited to, collection costs and legal expenses), plus interest thereon at the Default Rate; or

15

(d) **Alteration of Locks**. Additionally, with or without notice, and to the extent permitted by Law, Landlord may alter locks or other security devices at the Premises to deprive Tenant of access thereto, and Landlord shall not be required to provide a new key or right of access to Tenant.

## 18. Payment by Tenant; Non-Waiver; Cumulative Remedies.

(a) **Payment by Tenant**. Upon any Event of Default, Tenant shall pay to Landlord all costs incurred by Landlord (including court costs and reasonable attorneys' fees and expenses) in (1) obtaining possession of the Premises, (2) removing and storing Tenant's or any other occupant's property, (3) repairing, restoring, altering, remodeling, or otherwise putting the Premises into the condition existing at the time of the Commencement Date, normal wear and tear excepted, (4) if Tenant is dispossessed of the Premises and this Lease is not terminated, reletting all or any part of the Premises (including brokerage commissions, cost of tenant finish work, and other costs incidental to such reletting), (5) performing Tenant's obligations which Tenant failed to perform, and (6) enforcing, or advising Landlord of, its rights, remedies, and recourses arising out of the Event of Default. To the full extent permitted by law, Landlord and Tenant agree the federal and state courts of the state in which the Premises are located shall have exclusive jurisdiction over any matter relating to or arising from this Lease and the parties' rights and obligations under this Lease.

(b) **No Waiver**. Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default. No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such term. Landlord's acceptance of any partial payment of Rent shall not waive Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

(c) **Cumulative Remedies**. Any and all remedies set forth in this Lease: (1) shall be in addition to any and all other remedies Landlord may have at law or in equity, (2) shall be cumulative, and (3) may be pursued successively or concurrently as Landlord may elect. The exercise of any remedy by Landlord shall not be deemed an election of remedies or preclude Landlord from exercising any other remedies in the future.

19. **Landlord's Lien.** Landlord waives all contractual, statutory and constitutional liens held by Landlord on Tenant's personal property, trade fixtures, goods, equipment, inventory, furnishings, chattels, accounts and assets ("**Tenant's Property**") to secure the obligations of Tenant under this Lease until such time as Landlord may obtain an enforceable judgment against Tenant from a court with jurisdiction of Tenant or Tenant's Property, at which time Landlord shall have such lien rights at law in equity to enforce and collect such judgment and Tenant's obligations under this Lease, subject to the rights and interests of prior lienholders.

20. **Surrender of Premises.** No act by Landlord shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord. At the expiration or termination of this Lease, Tenant shall deliver to Landlord the Premises with all improvements located therein in good repair and condition, free of Hazardous Materials placed on the Premises during the Term, broom-clean, reasonable wear and tear (and condemnation and Casualty damage not caused by Tenant, as to which Sections 133 and 144 shall control) excepted, and shall deliver to Landlord all keys to the Premises. Provided that Tenant has performed all of its obligations hereunder, Tenant may remove all unattached trade fixtures, furniture, and personal property placed in the Premises or elsewhere in the Building by Tenant (but Tenant may not remove any such item which was paid for, in whole or in part, by Landlord or any wiring or cabling unless Landlord requires such removal). Additionally, at Landlord's option, Tenant shall remove such alterations, additions, improvements, trade fixtures, personal property, equipment, wiring, conduits, cabling, and furniture (including Tenant's Off-Premises Equipment) as Landlord may request; however, Tenant shall not be required to remove any addition or improvement to the Premises if Landlord has specifically agreed in writing that the improvement or addition in question need not be removed. Tenant shall repair all damage caused by such removal. All items not so removed shall, at Landlord's option, be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant and without any obligation to account for such items. The provisions of this Section 20 shall survive the end of the Term.

16